**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **PRIMALEND CAPITAL PARTNERS, LP**, *et al.*[1] | § | **Case No. 25-90013 (MXM)** |
| | § | |
| Debtors. | § | **(Joint Administration Requested)** |

**DECLARATION OF TANYA MEEROVICH IN SUPPORT OF DEBTORS'
CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF**

I, Tanya Meerovich, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am a Senior Managing Director of FTI Consulting, Inc. ("**FTI**"), pre-petition consultants to PrimaLend Capital Partners, LP ("**PCP**"), Good Floor Loans LLC ("**GFL**"), and LNCMJ Management, LLC ("**LNCMJ**") (collectively, the "**Debtors**"). I was appointed the Chief Restructuring Officer ("**CRO**") of each of the Debtors on October 22, 2025. I am over 18 years of age and authorized to submit this declaration (this "**First Day Declaration**") on behalf of the Debtors.

2.      FTI is a publicly traded, global business advisory firm with more than 7,900 employees across thirty-four (34) countries around the world. FTI is dedicated to helping organizations manage change, mitigate risk, and resolve disputes: financial, legal, operational, political and regulatory, reputational, and transactional. With more than 2,200 professionals in seventy-two (72) offices across twenty-nine (29) countries, FTI's Corporate Finance & Restructuring segment is one of the leading restructuring advisors in the world. FTI focuses on the

---

[1] The debtors and debtors-in-possession in these Chapter 11 Cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: PrimaLend Capital Partners, LP (0313) ("**PCP**"), Good Floor Loans LLC (8219) ("**GFL**"), and LNCMJ Management, LLC (1374) ("**LNCMJ**"). The location of the Debtors' headquarters is 3460 Lotus Dr. Ste. 100, Plano, TX 75075.

strategic, operational, financial, transactional and capital needs of clients to deliver a wide range

of services centered around three core offerings: (i) Turnaround, Restructuring and Bankruptcy;

(ii) Business Transformation; and (iii) Transactions. FTI also couples industry experts with

seasoned operators and restructuring professionals, to provide outside-the-box, yet practical

solutions in complex situations. FTI's clients include corporations, boards of directors, investors,

private equity sponsors, banks, lenders and other financing sources and creditor groups, as well as

other parties-in-interest.

3.    I have more than twenty years of experience leading complex transformations and

advising on in- and out-of-court restructurings for companies across industries, with expertise in

the financial services, real estate, nonprofit, insurance, healthcare, education, energy,

manufacturing, infrastructure, print, entertainment, and retail industries. I graduated from

Roosevelt University with a Bachelor's degree in business management and finance. I am a

Chartered Financial Analyst, a Certified Insolvency and Restructuring Advisor and a Certified

Turnaround Professional. I have extensive experience in interim management roles, acting as Chief

Restructuring Officer ("CRO"), Chief Transformation Officer ("CTO"), Windup Director and

Liquidating Trustee. My recent engagements in the financial services industry include, among

others: Reverse Mortgage Investment Trust, where I served as a Chief Restructuring Officer; First

Guaranty Mortgage Corporation, where I served as a Chief Restructuring Officer; AG Mortgage

Investment Trust Inc; Impac Mortgage; MFA Financial; Ocwen Financial; Residential Capital;

Reverse Mortgage Solutions; Credit-Based Asset Servicing and Securitization; Progrexion; JH

Capital; Litton Loan Servicing; Ditech Corporation; Walter Investments; and Stearns Lending.

Prior to joining FTI, I was in the Financial Services Advisory group of RSM Cayman Islands,

where I was involved in a number of high-profile and complex cross-border insolvency engagements in the financial services sector.

4.      I have worked to familiarize myself with the Debtors' financial affairs and business operations. I am responsible for overseeing the Debtors' preparation for these chapter 11 cases (these "**Chapter 11 Cases**"). I have further familiarized myself with the Debtors' day-to-day operations, organizational structure, and books and records by reviewing key financial documents and engaging in discussions with other members of the Debtors' management team, the Debtors' advisors, and the FTI professionals providing financial advisory services to the Debtors.

5.      In March 2025, the Debtors engaged FTI to serve as financial advisor to the Debtors. My team members and I have been working closely with the Debtors to provide certain financial advisory and consulting services to the Debtors in connection with their assessment and management of liquidity, sizing of potential financing requirements, execution of deleveraging transactions, and evaluation of strategic alternatives, including review of associated financial and operating information, assistance with operational readiness, and due diligence support in connection with such strategic alternatives. As noted above, on October 22, 2025, I was appointed the CRO for the Debtors, and the Debtors entered into a new engagement with me and FTI regarding the CRO role.

6.      Except as otherwise stated in this First Day Declaration, the statements set forth herein are based upon: (i) my personal knowledge or opinions based upon my experience; (ii) information that I have received from the Debtors' advisors or employees and/or the FTI professionals working directly with me or under my supervision, direction, or control, and/or (iii) my review of relevant documents and information concerning the Debtors' operations and financial affairs. Any references to the Bankruptcy Code (as defined below), the chapter 11

process, and related legal matters herein reflect my understanding of such matters based on the explanations and advice provided to me by the Debtors' counsel. If called upon, I could and would testify competently to the facts set forth in this First Day Declaration.

7.      I submit this First Day Declaration on behalf of the Debtors in support of: (a) the Debtors' voluntary petitions for relief that they filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-152 (the "**Bankruptcy Code**"); and (b) the "first-day" motions filed concurrently herewith (collectively, the "**First Day Motions**"). The relief sought in the First Day Motions is intended to minimize the adverse effects of the commencement of these Chapter 11 Cases on the Debtors' operations. I have reviewed the Debtors' petitions and the First Day Motions, and it is my belief that the relief sought therein is necessary to preserve and maximize the value of the Debtors' estates and serves the best interests of the Debtors' estates, creditors, and other parties in interest.

## THE COMPANY'S BUSINESS

### A.      The Buy Here Pay Here Industry

8.      The Buy Here Pay Here ("**BHPH**") industry involves a specific type of car dealership model where the dealership not only sells vehicles on its lot, but also finances the purchase to the consumer. The financing of the sale by the BHPH dealer is generally done pursuant to a seller-financed contract called a Retail Installment Sales Contract ("**RISC**"). The BHPH industry serves an important role in the marketplace by providing opportunities for vehicle ownership to those with poor or no credit. In recent years, elevated used-vehicle prices and rising interest rates have exacerbated the need for this segment, as many consumers remain locked out of prime auto credit markets. Further, the BHPH industry creates value for the economy as a whole

by attributing value to used or lower-valued vehicles that otherwise might not be sold by a more traditional car dealership.

9.    The financing and funding for BHPH dealers can generally be characterized into one of three categories: (i) self-funded payment streaming and/or bulk receivable sales (*i.e.*, the BHPH dealer originates RISCs and either immediately sells them, or packages them together and sells them periodically as a portfolio), (ii) non-traditional lenders that specialize in lending to the BHPH industry, and (iii) traditional bank financing. The Debtors  and their non-Debtor affiliates fall into the second category (non-traditional lender specializing in lending to the BHPH industry) and serve an important purpose in the BHPH industry—providing liquidity to profitable dealers that cannot self-fund and that may not yet qualify for traditional bank financing. Over the years, the Company has assisted multiple borrowers (*i.e.,* BHPH dealers) in "graduating" from the Company's lending platform to more traditional bank financing, thus lowering the cost of capital of the dealers and increasing their profitability.



10.    With approximately 30,000 licensed BHPH dealers and approximately $20 billion in annual receivables originations (in other words, BHPH dealer loans to consumers), the market to finance these BHPH dealers is sizable and complex. Barriers to entry in the industry are high due to the complexity of independent auto dealer finance, the experience required to adequately address industry changes, the fragmented independent dealer universe, and significant regulatory requirements, among others.

B.    **The Company and its History**

11.    Founded in Dallas in 2007, the Debtors and their non-Debtor affiliates, PCAP Holdings, LP ("**PCAP**") and PrimaLend Real Estate LLC ("**PRE**," and collectively with PCAP and the Debtors, the "**Company**" or "**PrimaLend**") are one of the largest national asset-based lenders that directly finances BHPH car dealerships and third-party RISC investors (each a "**Dealer-Borrower**"). The Debtors and their non-Debtor affiliates originate first-lien revolving lines of credit ("**RLOCs**"), sub-debt loans, inventory floorplan loans, and real-estate backed loans in twelve different states, approximately two-thirds of which are with Dealer-Borrowers based in Texas. As of the Petition Date, the Company holds approximately $280 million in loans from its Dealer-Borrowers.

12.    The Company, then doing business as PrimaLend Capital Group, Inc., obtained its first credit facility in 2007 for $2.5 million, growing its borrowing base capacity to $6.0 million later that year. In 2010, PrimaLend Capital Partners, LP ("**PCP**") was formed. In 2019, to further meet its Dealer-Borrowers' needs, the Company began offering floor plan loans through its business unit, Good Floor Loans, LLC ("**GFL**"). Between 2020 and 2023, the Company continued experiencing significant year-over-year growth, and added its third business unit—PrimaLend Real Estate LLC ("**PRE**")—which lends money to Dealer-Borrowers related to their real estate to

allow them to unlock equity values in real property to grow their businesses. The Company's three primary offerings through PCP, GFL, and PRE combine to form a portfolio of liquidity options for Dealer-Borrowers, with many Dealer-Borrowers having outstanding loans in two or even all three business segments.

13.     The Company differentiates itself through its strong reputation as a market leader, its advanced technology platform, and its deep industry expertise. More specifically, the Company's breadth of services (including end-to-end servicing, floor plan financing, and solutions to unlock real estate equity) allows it to partner with Dealer-Borrowers to support them in growing and scaling their businesses in ways few competitors can match. In addition to its breadth of offerings, the Company employs proprietary technology that integrates in real time with dealers' dealer-management systems ("DMS") to monitor their inventory, sales and collections. The Company's platform provides enhanced monitoring of its Dealer-Borrowers' loan portfolios and inventory collateral, which supports faster funding decisions and earlier visibility into risk. The Company is led by a seasoned executive leadership team with over sixty (60) years of combined experience in the BHPH industry.

### C.     The Company's Organizational Structure



### i.    PCAP Holdings LP

14.    PCAP is the holding company and as such owns the equity interests in each of PCP, GFL and PRE. As explained in the capital structure below, PCAP is the primary borrower on the Senior Unsecured Notes (as defined below). PCAP ownership is comprised of approximately thirty-one (31) limited partners.

### ii.    LNCMJ Management, LLC

15.    As shown above, LNCMJ is the management company and acts as the general partner of both PCAP and PCP. LNCMJ is owned 50/50 by Mark and Christi Jensen, but is managed pursuant to its amended operating agreement, by a board of managers (the "**Board**") consisting of Mark Jensen (Chief Executive Officer), Kellie Casse (Executive Vice President), and an independent manager, Matthew Kahn.

### iii.    PrimaLend Capital Partners, LP

16.    PCP concentrates its lending practice on loans to BHPH dealers based upon the dealer's portfolio of RISCs. As of September 30, 2025, the amount of the loans in PCP's loan portfolio was approximately $233.8 million. The overwhelming majority (90%) of the loans in PCP's loan portfolio are first-lien revolving lines of credit made to Dealer-Borrowers based upon the Dealer-Borrower's portfolio of RISCs. PCP's loan portfolio also contains approximately $23.5 million of subordinated loans to Dealer-Borrowers.

### iv.    Good Floor Loans, LLC

17.    Like PCP, GFL loans to BHPH dealers. However, GFL makes loans to dealers based upon the dealer's vehicle inventory. In this way, GFL and PCP work together to assist Dealer-Borrowers with purchasing vehicles (via the Dealer-Borrower's floorplan loan with GFL),

and monetizing the sale of those vehicles (via the Dealer-Borrower's RLOC loan with PCP). When a Dealer-Borrower sells a vehicle it financed on its line of credit with GFL, it borrows money from PCP (pledging the RISC it received related to the sale of the vehicle as collateral to PCP) to pay down the amount the Dealer-Borrower owed to GFL related to the vehicle sold. As of September 30, 2025, the amount of the loans in GFL's loan portfolio was approximately $24.6 million.

> ### v.   *PrimaLend Real Estate, LLC*

18.   A number of the Company's Dealer-Borrowers (and the Dealer-Borrower's affiliates and related entities) own real estate. To assist those Dealer-Borrowers with liquidity needs, PRE offers loans to finance the real estate owned by those Dealer-Borrowers, or by affiliates of the Dealer-Borrowers or their principals. As of September 30, 2025, the amount of loans in PRE's loan portfolio was approximately $20.2 million.

> ### vi.   *PrimaLend Investments Corp*

PrimaLend Investments Corp is an active entity but is not being used by the Debtors, or anyone else, at this time. It holds no assets, no liabilities, and has no revenues or expenses.

### PREPETITION CAPITAL STRUCTURE[2]

19.   As of the Petition Date, the Company's capital structure consists of (i) funded debt liabilities totaling approximately $286.1 million, including approximately (a) $186.5 million in outstanding principal interest in senior secured indebtedness, (b) $75.0 million in senior unsecured notes, and (c) $24.6 million in junior subordinated indebtedness; and (ii) equity.

| Debt | Maturity Date | Facility Limit ($) | Approx. Balance as of Petition Date ($) |
|---|---|---|---|
| **Secured Debt** | | | |
| PCP Credit Facility | October 23, 2025 | $180,000,000 | $161,700,000 |
| GFL Credit Facility | December 31, 2027 | $40,000,000 | $16,200,000 |

---

[2] The following description of the Company's capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

| PRE Credit Facility | May 5, 2026 | $20,000,000 | $8,600,000 |
| **Unsecured Debt** | | | |
| Senior Unsecured Notes | July 15, 2028 | n/a | $75,000,000 |
| Junior Unsecured Subordinated Notes | various | n/a | $24,600,000 |
| **Total** | | | **$286,100,000** |

### A.   Senior Secured Indebtedness

#### i.   PCP Credit Facility

20.   PCP's senior secured indebtedness consists of that certain *Amended and Restated Credit Agreement* (as amended, modified, restated and/or replaced from time to time) dated as of August 27, 2024, among PCP, as borrower, PCAP, LNCMJ, Mark Jensen, Christi Jensen, and Paxton Wright, as guarantors, the lender parties thereto, and CIBC Bank USA ("**CIBC**"), as administrative agent (the "**Prepetition First Lien PCP Credit Facility**"). In January of 2025, the Prepetition First Lien PCP Credit Facility was amended pursuant to that certain *First Amendment, Consent, and Limited Waiver to Amended and Restated Credit Agreement* (the "**January 2025 Amendment**"). In September of 2025, the Prepetition First Lien PCP Credit Facility was further amended pursuant to that certain *Second Amendment to Amended and Restated Credit* Agreement (the "**September 2025 Amendment**"). As of the Petition Date, the aggregate principal balance owed pursuant to the Prepetition First Lien PCP Credit Facility was approximately $161.7 million.

#### ii.   GFL Credit Facility

21.   GFL's senior secured indebtedness consists of that certain Commercial Credit Agreement (as amended, modified, restated and/or replaced from time to time) dated as of September 20, 2022, among GFL, as borrower, PCAP, LNCMJ, Mark Jensen, and Christi Jensen, as guarantors, and Amarillo National Bank, a national banking association ("**ANB**"), as lender (the "**GFL Credit Agreement**"). In connection with the GFL Credit Agreement, GFL executed that

certain Promissory Note providing for a revolving line of credit (the "**ANB Note**"). As of the Petition Date, the aggregate principal balance owed pursuant to the GFL Credit Agreement was approximately $16.2 million.

> ### iii.    *PCP/GFL Intercreditor Agreement*

22.    As explained above, there is overlap between the Dealer-Borrowers that PCP and GFL both lend to. Both PCP's and GFL's loans to the Dealer-Borrowers are secured by all-asset liens against the Dealer-Borrowers' assets. Further, in the majority of (if not all of) the instances where PCP and GFL have both loaned money to a Dealer-Borrower, PCP's UCC-1 financing statement is first-filed in-time, and thus, absent an agreement between the entities, PCP's lien would be superior to GFL's lien. However, PCP and GFL entered into an Intercreditor Agreement that sets forth the relative rights between the two debtors (the "**PCP/GFL Intercreditor Agreement**"). Generally, the PCP/GFL Intercreditor Agreement provides that PCP's lien is senior as to the Dealer-Borrower's portfolio of RISC, and GFL's lien is senior as to the Dealer-Borrower's vehicle inventory. In other words, PCP agrees that, regardless of lien validity, perfection order, applicable law or possession, its lien on Good Floor Priority Collateral (as that term is defined in the PCP/GFL Intercreditor Agreement) is junior to GFL's lien on that same collateral. Conversely, GFL agrees, that, under the same conditions, its lien on the PrimaLend Priority Collateral (as that term is defined in the PCP/GFL Intercreditor Agreement) is junior to PCP's lien on that collateral.

> ### iv.    *PRE Credit Facility*

23.    PRE, as borrower, and ANB, as lender, were parties to that certain Commercial Credit Agreement dated as of May 5, 2022, as amended by the April 25, 2023 First Amendment to Commercial Credit Agreement (the "**PRE Credit Agreement**"). In connection with the PRE

Credit Agreement, PRE, as borrower, executed a promissory note and other ancillary loan documents related to the PRE Credit Agreement (collectively, the "**PRE Loan Documents**"). PCAP is a guarantor in the PRE Credit Facility (by virtue of the fact that PCAP was a guarantor on ANB's loan to PRE, and PrimaLend Capital Group, Inc. ("**PCG**") took assignment of ANB's loan to PRE.

24.     PCG later purchased ANB's loan to PRE, evidenced by the PRE Credit Agreement and the PRE Loan Documents, effective December 30, 2024, pursuant to that certain Loan Purchase Agreement by and between PRE, as borrower, ANB, as seller, and PCG, as purchaser. As of the Petition Date, the aggregate principal balance owed pursuant to the PRE Credit Agreement was approximately $8.6 million.

**B.     Senior Unsecured Noteholders**

25.     PCAP is a party to that certain Note Purchase Agreement, dated July 9, 2021, for the issuance of 6.50% senior unsecured notes due 2028 (the "**Senior Unsecured Notes**"), pursuant to which PCAP borrowed $75.0 million in principal in July 2021. Pursuant to the Senior Unsecured Notes, PCAP issued $75.0 million in aggregate principal amount of 6.50% Senior Unsecured Notes.

26.     The 6.50% Senior Unsecured Notes bear interest at 6.50% per annum with interest payable quarterly in cash. On July 15, 2025, the Company determined not to make an interest payment on the 6.50% Senior Unsecured Notes. As of the Petition Date, the aggregate principal amount outstanding on the 6.50% Senior Unsecured Notes was approximately $75.0 million.

27.     On or about the time of the issuance of the 6.50% Senior Unsecured Notes, PCAP loaned certain amounts of the $75.0 million borrowed to its three subsidiaries—PCP, GFL, and PRE—and accordingly entered into intercompany notes (the "**PCAP Intercompany Notes**") with

each of the subsidiaries memorializing the amounts loaned. More specifically, PCAP loaned PCP the aggregate amount of $61.5 million. Additionally, PCAP loaned GFL the aggregate amount of $7.5 million. And finally, PCAP loaned PRE the aggregate amount of $6.0 million.

### C.    Junior Unsecured Subordinated Notes

28.    In addition to the senior secured indebtedness and senior unsecured noteholders described herein, the Debtors have borrowed money pursuant to certain junior unsecured subordinated notes. The junior unsecured unsubordinated notes can generally be divided into two categories of subordinated notes: (i) notes to individuals and entities not related to the Debtors and their principals (the "**Unsecured Subordinated Notes**"), and (ii) notes to individuals and entities related to, or affiliated with, the Debtors and their principals (the "**Related Party Subordinated Notes**" and collectively with the Unsecured Subordinated Notes, the "**Junior Unsecured Subordinated Notes**"). As of the Petition Date, the amount outstanding on the Unsecured Subordinated Notes is approximately $17.5 million and the aggregate amount outstanding on the Related Party Subordinated Notes is approximately $7.1 million.

### D.    Equity

29.    As explained above, PCAP is owned by thirty-one limited partners. Twenty of the limited partners each own less than one percent (1%) of limited partnership interests. Further, another eight limited partners each own less than five percent (5%) of the limited partnership interests. The limited partner with the highest percentage of the limited partnership interests is PrimaLend Capital Group, Inc., which owns approximately thirty-six percent (36%) of the limited partnership interests in PCAP. The limited partner with the next highest percentage of limited partnership interests is Ovation Alternative Income Master Fund LP, which owns approximately thirty-two percent (32%) of the limited partnership interests in PCAP.

## EVENTS LEADING TO THE CHAPTER 11 CASES

### A.     Macro Economic Factors and Industry Headwinds

30.     Like many industries, the COVID-19 pandemic had a substantial impact on the BHPH industry. The global supply chain interruptions caused by the pandemic led to an increase in the price of new cars, which quickly spread to used cars as well. In response to the COVID-19 pandemic, the government enacted a number of programs and policies that provided cash to businesses and consumers, initially helping consumers make auto payments. However, when these funds were no longer available following the COVID-19 pandemic, consumer defaults on auto loans increased significantly. As discussed below, the sharp and dramatic increase in the amount of money in circulation contributed to the rapid inflation seen in 2022 and 2023, which then triggered a corresponding rapid rise in interest rates, both of which dramatically affected the auto industry and the BHPH industry as a whole.

31.     Beginning in 2021, the United States began experiencing rapid inflation. According to the Bureau of Labor Statistics, in October 2021, inflation was 6.2%. Two months later, in December 2021, inflation had risen to 7.0%. By June 2022, inflation had risen to 9.1%, the highest the country had seen in over forty years. The rapid rise in inflation had a significant impact on discretionary spending, including on automobiles.

32.     In response to the rapid rise in inflation, the Federal Reserve Bank began to aggressively raise interest rates in 2022. The rapid increase in interest rates made dealers' borrowing costs more expensive. The increased cost also resulted in higher consumer defaults on auto loans. Further, after a significant increase in used car prices through 2023 (as a result of the factors discussed above), used car prices have recently normalized from the elevated post-COVID

levels. As a result, dealers experienced additional losses due to the reduced recovery on repossessed vehicles.

33.     Starting in the second half of 2022, delinquency rates began steadily increasing. In the subprime and deep subprime markets, where BHPH dealers lend, increases in delinquencies affect not only lenders but also the dealers directly. As consumers default on RISCs, dealers lose a critical source of liquidity (*i.e.*, the revenue derived from collecting the monthly payments made pursuant to the RISCs). At the same time, as consumers become further delinquent, the delinquent loans become ineligible on the dealer's borrowing base line of credit, thus limiting the dealer's ability to procure new vehicles and further exacerbating its liquidity problems. These dual impacts can quickly create a cycle that affects all industry participants.

**B.     Background to Restructuring**

34.     The preceding factors and effects on the BHPH industry profoundly affected the Debtors. As a consequence of the industry-wide headwinds discussed above, as well as declining performance at certain of the Debtors' Dealer-Borrowers, the Debtors saw unprecedented losses, leading to an over-advance on the CIBC Credit Facility in August 2024.

35.     In an effort to mitigate these factors and improve liquidity, the Debtors sold partial participations in their loans to Dealer-Borrowers during the fall and winter of 2024. These participations (the "**BVY2 Participations**") were sold to BVY Partners II, LLC ("**BVY2**"), a non-Debtor affiliate described further herein. These efforts raised over $34.0 million in liquidity, enabling the Company to cure the over-advance on the CIBC Credit Facility and providing for further deleveraging.

36.     Notwithstanding these efforts, the stress on liquidity continued and it became clear that these stopgap solutions were insufficient, resulting in another over-advance on the CIBC

Credit Facility in January 2025, as well as an over-advance on the ANB Credit Facility. It was apparent that a more comprehensive solution was required and that the Debtors' capital structure was no longer sustainable.

37.    In February 2025, CIBC sent notices of default to the Company and demanded the Company take certain actions, including hiring a financial advisor. Shortly thereafter, the Company engaged FTI and Spencer Fane to begin assisting with development of a strategy to stabilize the Debtors' businesses and maximize value for stakeholders. Since then, the Company and its advisors have been working closely with the various stakeholders to define the path forward.

38.    Since March 2025, the Debtors worked with multiple of their distressed Dealer-Borrowers to execute a number of deleveraging transactions, which led to principal paydowns by the Dealer-Borrowers and other cash inflows that allowed the Debtors to lower their exposure to its senior secured lenders.

39.    In July of 2025, LNCMJ amended its operating agreement (the "**Amended LNCMJ Operating Agreement**") to provide for greater corporate governance. Among other things, the Amended LNCMJ Operating Agreement established a board of managers (the "**Board**") to govern LNCMJ (and as a result, the governance of each of the Debtors and non-Debtors), with an independent manager. In connection with the execution of the Amended LNCMJ Operating Agreement, in July 2025, the Debtors engaged Matthew Kahn to serve as independent manager to the Board (the "**Independent Manager**"). Shortly thereafter, the Board formed a Special Committee and appointed Matthew Kahn as its sole initial member to *inter alia* review, negotiate, evaluate, and approve, if applicable, any transaction or portion of a transaction that may constitute a conflict matter. Further, the Special Committee was delegated the authority and power

16

to take any and all actions, including, but not limited to: assessing, prosecuting, releasing, or settling potential claims or causes of action of the Company or its subsidiaries, if any, against Insiders or Affiliates (as those terms are defined in the Bankruptcy Code)(collectively, the "**Related Parties**"). As of August 27, 2025, LNCMJ, at the sole direction of the Independent Manager, engaged Katten Muchin Rosenman LLP ("**Katten**") as independent counsel to assist in, among other things, conducting an independent investigation (the "**Independent Investigation**") into any and all potential estate claims and causes of action against the Related Parties arising from the Debtors' prepetition transactions and business dealings. The Independent Manager, with the assistance of Katten, has begun conducting the Independent Investigation, which is ongoing as of the Petition Date and will proceed during the Chapter 11 Cases.

40.     Also in July 2025, the Debtors engaged Houlihan Lokey ("**Houlihan**") to pursue refinancing options, including pursuing capital solutions related to the maturing RLOC debt with CIBC, and to initiate a sale process. During the marketing process Houlihan identified and approached over fifty (50) different capital sources and strategic parties. In response, the Company, with its advisors' assistance, received and executed approximately twenty-eight (28) non-disclosure agreements. Houlihan hosted calls and provided documents in response to diligence requests to multiple parties, and ultimately received four indications of interest. After calls and discussions with those four parties, one party emerged as a potential purchaser (the "**Potential Purchaser**"). Simultaneously with their discussions with the Potential Purchaser, the Debtors engaged in discussions and negotiations with certain holders of the Senior Unsecured Notes (the "**Noteholders**") owed by the Debtors' parent, PCAP.

41.     As discussions and negotiations progressed with the Potential Purchaser and Noteholders, it became apparent that the BVY2 Participations, and certain provisions in the BVY2

17

Participations, were causing concerns. The BVY2 Participations contain provisions that prohibit PCP from unilaterally making certain modifications to RLOCs in which BVY2 owns a BVY2 Participation. More specifically, the BVY2 Participation Agreement generally prohibits PCP from reducing the principal of the RLOCs, increasing the amount of the RLOC, reducing the interest under the RLOCs, extending the term of any RLOCs, postponing any payment dates, or releasing all or substantially all of the collateral securing the RLOCs, without first obtaining BVY2's consent (the "**BVY2 Consent Rights**").

42.     In response, the Debtors and their advisors engaged in negotiations with BVY2 and its advisors regarding a potential transaction to resolve the issues related to the concerns raised by the Potential Purchaser. Prior to the Petition Date, the Debtors and BVY2 reached an agreement in principle, that the Potential Purchaser has also reviewed, that involves BVY2 transferring its BVY2 Participations in twenty-seven (27) loans to PCP, in exchange for PCP transferring to BVY2 five (5) loans in which BVY2 owns BVY2 Participations (the "**Exchange Transaction**"). The Exchange Transaction results in PCP owning twenty-seven (27) loans unencumbered by the obligations of the BVY2 Participation Agreements and BVY2 Consent Rights.

43.     As of the Petition Date, the Company and its advisors continue to engage in discussions and negotiations with the Potential Purchaser and are striving to obtain a binding letter of intent in the near future. Additionally, in the days leading up to the Petition Date, one of the parties that originally provided an indication of interest has reaffirmed its interest in the Debtors, and is working to provide the Debtors with an updated offer.

44.     Against this backdrop, the Debtors have negotiated postpetition financing (the "**PCP DIP Facility**") from the PCP prepetition senior secured lenders to support the Debtors and their operations. The PCP DIP Facility is fully supported by PCP's prepetition senior secured

lenders and will provide the Debtors with the financial stability necessary to continue servicing their Dealer-Borrower customers, while pursuing their restructuring efforts.

## FIRST DAY MOTIONS

45.    Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, and execute an efficient and smooth restructuring. I am familiar with the contents of each of the First Day Motions and believe that the relief sought there is necessary to enable the Debtors to operate during these Chapter 11 Cases with minimal disruption or loss of productivity and value and best serves the Debtors' estates and creditors' interests. The First Day Motions include the following:

### Administrative Motions

- "**Joint Administration Motion**": *Debtors' Emergency Motion for Entry of an Order Jointly Administering the Affiliated Debtors;*

- "**Consolidated Matrix Motion**": *Debtors' Emergency Motion for Enry of an Order (I) Authorizing the Debtors to File (A) A Consolidated Creditor Matrix, (B) A Consolidated List of Top 30 Unsecured Creditors (II) Authorizing the Debtors to Redact Certain PII from the Consolidated Creditor Matrix, (III) Establishing a Complex Service List, (IV) Authorizing the Form and Manner of Notice of Commencement, and (V) Granting Related Relief;*

- "**Claims Agent Retention Application**": *Debtors' Emergency Application for Entry of Order Authorizing the Employment and Retention of Stretto, Inc. as Claims, Noticing, and Solicitation Agent Effective as of the Petition Date*; and

- "**SOAL/SOFA Motion**": *Debtors' Emergency Motion for Entry of an Order Extending Time for Debtors to File Schedules and Statement of Financial Affairs.*

### Operational Motions

- "**Cash Management Motion**": *Debtors' Emergency Motion For Entry of an Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash*

*Management System and Maintain Existing Bank Accounts, (B) Continue Using Existing Checks and Business Forms, (C) Maintain Their Corporate Card Program, and (D) Continue Intercompany Transactions; (II) Waiving Certain UST Guidelines, and (III) Granting Related Relief;*

- **"Wages Motion"**: *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay Prepetition Wages, Compensation, and Employee Benefits, and (II) Granting Related Relief;*

- **"Insurance Motion"**: *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, and (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Coverage on a Postpetition Basis in the Ordinary Course; (II) Modifying the Automatic Stay Solely with Respect to Workers' Compensation Claims; and (III) Granting Related Relief;*

- **"Tax Motion"**: *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Taxes and Fees, and (II) Granting Related Relief;*

- **"Utilities Motion"**: *Debtors' Emergency Motion for Entry of an Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Deeming Utilities Adequately Assured of Future Performance; (III) Establishing Procedures for Determining Adequate Assurance of Payment; and (IV) Granting Related Relief;*

- **"Servicing Motion"**: *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue Their Servicing Obligations, (II) Approving Procedures Loss Mitigation and Settlement Procedures, and (III) Granting Related Relief;* and

- **"DIP Motion"**: *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Lenders, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*

46.     I have consulted with the Debtors' management and advisors regarding the relief requested in the First Day Motions and I understand each of the First Day Motions and the relief requested therein. To the best of my knowledge and belief, the factual statements contained in each First Day Motion are true and accurate. Capitalized terms used but not otherwise defined in this

section of this Declaration shall have the meanings ascribed to such terms in the relevant First Day Motions.

47.     The operational First Day Motions seek authority to, among other things, continue use of the Debtors' cash management system, honor employee-related wages and benefit obligations, continue their Servicing Obligations, and maintain other operations in the ordinary course of business. Certain of the First Day Motions seek authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, except to the extent necessary "to avoid immediate and irreparable harm." In light of this requirement, I understand the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Accordingly, I believe and am advised that emergency consideration of such motions is justified and warranted.

48.     I further believe that the relief requested in the First Day Motions is necessary, is in the best interest of the Debtors' estate, their creditors, and all other parties in interest, and will allow the Debtors to operate with minimal disruption and maximize value preservation during the pendency of these Chapter 11 Cases. Additionally, I believe that (i) the relief requested in each operational First Day Motion is critical, (ii) unless the relief is granted, the Debtors risk the probability of harm, or, alternatively, loss of economic advantage to the estate which is disproportionate to the amount of the prepetition claim sought to be satisfied; and (iii) there are no practical or legal alternatives by which the Debtors can deal with the claimants sought to be paid other than by payment of the claim.

49. Accordingly, for the reasons set forth herein and in each respective First Day Motion, I believe that the Court should grant the relief requested in the First Day Motions.

### A. Joint Administration Motion

50. Pursuant to the Joint Administration Motion filed concurrently herewith, the Debtors request entry of an order directing consolidation of these Chapter 11 Cases for procedural purposes only. There are three Debtors, who I understand are all affiliates of one another because, among other reasons, LNCMJ Holdings, LLC directly or indirectly owns or controls 20% of more of the outstanding voting securities of each other Debtor. Accordingly, I believe that joint administration is appropriate and authorized by the Bankruptcy Code and Bankruptcy Rules.

51. Moreover, I believe joint administration of the Debtors' Chapter 11 Cases will save the Debtors and their estates substantial time and expense by removing the need to prepare, replicate, file, and serve duplicate notices, applications, and orders. Further, joint administration would relieve the Court of entering duplicative orders and maintaining duplicative files and dockets. The United States Trustee and other parties in interest would also certainly benefit from joint administration of these cases because it would spare them the time and effort of reviewing multiple dockets and duplicative pleadings and papers.

52. As such, based on the foregoing, I believe that joint administration of these Chapter 11 Cases is in the best interest of the Debtors, their estates, and all other parties in interest and should be approved.

### B. Consolidated Matrix Motion

53. Pursuant to the Consolidated Matrix Motion, the Debtors seek entry of an order (i) authorizing the Debtors to (a) file a consolidated creditor matrix in lieu of submitting separate mailing matrices for each Debtor, (b) file a consolidated list of the Debtors' 30 largest unsecured

creditors in lieu of filing separate lists for each Debtor, (ii) authorizing the Debtors to redact certain personal identification, (iii) establishing a Complex Service List, (iv) authorizing the form and manner of notice of commencement of these Chapter 11 Cases; and (v) granting related relief.

54.    It is my understanding, that Bankruptcy Rule 1007 requires each debtor to file a list containing names and addresses of all creditors, including individuals, as well as a separate list of creditors holding the largest unsecured claims against each debtor. Because the Top 30 Lists of the Debtors likely overlaps, and certain Debtors may have fewer than 30 significant unsecured creditors, I believe that filing separate Top 30 Lists for each Debtor would be of limited utility. I believe that a single consolidated list of the Debtors' top 30 unsecured creditors that have the greatest stake in these cases provides more clear information to case stakeholders than separate lists for each of the Debtors. In addition, I believe the exercise of compiling separate Top 30 Lists for each individual Debtor would consume excess and additional amounts of the Debtors' limited time and resources. A single Top 30 List will also help alleviate administrative burden, costs, and the possibility of duplicative service. Consequently, I believe that filing a consolidated Top 30 List is necessary for the efficient and orderly administrative of these Chapter 11 Cases, appropriate under the facts and circumstances, and is in the best interests of the Debtors and their estates.

55.    The Debtors also request that certain personal identification information be redacted of the Debtors' employees and individual creditors of the Debtors from the Creditor Matrix because such information could be used to perpetuate identity theft or to harm employees. The Debtors propose to provide an unredacted version of the Creditor Matrix to the U.S. Trustee, counsel to any official committee of unsecured creditors appointed in these Chapter 11 Cases, and the Court.

56.     Based on the foregoing, I believe any delay in granting the relief requested in the Consolidated Matrix Motion would hinder the Debtors' operations and cause immediate and irreparable harm. Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the Consolidated Matrix Motion be approved.

### C.      Claims and Notice Agent Application

57.     Pursuant to the *Debtors' Emergency Application for Entry of Order Authorizing the Employment and Retention of Stretto, Inc. as Claims, Noticing, and Solicitation Agent Effective as of the Petition Date* (the "**Claims and Notice Agent Application**"), the Debtors requests entry of an order (i) appointing Stretto, Inc. ("**Stretto**") as the Claims, Noticing, and Solicitation Agent for the Debtors and their Chapter 11 Cases, and (ii) granting related relief, the Claims and Notice Agent Application is also supported by the *Declaration of Sheryl Betance in Support of Debtors' Emergency Application for Entry of an Order Authorizing the Employment and Retention of Stretto, Inc. as Claims, Noticing, and Solicitation Agent Effective as of the Petition Date* (the "**Betance Declaration**") attached as **Exhibit B** to the Claims and Notice Agent Application.

58.     I believe that the Claims and Noticing Agent Application should be granted because the Agent is required to effectuate the Debtors' transition into bankruptcy and to immediately begin providing effective notice of pleadings and orders to interested parties. Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the Claims and Noticing Agent Application be approved.

### D.      Schedules Motion

59.     The Debtors request, pursuant to their *Emergency Motion for an Order Extending Time for Debtors to File Schedules and Statements of Financial Affairs* (the "**Schedules Motion**"), entry of an order (i) extending the deadline to file (a) schedules of assets and liabilities, (b)

24

statement of financial affairs, (c) schedules of current income and expenditures, and (d) statements of executory contracts and unexpired leases (collectively, the "**SOALs and SOFA**") by thirty (30) days to file their SOALs and SOFA, thereby establishing a deadline of December 5, 2025 for the filing of the SOALs and SOFA, and (ii) granting related relief.

60.     Due to the multi-debtor filing and the significant number of first-day pleadings, the Debtors require more time than the fourteen days provided by Bankruptcy Rule 1007(c) to prepare their SOALs and SOFA. The Debtors estimate that the short extensions requested will provide sufficient time to prepare and file the SOALs and SOFA. Consequently, the Debtors therefore requests that the Court extend the deadline by which they must file their SOALs and SOFA by 30 days, without prejudice to the Debtors' right to seek further extensions from this Court.

61.     It is my understanding that after the Petition Date, it may take a couple of weeks for the Debtors to close their prepetition books and for all prepetition invoices to be received by the Debtors' accounting department. I understand that the Debtors will have to extract all necessary information from their books and records and populate such information in the official forms. Additionally, the Debtors' lean management team has thus far focused most immediately on the Debtors' efforts to smoothly transition into chapter 11 and, in light of the complexity of these cases, it will take additional time to complete the process of preparing the SOALs and SOFAs.

62.     Based upon the foregoing, I believe any delay in granting the relief requested in the Schedules Motion would hinder the Debtors' operations and cause immediate and irreparable harm. Accordingly, on behalf of the Debtors, I respectfully request that the relief requested in the Schedules Motion be granted.

### E.   Cash Management Motion

63.     Pursuant to the Cash Management Motion, the Debtors seek entry of an order (i)
authorizing the Debtors to (a) continue utilizing their existing Cash Management System (as
defined in the Cash Management Motion) and maintain their existing bank accounts; (b) continue
using the Debtors' existing business forms and checks; (c) maintain their Corporate Card Program;
and (d) continue to engage in intercompany transactions; (ii) waiving certain operating guidelines
(the "**UST Guidelines**") established by the Office of the United States Trustee ("**UST**"), including
the requirement that the Debtors close all prepetition bank accounts and open new accounts
designated as debtor-in-possession accounts; and (iii) granting related relief.

64.     Maintaining the Debtors' Cash Management System in its current state is crucial to
the Debtors' continued operations, given the volume of transactions processed through the Cash
Management System each day. Any disruption to the Cash Management System would
unnecessarily and significantly disrupt the Debtors' operations and impede the successful
administration of their Chapter 11 Cases.

65.     I believe that the relief requested in the Cash Management Motion is in the best
interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the
Debtors to continue to operate their businesses in these Chapter 11 Cases with minimal disruption,
thereby benefiting all parties in interest. Accordingly, for the reasons set forth herein and in the
Cash Management Motion, on behalf of the Debtors, I respectfully submit that the relief requested
in the Cash Management Motion should be granted.

### F.   Wages Motion

66.     The Debtors' employees are a critical component to the Debtors' continued
operations. To avoid certain immediate and irreparable harm to the Debtors' business operations

and restructuring efforts that I believe would occur if the Debtors' employees obligations are not

paid when due and the Debtors' compensation and benefit programs are not continued in the

ordinary course of business, and to minimize personal hardship on the Debtors' employees, the

Debtors seek, pursuant to their *Emergency Motion for an Order Authorizing the Debtor to Pay*

*Prepetition Wages, Compensation, and Employee Benefits* (the "**Wage Motion**"), entry of an order

(i) authorizing, but not requiring, the Debtors to (a) pay, in their sole discretion, wage, salary and

commission obligations, payroll taxes, and costs incident to the foregoing, and (b) maintain and

continue to honor their practices, programs, and policies for their employees as they were prior on

the Petition Date, and as they may be modified, amended, or supplemented from time to time in

the ordinary course of business, (ii) authorizing the Debtors' bank and financial institutions to

receive, honor, process, and pay any and all checks or electronic funds transfers drawn on the

Debtors' accounts in satisfaction of any such obligations, and (iii) granting related relief.

67.     The Debtors' Employees perform a wide variety of functions that support the

Debtors' operations and will be critical to the administration of these chapter 11 cases and to

maximizing the value of the Debtors' estates. Their skills, knowledge, and understanding of the

Debtors' operations are essential to preserving operational stability and efficiency during these

chapter 11 cases. The Employees have developed strong relationships with their Dealer-Borrowers

and have a deep understanding of each Dealer-Borrower's operations. Further, the Employees have

specialized industry knowledge and the ability to analyze data using the Debtors' technology that

are necessary for operations. Without the continued, uninterrupted services of the Employees, the

Debtors' business operations will suffer immediate and irreparable harm.

68.     Moreover, the vast majority of the Debtors' Employees rely exclusively on their

compensation and benefits from the Debtors to pay their daily living expenses and support their

families. Thus, the Employees will be exposed to significant personal financial hardship if the Debtors are not permitted to continue paying their compensation and providing benefits in the ordinary course. Consequently, the relief requested herein is necessary and appropriate.

**G.    Insurance Motion**

69.    Pursuant to the Insurance Motion, the Debtors seek entry of an order: (i) authorizing the Debtors to (a) continue insurance coverage entered into prepetition and satisfy obligations thereto in the ordinary course of business, and (b) renew, supplement, or purchase insurance coverage in the Debtors' discretion on a postpetition basis; (ii) modifying the automatic stay solely with respect to workers' compensation claims; and (iii) granting related relief. Maintaining the Insurance Policies is essential to preservation of the value of the Debtors' business, properties and assets. In many cases, coverage provided by the Insurance Policies is required by regulations, laws, and contracts that govern the Debtors' commercial activities.

70.    Accordingly, for the reasons set forth herein and expanded on in the Insurance Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in the Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

**H.    Tax Motion**

71.    Pursuant to the Tax Motion, the Debtors seek entry of an order: (i) authorizing the Debtors to remit and pay (or use tax credits to offset) certain accrued and outstanding prepetition taxes and fees that will become payable during the pendency of these chapter 11 cases in the ordinary course of business and (ii) granting related relief. In addition, for the avoidance of doubt,

28

the Debtors seek authority to pay certain pre-petition and post-petition Taxes and Fees in the ordinary course business. for the so-called "straddle" periods.

72.     Accordingly, as expanded on in the Tax Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Tax Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in the Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

## I.     Utilities Motion

73.     Pursuant to the Utilities Motion, the Debtors seek entry of an order: (i) prohibiting the Debtors' utility companies from altering, refusing, or discontinuing services to the Debtors on account of prepetition invoices, unless and until this Court issues an Order authorizing such action; (ii) determining the Utilities are adequately assured of future performance; (iii) establishing procedures the Debtors' utility companies must follow in order to request additional Adequate Assurance payments, and (iv) granting related relief.

74.     The Debtors currently use telecommunications, waste management (including sewer and trash), and internet (collectively, the "**Utility Services**") from utility providers (collectively, the "**Utility Companies**," and individually, a "**Utility Company**").

75.     Uninterrupted utility services are critical to the Debtors' ability to operate and maintain the value of their business. The Debtors could not continue normal business operations without utility service. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors would more than likely be forced to cease operations. Such a cessation would substantially disrupt operations and/or repairs and result in loss of revenues, which could irreparably harm and jeopardize the reorganization efforts of the Debtors.

76.     The Debtors have proposed to provide Utility Companies with Adequate Assurance of payment for Utility Services and customary procedures for resolving any disputes. I understand such procedures are routinely approved in this district and would request the Court approve the Utilities Motion to ensure the Debtors maintain uninterrupted Utility Services.

**J.     Servicing Motion**

77.     Pursuant to the Servicing Motion, the Debtors seek an order: (i) authorizing the Debtors to continue their Servicing Obligations to the Dealer-Borrowers, to third-parties they have agreed to provide Servicing Obligations, and to the holders of Participations that contain Servicing Obligations, (ii) approve the Loss Mitigation Settlement Procedures described and proposed therein, and (iii) granting related relief.

78.     On a monthly basis, and in the ordinary course of business, PCP performs a number of servicing functions (the "**Servicing Obligations**") including: (i) funding scheduled and unscheduled Dealer-Borrower draws, (ii) receive scheduled and unscheduled payments, (iii) collateral monitoring, (iv) corresponding with Dealer-Borrowers regarding the status of their loans, and (v) calculating and collecting interest owed on the Dealer-Borrower, and (vi) the Loss Mitigation and Workout Functions (as defined below). PCP primarily performs these Servicing Obligations for its own benefit and the benefit of the affiliated Debtors, GFL and PRE. However, in addition to providing Servicing Obligations for the Dealer-Borrowers, itself, and the affiliated Debtors, PCP also provides Servicing Obligations for multiple third parties, including parties that own parts of the Dealer-Borrower Loans either via syndications or participations.

79.     In addition to the other Servicing Obligations, each of the Participations in PCP senior secured revolving loans to Dealer-Borrowers owned by BVY2 has a component to them that prohibits BVY2 from owning more than forty-nine and ninety-nine one-hundredths percent (49.99%) of any

Dealer-Borrower Loan, triggering a buy-back obligation in the event the amount BVY2 holds exceeds

that level (the "**PCP Buy-Back Obligation**").[3] Two term loan Participations owned by BVY2 do not

have such buy-back obligations.

80.     As a subset of the Debtors' Servicing Obligations, and in the ordinary course of their

businesses, the Debtors engage in certain settlement, negotiation, and when necessary, litigation

actions in relation to Dealer-Borrowers who are in default of their obligations to the Debtors under the

respective loan agreements and documents (the "Loss Mitigation and Workout Functions"). The Loss

Mitigation and Workout Functions include, but are not limited to the following: (i) negotiating

amendments or modifications to the Dealer-Borrower Loans, (ii) negotiating forbearances related to

the Debtors exercising their remedies under the loan agreements and documents, (iii) initiating

litigation against the Dealer-Borrowers and guarantors of the relative Dealer-Borrower Loans, (iv)

seeking the assistance of the courts, including applications for a court-appointed receiver, and (v)

pursuing other remedies under the loan documents including repossessing and liquidating the Debtors'

collateral (i.e., the Dealer-Borrowers' assets, including the RISCs and vehicle inventory).

81.     Consistent with their ordinary course business practices, the Debtors anticipate that

they will continue to have to perform certain Loss Mitigation and Workout Functions during the

pendency of these chapter 11 cases. Further, the Debtors have determined, in their business judgment,

that conducting the Loss Mitigation and Workout Functions is a necessary element of their chapter 11

cases, and is beneficial to the estate. Specifically, the Loss Mitigation and Workout Functions are a

crucial element in protecting the value of the Debtors' collateral and ensuring the maximum amount

of collection of the Dealer-Borrower Loans, which are the Debtors' primary asset.

---

[3] The Prepetition CIBC Credit Facility expressly permits PCP to sell participations in the Dealer-Borrower Loans
(which constitute the Prepetition First Lien PCP Lenders' collateral), *provided, however,* in order for the senior secured
Dealer-Borrower Loan to remain eligible and included in PCP's borrowing base, the participations cannot be greater
than fifty percent (50%) of the Dealer-Borrower Loan.

82.     I believe the procedures proposed in the Servicing Motion are in the best interests of the Debtors' estates, their creditors, and other parties in interest in these chapter 11 cases. Accordingly, I submit that the relief requested in the Servicing Motion should be approved.

**K.      DIP Motion**

83.     Access to financing during these Chapter 11 Cases is critical to the Debtors' restructuring efforts and their ability to preserve and maintain business operations. The Debtors require operating liquidity for payment of general operating expenses such as payroll, vendors, and other day-to-day expenses. Further, access to financing ensures that the Debtors can honor their lending obligations to their customers and continue providing support to the Dealer-Borrowers. The Debtors lend money to approximately sixty Dealer-Borrowers to finance purchase of inventory and to provide financing to consumers.  PCP's Dealer-Borrower customers service approximately 30,000 consumer RISCs on a daily basis. Inability to access the PCP DIP Facility and Cash Collateral will negatively impact the Debtors' ability to continue servicing its loans to the Dealer-Borrowers, and ultimately the Dealer-Borrowers' ability to collect and service their respective RISCs, thereby destroying value.

84.     Court-approved access to Cash Collateral and new-money financing sends a strong message to the Debtors' customers, vendors, employees, and contract counterparties that operations are funded, which will minimize the impact on the Debtors' businesses.  Without access to Cash Collateral and new-money financing, the Debtors will be unable to fund their lending obligations, pay administrative expenses, and consummate a value maximizing transaction for stakeholders.

85.     The Debtors are in need of immediate access to capital, including existing cash. FTI, together with the Debtors' other advisors, undertook a detailed analysis of the Debtors' operations and funding needs. The Debtors determined, in consultation with FTI and their other advisors, that they would require access to additional operating capital to allow the Debtors to operate in chapter 11 as a

going concern as they work with their advisors and key stakeholders to achieve their restructuring goals. Access to DIP Financing and the use of cash collateral is critical to ensure the Debtors' smooth entry into chapter 11. The commencement of these Chapter 11 Cases will place increased demands on the Debtors' liquidity due to, among other things, the costs of administering the Chapter 11 Cases. The relief requested is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtors are denied the proposed interim and final borrowings, including, among other things, frustrating the Debtors' ability to successfully navigate the Chapter 11 Cases.

86.    The PCP DIP Lenders have agreed to provide the PCP DIP Facility on the terms set forth in the PCP DIP Term Sheet and the Interim Order, which includes amounts being used in accordance with the Approved Budget.

87.    The proceeds of the PCP DIP Facility will be used for, inter alia, making payments that are critical to the Debtors' business operations, including funding and honoring the Debtors' lending obligations to their Dealer-Borrower clients, paying administrative expenses associated with these Chapter 11 Cases, and satisfying working capital needs in the ordinary course of business. Moreover, the liquidity to be provided under the DIP Facility, combined with access to existing Cash Collateral, will enable the Debtors to (i) fund their operations during the course of these Chapter 11 Cases, including chapter 11 administrative costs, (ii) ensure that value is preserved during the course of the Debtors' Chapter 11 Cases, and (iii) fund value maximizing transaction(s).

88.    PCP will use the PCP Cash Collateral in conjunction with the proceeds of the PCP DIP Facility to fund its lending obligations to Dealer-Borrower clients, pay PCP's share of the administrative expenses (including its share of the professional fees and the costs of these Chapter 11 Cases), and to fund the expenses unique to PCP.

89.     GFL will use the GFL Cash Collateral to fund its lending obligations to Dealer-Borrower clients under their warehouse lines of credit, pay GFL's share of the administrative expenses (including its share of the professional fees and the costs of these Chapter 11 Cases), and to fund the expenses unique to GFL.

90.     Considering the facts and circumstances, at this time, the proposed PCP DIP Facility and the use of Cash Collateral provide the best financing available, will ensure the continued viability of the Debtors, and allow the Debtors to continue their goal of effectuating value-maximizing restructuring transactions for the benefit of their stakeholders.

91.     Accordingly, the Debtors respectfully request that the relief requested in each of the DIP Motion be granted because such relief is a critical element in stabilizing and facilitating the Debtors' operations during the pendency of the Chapter 11 Cases.

### Conclusion

92.     The above describes the Company's business and capital structure, the factors leading up to and that precipitated the commencement of these Chapter 11 Cases, and the critical need for the Debtors to commence these Chapter 11 Cases. The above also describes the need for First Day Motions which are critical in helping the Debtors' ultimate goal in these Chapter 11 Cases is to stabilize their operations to effectuate the restructuring described herein.

[*Remainder of page left intentionally blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Date: October 22, 2025

New York, NY

Tanya Meerovich
Chief Restructuring Officer