Jason P. Kathman (Texas Bar No. 24070036)
Laurie N. Patton (Texas Bar No. 24078158)
Alex Anderson (Texas Bar No. 24138084)
**SPENCER FANE LLP**
5700 Granite Parkway, Suite 650
Plano, TX 75024
(972) 324-0300 – Telephone
(972) 324-0301 – Facsimile
Email:   jkathman@spencerfane.com
    lpatton@spencerfane.com
    alanderson@spencerfane.com

Zachary R.G. Fairlie (*Pro Hac Vice* Pending)
**SPENCER FANE LLP**
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
(816) 474-8100 – Telephone
(816) 474-3216 – Facsimile
Email: zfairlie@spencerfane.com

**PROPOSED COUNSEL FOR
DEBTORS AND DEBTORS-IN-POSSESSION**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **PRIMALEND CAPITAL PARTNERS, LP,** *et al.*[1] | § | Case No. 25-90013 (MXM) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING (A) POSTPETITION FINANCING AND
(B) THE USE OF CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING
ADEQUATE PROTECTION TO PREPETITION LENDERS, (IV) MODIFYING
THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING,
AND (VI) GRANTING RELATED RELIEF**

---

[1] The debtors and debtors-in-possession in these Chapter 11 Cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: PrimaLend Capital Partners, LP (0313) ("**PCP**"), Good Floor Loans LLC (8219) ("**GFL**"), and LNCMJ Management, LLC (1374) ("**LNCMJ**"). The location of the Debtors' headquarters is 3460 Lotus Dr. Ste. 100, Plano, TX 75075.

**Emergency relief has been requested. If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing, or file a written response no later than Thursday, October 23, 2025. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on the matters set forth in this motion on October 24, 2025, and 9:00 a.m. prevailing Central Time in Room 128, U.S. Courthouse, 501 W. Tenth Street, Fort Worth, Texas 76102. You may participate in the hearing either in person or by an audio or video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at https://us-courts.webex.com/meet/mullin. The dial-in is 1.650.479.3207. The meeting code is 2310-650-8783. Video communications will be by use of the Cisco WebEx platform. Connect via the Cisco WebEx application or click the link on Judge Mullin's home page. Click the settings icon in the upper right corner and enter your name under the personal information setting. WebEx hearing instructions may be obtained from Judge Mullin's hearing/calendar site:** [https://www.txnb.uscourts.gov/sites/txnb/files/hearings/WebEx%20Hearing%20Instructions%20for%20Judge%20Mullin%205.14.2024.pdf](https://www.txnb.uscourts.gov/sites/txnb/files/hearings/WebEx%20Hearing%20Instructions%20for%20Judge%20Mullin%205.14.2024.pdf).

**Hearing appearance must be made electronically in advance of electronic hearings. To make your appearance, click the "Electronic Appearance" link on Judge Mullin's home page. Select the case name, complete the required fields and click "submit" to complete your appearance.**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

PrimaLend Capital Partners, LP ("**PCP**"), Good Floor Loans LLC ("**GFL**"), and LNCMJ Management, LLC ("**LNCMJ**", and collectively with PCP and GFL, the "**Debtors**"), debtors and debtors-in-possession in the above referenced cases ("**Chapter 11 Cases**"), file this motion (the "**Motion**"). In support of this Motion, the Debtors submit the *Declaration of Tanya Meerovich in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "**First Day Declaration**"), filed contemporaneously herewith, and the *Declaration of Jeffrey Lewis in Support of the DIP Motion* (the "**Lewis Declaration**"), attached as **Exhibit A** hereto. The Debtors further state as follows:

PL 6496767.6

## PRELIMINARY STATEMENT[2]

1.      By this Motion, the Debtors seek authorization to obtain postpetition financing and approval of a super-priority senior secured postpetition revolving credit facility, provided by the PCP DIP Lenders (as defined herein), in an aggregate principal amount of up to $16,000,000.[3] Additionally, the Motion seeks to use the Cash Collateral (as defined herein) of their prepetition secured lenders, the Prepetition First Lien PCP Lenders and Amarillo National Bank.

2.      Access to financing during these Chapter 11 Cases is critical to the Debtors' restructuring efforts and their ability to preserve and maintain business operations. More importantly, access to financing insures that the Debtors can honor their lending obligations to their customers and continue providing support to the Dealer-Borrowers. The Debtors lend money to approximately sixty Dealer-Borrower to finance purchase of inventory and to provide financing to consumers. PCP's Dealer-Borrower customers service approximately 30,000 consumer RISCs on a daily basis. Inability to access the PCP DIP Facility and Cash Collateral will negatively impact the Debtors' ability to continue servicing its loans to the Dealer-Borrowers, and ultimately the Dealer-Borrowers' ability to collect and service their respective RISCs, thereby destroying value. Court-approved access to Cash Collateral and new-money financing sends a strong message to the Debtors' customers, vendors, employees, and contract counterparties that operations are funded, which will minimize the impact on the Debtors' businesses.  Without access to Cash Collateral and new-money financing, the Debtors will be unable to fund their lending obligations, pay administrative expenses, and consummate a value maximizing transaction for stakeholders.

---

[2] Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the DIP Term Sheet, the First Day Declaration, or the Interim Order, as applicable.

[3] The $16,000,000 PCP DIP Commitment consists of a $4,000,000 New Money Loan (defined below) and a $12,000,000 Roll-Up Loan (defined below).

PL 6496767.6

3.      PCP should be authorized to into the PCP DIP Facility. As detailed herein, the PCP

DIP Facility contains terms that are the most favorable available, are reasonable and market under

the circumstances, and provide the Debtors with liquidity to (i) fund their operations during the

course of these Chapter 11 Cases, including chapter 11 administrative costs, (ii) ensure that value is

preserved during the course of the Debtors' Chapter 11 Cases, and (iii) fund value maximizing

transaction(s)

4.      The Debtors have been, and remain, committed to evaluating all value-maximizing

paths forward, both with respect to the PCP DIP Facility and with respect to potential restructuring

transactions to be effectuated in the Chapter 11 Cases.

5.      Considering the facts and circumstances, at this time, the proposed PCP DIP Facility

and the use of Cash Collateral provide the best financing available, will ensure the continued viability

of the Debtors, and allow the Debtors to continue their goal of effectuating value-maximizing

restructuring transactions for the benefit of their stakeholders. Accordingly, the Debtors

respectfully request that the Court grant this Motion.

## RELIEF REQUESTED

6.      By this Motion, the Debtors seek entry of an interim order, substantially in the form

attached hereto as **Exhibit B** (the "**Interim Order**"), and a final order (the "**Final Order**" and,

together with the Interim Order, collectively, the "**DIP Orders**"),[4] granting, among other things,

the following relief:

     i.     authorizing PCP (the "**PCP DIP Borrower**") to obtain from the PCP DIP Lenders
          (as defined herein) a priming super-priority senior secured postpetition credit
          facility ("**PCP DIP Facility**," and the loan issued thereunder, the "**PCP DIP
          Loan**") in an aggregate amount not to exceed at any time outstanding aggregate
          commitments equal to the New Money Loan (defined below) advanced plus the
          Roll-Up Loan (defined below) (the "**PCP DIP Commitment**"), which PCP DIP
          Commitment is comprised of:

---

[4] The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

PL 6496767.6

    a. a multi-draw revolving debtor-in-possession loan facility in an aggregate amount not to exceed $4,000,000.00 to be funded in draws subject to the prior approval of the PCP DIP Lenders and at all times pursuant to the Approved Budget to support operations, dealer advances and Case Expenses (the "**New Money Loan**"); and

    b. a conversion or roll-up of the outstanding obligations under the Prepetition First Lien PCP Loan Documents (defined below) into the DIP Loan equal to 3.0 times the New Money Loan advanced, which such conversion and roll-up to occur contemporaneously with each advance of the New Money Loan. The aggregate amount of such converted obligations shall be referred to herein, collectively, as the "**PCP Roll-Up Loan**." Upon the funding of the PCP DIP Loan and the conversion of the obligations under the Prepetition First Lien PCP Loan Documents, the Roll-Up Loan shall constitute part of the PCP DIP Commitment and shall be entitled to all the rights, liens, and protections granted to the PCP DIP Agent, for itself and the other PCP DIP Lenders, under the PCP DIP Documents (defined below) and the Interim Order and Final Order.

The PCP DIP Commitment is subject to the terms and conditions set forth in that certain PrimaLend Capital Partners, LP Terms and Conditions Proposed Senior Secured Super-Priority Debtor-in-Possession Credit Facility (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**PCP DIP Term Sheet**") or, as applicable, a Debtor-in-Possession Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**PCP DIP Credit Agreement**" and, together with any ancillary, collateral or related documents and agreements, including the Interim Order, the "**PCP DIP Documents**"),[5] among PrimaLend Capital Partners L.P., as Borrower, and LNCMJ, as Guarantor, and PCAP Holdings, LP ("**PCAP**"), a non-Debtor affiliate Guarantor (collectively the "**PCP DIP Guarantors**" and together with the PCP DIP Borrower, the "**PCP DIP Obligors**"), each of the entities specified in the PCP DIP Term Sheet, as Lender (each a "**PCP DIP Lender**"), and CIBC Bank USA (the "**PCP DIP Agent,**" and collectively with each PCP DIP Lender, the "**PCP DIP Lenders**"), as agent for the PCP DIP Lenders, which PCP DIP Credit Agreement shall be consistent with the terms set forth in the attached PCP DIP Term Sheet attached as Exhibit A to the Interim Order;

ii.    approving the terms of the PCP DIP Term Sheet, and authorizing the PCP DIP Obligors to execute, deliver, and perform under the PCP DIP Term Sheet and any other PCP DIP Documents;

---

[5] Capitalized terms used but not defined herein have the meaning set forth in the Motion or the PCP DIP Term Sheet, as applicable.

iii.  authorizing the PCP DIP Obligors, on an interim basis, to issue, incur, and guarantee all loans, notes, advances, extensions of credit, financial accommodations, reimbursement obligations, fees and premiums, and all other obligations due or payable to or for the benefit of the PCP DIP Lenders under the PCP DIP Term Sheet and the other PCP DIP Documents (collectively, the "**PCP DIP Obligations**"), and to perform such other acts as may be required or appropriate in connection therewith;

iv.  authorizing and directing the PCP DIP Borrower, on an interim basis, to use the proceeds of the PCP DIP Facility and the PCP Cash Collateral (as defined below) solely in accordance with the respective PCP DIP Term Sheet and the Interim Order to (a) fund the postpetition working capital needs of the Debtors pending the Final Hearing (as defined below); (b) pay fees, costs and expenses of the PCP DIP Facility on the terms and conditions described in the Interim Order and the PCP Term Sheet, as applicable; and (c) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the PCP Term Sheet, the Approved Budget (as defined below), and the Interim Order;

v.  authorizing the PCP DIP Borrower to grant to the PCP DIP Lenders valid, enforceable, non-avoidable, and automatically and fully perfected and priming security interests, liens, and super-priority claims, including (a) allowed super-priority administrative expense claims pursuant to Sections 364(c)(1) of the Bankruptcy Code, subject only to the Carve-Out (as defined below) and (b) liens in the PCP DIP Collateral and all proceeds thereof, including, without limitation, all such property constituting "cash collateral," as defined in Section 363(a) of the Bankruptcy Code, ("**PCP Cash Collateral**"), pursuant to Sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, to secure the PCP DIP Obligations, subject only to the Carve-Out;

vi.  authorizing the PCP DIP Borrower to grant to the Prepetition First Lien PCP Lenders (as defined below), as adequate protection of their respective interest in the Prepetition PCP Collateral (as defined below), valid, enforceable, non-avoidable, and automatically and fully perfected security interests and replacement liens in the PCP DIP Collateral, solely to the extent of any Diminution (as defined below) of the Prepetition First Lien PCP Lenders' respective interest in the Prepetition PCP Collateral, as more fully set forth in the Interim Order, subject and subordinate only to the Carve-Out, the PCP DIP Liens (as defined below), and PCP DIP Superpriority Claims (as defined in the DIP Documents), with waiver of the Debtors' right to assert any and all challenges, causes of action, and claims against the Prepetition First Lien PCP Lenders; *provided, however,* such challenges shall be subject to the challenge provisions in the Interim Order;

vii.  authorizing the GFL to grant to ANB, as adequate protection of its interest in the Prepetition GFL Collateral (as defined below), valid, enforceable, non-avoidable, and automatically and fully perfected security interests and replacement liens in the Postpetition GFL Collateral (defined below), solely to the extent of any Diminution

of ANB's interest in the Prepetition GFL Collateral, as more fully set forth in the Interim Order, subject and subordinate only to the Carve-Out;

viii. authorizing the PCP DIP Lenders to take all commercially reasonable actions to implement and effectuate the terms of the Interim Order and the PCP DIP Term Sheet;

ix. authorizing the GFL to take all commercially reasonable actions to implement and effectuate the terms of the Interim Order;

x. authorizing payment of the DIP Fees (as defined in the Interim Order) at the times and in the amounts set forth in the Interim Order;

xi. upon entry of the Final Order, a waiving of (a) the PCP DIP Borrower's right to surcharge any collateral of the Prepetition First Lien PCP Lenders pursuant to Sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, and (b) the equitable doctrine of "marshaling" and other similar doctrines with respect to any collateral;

xii. modifying the automatic stay imposed by Section 362(a) of the Bankruptcy Code to the extent set forth herein and as necessary to permit the Debtors and the PCP DIP Lender to implement and effectuate the terms and provisions of the PCP DIP Term Sheet and the Interim Order, as applicable, and authorizing the PCP DIP Lender, upon the occurrence and continuation of an Event of Default (as set forth in the PCP DIP Term Sheet and Interim Order, as applicable), to deliver any notices and exercise rights and remedies, as contemplated in the Interim Order and the PCP DIP Term Sheet;

xiii. waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order;

xiv. scheduling a final hearing (the "**Final Hearing**") to consider final approval of the PCP DIP Facility pursuant to a proposed final order (the "**Final Order**").

## JURISDICTION AND VENUE

7.     The United States Bankruptcy Court for the Northern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984, entered by the United States District Court for the Northern District of Texas. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

PL 6496767.6

8.     The statutory basis for the relief requested in this Motion are Sections 105, 361, 362(d), 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 503(b), and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), rules 2002-1 and 9013-1 of the Local Bankruptcy Rules for the Northern District of Texas (the "**Local Bankruptcy Rules**"), and the Procedures for Complex Cases in the Northern District of Texas.

9.     The Debtors confirm their consent to the entry of a final order by the Court in connection with the Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

10.     The Debtors are collectively one of the largest national asset-based specialty lenders that directly finance Buy Here, Pay Here ("**BHPH**") car dealerships ("**Dealer-Borrowers**"). The Debtors' business can be broadly divided amongst three operating entities and the specific services and types of loans each provides. GFL makes floorplan revolving lines of credit to BHPH dealerships to finance their purchase of vehicles and inventory. PCP makes revolving lines of credit and term loans based upon the value of the BHPH dealers' portfolio of retail installment sales contracts ("**RISCs**") and to certain subprime finance companies serving the BHPH industry. Additionally, non-Debtor affiliate PrimaLend Real Estate LLC ("**PRE**") makes loans based upon BHPH dealers' real estate they or their affiliates own.[6] Collectively, the Debtors have helped more than one hundred BHPH dealerships grow their businesses, improve their

---

[6] GFL, PRE, and the limited partnership interests of PCP are owned by non-Debtor affiliate PCAP Holdings, LP ("**PCAP**"). The general partner of PCP is LNCMJ.

PL 6496767.6

business and compliance procedures, build and improve their credit, and refinance their loan obligations with loans from more traditional lending services to improve their profitability.

11.     Beginning on October 22, 2025 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The Debtors continue to operate their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. As of the date hereof, no request for the appointment of a trustee or examiner has been made, and no official committee of unsecured creditors has been appointed in these chapter 11 cases.

12.     A detailed description of the Debtors and their businesses, and the facts and circumstances surrounding the filing of the Debtors' chapter 11 cases, is set forth in greater detail in the First Day Declaration.

## CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001(B) AND SECTION D OF THE COMPLEX CASE PROCEDURES

13.     In accordance with Bankruptcy Rule 4001(b)–(d), the chart below summarizes material terms of the PCP DIP Facility.[7]

| Provision | Summary | Location |
|---|---|---|
| **PCP DIP Borrower** | PrimaLend Capital Partners, LP | Term Sheet, p.1 |
| **PCP DIP Lenders** | CIBC BANK USA; SouthState Bank N.A.; Hancock Whitney Bank; Prosperity Bank; Woodforest National Bank; First Horizon Bank; BOKF, NA, d/b/a Bank of Texas; Sunflower Bank, N.A.; Cadence Bank; The Huntington National Bank, S/B/M to Veritex Community Bank; Georgia Banking Company (the "**PCP DIP Lender(s)**"). CIBC USA ("**DIP Agent**") | Term Sheet, p.2 |

---

[7] The following summary of the terms of the PCP DIP Facility is qualified entirely by the express terms of the referenced documents, including the PCP DIP Term Sheet and the Interim DIP Order. If there are any inconsistencies between the summary below and such documents, the terms of such documents shall control. Capitalized terms used but not otherwise defined in this summary chart shall have the meanings ascribed to them in the PCP DIP Term Sheet or the Interim Order, as applicable.

PL 6496767.6

| Provision | Summary | Location |
|---|---|---|
| **Facility Type and Amount** | The PCP DIP Lenders, at the direction of the DIP Agent, agree to make a senior secured super-priority priming debtor-in-possession loan, at their existing pro-rata commitments and funding allocations, as set forth in the Prepetition First Lien PCP Loan Documents (the "**DIP Loan**") to the PCP DIP Borrower from time to time pursuant to a multi-draw revolving debtor-in-possession loan facility (the "**PCP DIP Facility**") in an aggregate amount not to exceed at any time outstanding aggregate commitments equal to the New Money Loan advanced plus the Roll-Up Loan (the "**PCP DIP Commitment**"), which PCP DIP Commitment is comprised of<br><br>(i) a multi-advance loan with a commitment not to exceed $4,000,000 to be funded in draws subject to the prior approval of the DIP Lenders and at all times pursuant to the DIP budget to support operations, dealer advances and Case Expenses; and<br><br>(ii) a conversion or roll-up of the outstanding obligations under the PCP Prepetition Obligations into the PCP DIP Loan equal to 3.0 times the PCP New Money Loan advanced, which such conversion and roll-up to occur contemporaneously with each advance of the PCP New Money Loan. The aggregate amount of such converted obligations totaling $12,000,000 shall be referred to herein, collectively, as the "**Roll-Up Loan.**" Upon the funding of the PCP DIP Loan and the conversion of the PCP Prepetition Obligations, the Roll-Up Loan shall constitute part of the PCP DIP Commitment and shall be entitled to all the rights, liens, and protections granted to the DIP Agent, for itself and the other PCP DIP Lenders, under the PCP DIP Documents and any Bankruptcy Court orders. | Term Sheet, p.1-2 |
| **Use of Proceeds/Purpose** | Proceeds of the PCP DIP Facility shall be used solely for the following purposes, and only to the extent identified and provided for in the Approved Budget: (a) to fund postpetition operating expenses and working-capital needs of the Debtors under the Approved Budget; (b) to pay Case Expenses, *provided,* the amount in the Approved Budget for the professional fees shall be set aside in segregated escrow accounts for each party's professionals; (c) to pay DIP Adequate Protection Payments; and (d) to fund contingent dealer draws as set forth in the Approved Budget. | Term Sheet, p.6 |
| **Maturity Date** | November 26, 2025, unless the Debtors requests an extension of the Maturity Date and the PCP DIP Lenders, in their sole and reasonable discretion, consent in writing to such extension. | Term Sheet, p.13 |
| **DIP Budget** | Unless waived in writing by DIP Agent, by no later than two (2) Business Days before the Petition Date, Debtors shall deliver to the DIP Agent a weekly budget for the thirteen (13)-week period commencing on the Petition Date, and such weekly budget shall be approved by the DIP Agent (such consent, which shall not be unreasonably withheld, conditioned, or delayed) and shall set | Term Sheet, p.7 |

PL 6496767.6

| Provision | Summary | Location |
|---|---|---|
| | forth, among other things, all projected cash receipts, sales, and cash disbursements as more fully set forth in the definition of the "**Approved Budget**".<br><br>The Debtors shall obtain the DIP Secured Parties approval of all interim, final and monthly budgets. | |
| **Variance Reporting** | See Conditions Precedent to Effectiveness / Credit Extensions | Term Sheet, p.7 |
| **Interest Rate** | Interest shall accrue as follows and will be computed for the actual number of days elapsed on the basis of a year of 360 days:<br><br>(i) on the New Money Loan, at SOFR, plus 750 bps (the "**New Money Rate**") and shall be payable monthly, in arrears, in cash on the first day of each calendar month, with all remaining interest on the New Money Loan due and payable on the DIP Payment Date.<br><br>(ii) on the Roll-Up Loan, at the non-default interest rate in the Prepetition Loan Documents, and shall be payable monthly, in arrears, in cash on the first day of each calendar month, with all remaining interest on the Roll-Up Loan due and payable on the DIP Payment Date (as defined in the PCP DIP Term Sheet). | Term Sheet, p.8 |
| **Default Rate** | Effective immediately upon the occurrence of an Event of Default unless waived in writing by the DIP Agent in its sole discretion, interest on the outstanding obligations under the PCP DIP Facility shall accrue at 2.0% over the New Money Rate, *provided, however,* an Event of Default shall not occur (and thus be subject to the Default Interest Rate) unless and until notice has been given pursuant to the applicable PCP DIP Documents, and any cure periods have been exhausted the Debtors have not cured any alleged defaults. | Term Sheet, p.8 |
| **Fees** | In connection with the PCP DIP Loan, the PCP DIP Borrower agrees to pay the following fees:<br><br>(i) an upfront fee of 2.5% (on New Money Loan only)<br><br>(ii) $50,000/month Agency Fee payable on the first day of each calendar month<br><br>(iii) an unused line fee of 50 bps (on New Money Loan only) payable on the first day of each calendar month and will be computed for the actual number of days elapsed on the basis of a year of 360 days; and<br><br>(iv) an exit fee of 1% (on New Money Loan only) | Term Sheet, p.8 |
| **Priority** | The PCP DIP Facility (including accrued interest, fees, costs and expenses relating thereto) shall be secured by (collectively, the "**PCP DIP Collateral**") first priority senior and priming liens, subject and junior only to the Carve-Out (the "**PCP DIP Liens**") | Term Sheet, p.9 |

11

| Provision | Summary | Location |
|-----------|---------|----------|
| | in all of the assets of the PCP DIP Borrower, including, without limitation, all of the PCP DIP Borrower's existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, cash, accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, loans, chattel paper, documents, instruments, deposit accounts, contract rights, equity interests, any tax refunds of the PCP DIP Borrower, any and all intellectual property, and subject to entry of the Final Order all Avoidance Actions of the PCP DIP Borrower and the proceeds thereof. | |
| **Adequate Protection / Superpriority Expense Claims** | Amounts owed by the Debtors to the PCP DIP Lenders pursuant to the PCP DIP Facility (including all accrued interest, fees, costs and expenses) shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code (as defined below), a claim having super-priority over any or all administrative expenses of the kind specified in, among other sections, Sections 326, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726 of the Bankruptcy Code. | Interim Order §§ 8-10 |
| **Conditions Precedent to Effectiveness / Credit Extensions** | The Debtors have provided the PCP DIP Lenders with a weekly statement of receipts and disbursements of the PCP DIP Borrower on a consolidated basis for the thirteen (13) weeks commencing with the first week following the Petition Date, including (i) individual line items for "Total Disbursements," and (ii) the anticipated uses of the proceeds of the PCP DIP Loan and Cash Collateral for such period, in form and substance reasonably satisfactory to the DIP Agent (substantially similar to the form of the Approved Budget).<br><br>No less frequently than every two (2) week period, the PCP DIP Borrower will provide an updated Approved Budget for the following thirteen (13) week period to the PCP DIP Lenders (the "**Proposed Budget**"), and the PCP DIP Lenders shall have three (3) Business Days upon receipt of such proposed budget to object. If no timely objection is received, the proposed budget shall be deemed the Approved Budget.<br><br>In addition, on the first Wednesday of the first full week following entry of the Interim Order (November 5, 2025) and on Wednesday of each week thereafter, the Debtors shall provide the PCP DIP Lenders with, at a minimum, a weekly cash reporting (with continuing call schedule) & weekly variance reporting (against the prior week's Approved Budget and actual performance), as well as collateral roll-forward schedules (*e.g.*, core vs. non-core updates, dealer matrix updated bi-weekly, PRE recovery updates, GFL availability and needs assessment). | Term Sheet, p.7 |

PL 6496767.6

| Provision | Summary | Location |
|---|---|---|
| **Affirmative Covenants** | The Debtors shall also comply with the following affirmative and negative covenants:<br><br>1) <u>Adequate Protection Payments to DIP Secured Parties</u>. The PCP DIP Borrower agrees that, during the term of the PCP DIP Loan, it will make adequate protection payments to the PCP DIP Lenders (the "**DIP Adequate Protection Payments**") consisting of monthly interest due on the New Money Loan and the Roll-Up Loan, at the rate set forth herein, and payable in arrears, in cash on the first day of each calendar month, with all remaining interest on the New Money Loan and the Roll-Up Loan due and payable on the DIP Payment Date (as defined in the PCP DIP Term Sheet).<br><br>2) <u>Payment of Case Expenses of PCP DIP Lenders</u>. The PCP DIP Borrower agrees to pay the Case Expenses incurred by the PCP DIP Lenders.<br><br>3) <u>Replacement Liens</u>. The PCP DIP Borrower agrees to provide the PCP DIP Lenders with replacement liens on PCP DIP Collateral.<br><br>4) <u>Asset Sale Proceeds</u>. The Debtors agree the proceeds from any Asset Sale (the "**Sale Proceeds**") shall be separately segregated from the PCP Cash Collateral, and shall be held separate from any other Cash Collateral, and the use of any Sale Proceeds shall be expressly subject to the written agreement of the PCP DIP Lenders or order of the Court, with the PCP DIP Lenders reserving all rights under their loan documents, applicable law or otherwise to the Sale Proceeds.<br><br>5) <u>Sharing of Expenses</u>. GFL shall bear its proportionate share of the operating costs and Case Expenses paid by the PCP DIP Borrower in accordance with the Approved Budget.<br><br>6) <u>Approved Budget Variance Covenant</u>. The Debtors shall not exceed the permitted 10% variance threshold for operating disbursements as set forth in the Approved Budget.<br><br>7) <u>Cash on Hand</u>. The PCP DIP Borrower shall not maintain less than $500,000 in cash on hand at any time, without the prior written consent of the PCP DIP Lenders.<br><br>8) <u>Prohibition on Other Disbursements</u>. The PCP DIP Borrower shall not send monies, proceeds, and/or cash to, or pay any intercompany payment obligations that may be owed to DIP Guarantors, PRE, GFL, and/or any other non-Debtor related parties, without the prior written consent of the PCP DIP Lenders | Term Sheet, p.10-11 |
| **Negative Covenants** | See Affirmative Covenants | Term Sheet, p.10-11 |

PL 6496767.6

| Provision | Summary | Location |
|---|---|---|
| **Milestones** | The case milestones assume a Petition Date by the end of October 2025, with a six (6) month case duration, and with such case milestones (the "**Milestones**") to be included in the Interim Order and Final Order but which will be consistent with the following dates and deadlines:<br><br>• October 24, 2025—Entry of Interim Order, acceptable to the PCP DIP Lenders<br><br>• November 7, 2025—Deadline to Select a Stalking Horse<br><br>• November 26, 2025—Entry of Final Order, acceptable to PCP DIP Lenders, and upon such entry, execution of appropriate documentation, including any PCP DIP Credit Agreement, which incorporates, if requested by the PCP DIP Borrower, any Maturity Date extension, as may be agreed to by the PCP DIP Lenders, in their sole and reasonable discretion.<br><br>• December 5, 2025—Deadline for Stalking Horse to Sign APA and File Bidding Procedures Motion<br><br>• December 19, 2025—Auction Deadline<br><br>• December 22, 2025—Sale Approval (if 363)/ Deadline to File Plan and DS (if Sale through Plan)<br><br>• January 22, 2026—Hearing on DS and Final Sale Approval (if no 363 sale)<br><br>• February 18, 2026—Confirmation Hearing<br><br>• March 1, 2026—Effective Date of Plan<br><br>The inclusion of any Milestones beyond the Maturity Date shall not be construed as an agreement by the PCP DIP Lenders to extend the PCP DIP Loan beyond that Maturity Date. | Term Sheet, p.9 |
| **Postpetition Default** | The occurrence of any of the following shall be an event of default under the PCP DIP Facility (each, an "**Event of Default**"):<br>• The failure to pay principal, interest, fees, or other amounts when due;<br>• The breach of covenants under any of the PCP DIP Documents;<br>• The material inaccuracy by the PCP DIP Obligors in connection with any representation or warranty made to the PCP DIP Lenders;<br>• A cross-default and/or cross-acceleration in connection with a material indebtedness, which is above the minimum threshold $250,000.00; | Term Sheet, p.11-12 |

14

PL 6496767.6

| Provision | Summary | Location |
|---|---|---|
| | • Should any of the PCP DIP Documents or orders entered by the Court approving the PCP DIP Documents become invalid, unenforceable, and/or subordinated;<br>• Any successful challenge made to, or impairment of, the PCP DIP liens or super-priority claims in favor of the PCP DIP Lenders;<br>• The dismissal or conversion of the PCP DIP Borrower's Chapter 11 Case to one under Chapter 7;<br>• The appointment of a trustee or examiner with expanded powers (without the prior written consent of the PCP DIP Lenders);<br>• The entry of an order granting stay relief on collateral beyond a de minimis threshold;<br>• The PCP DIP Borrower's failure to obtain or maintain entry of the Final Order, or material modification or reversal thereof; and<br>• The failure of the PCP DIP Borrower to make the PCP DIP Adequate Protection Payments, or if such payments are revoked and/or modified by the Court in any manner that is adverse to PCP DIP Lenders. | |
| **Remedies; Waiver or Modification of the Automatic Stay** | Customary and standard remedies regarding default of a DIP loan in chapter 11 cases, and as provided in the Interim Order and Final Order. | Term Sheet, p.11 |
| **Prepayments** | Voluntary prepayments of the PCP DIP Loan shall be permitted at any time, subject to payment of the ratable portion of the Exit Fee due thereon. | Term Sheet, p.8 |
| **Fees and Expenses; Indemnification** | The PCP DIP Documents shall contain customary indemnification provisions for the benefit of the PCP DIP Lenders, and its related parties, including, without limitation, indemnification against losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated by the PCP DIP Documents or the use of the proposed proceeds thereof.<br><br>Subject to the DIP Documents, all documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of the PCP DIP Lenders. | Interim Order, §§ 26-27 |
| **Releases, Waivers or Limitation on any Claim or Cause of Action** | The DIP Orders shall include a customary release of the PCP DIP Lenders with respect to any and all claims and causes of action arising from or related to the PCP DIP Facility.<br>The Final Order shall include terms and conditions customary for final DIP financing orders and shall be reasonably acceptable to the PCP DIP Lenders, including waiver of the automatic stay, credit-bidding rights, "no marshalling" provisions and other similar doctrines, and waivers of the imposition of costs or right to surcharge the PCP DIP Collateral pursuant to Sections 105(a) and 506(c) of the Bankruptcy Code. | Interim Order, §§ 29-33 |

PL 6496767.6

| Provision | Summary | Location |
|---|---|---|
| **Avoidance Actions** | Effective upon entry of the Final Order, the PCP DIP Collateral shall include all avoidance actions, including any claims and causes of action arising under Sections 544, 545, 547, 548, and 550 of the Bankruptcy Code and similar such claims and causes of action under applicable non-bankruptcy law, and the proceeds thereof. | Term Sheet, p.9 Interim Order, § 2(e)(ii) |
| **Section 506(c)** | Subject to and effective upon entry of the Final Order, the PCP DIP Obligors shall waive any right to surcharge the PCP DIP Collateral pursuant to Sections 105(a) and 506(c) of the Bankruptcy Code. | Interim Order § 31 |
| **Waiver** | Collateral pursuant to Sections 105(a) and 506(c) of the Bankruptcy Code or otherwise. | Interim Order § 31 |
| **Marshalling** | Subject to and effective upon entry of the Final Order, the PCP DIP Obligors shall waive the equitable doctrine of marshaling and other similar doctrines regarding the PCP DIP Collateral. | Interim Order § 31 |

14.     PCP respectfully submits that the foregoing material terms are appropriate as necessary components of the agreement with the PCP DIP Lenders regarding the PCP DIP Facility and the use of the PCP Prepetition Collateral, including to the extent the same constitutes PCP Cash Collateral. As set forth in greater detail herein, granting the requested relief is critical to continued operation of the Debtors' businesses and will maximize the value of the Debtors' estates for all stakeholders. Accordingly, the material provisions in the DIP Orders should be approved.

## PREPETITION CAPITAL STRUCTURE[8]

15.     As detailed in the First Day Declaration, as of the Petition Date, the capital structure of the Debtors and certain non-debtor affiliates includes (i) funded debt liabilities totaling approximately $286.1 million, including approximately (a) $186.5 million in outstanding principal

---

[8] The following description of the Company's capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

PL 6496767.6

interest in senior secured indebtedness, (b) $75.0 million in senior unsecured notes, and (c) $24.6 million in junior subordinated indebtedness; and (ii) equity.

| Debt | Maturity Date | Facility Limit ($) | Approx. Balance as of Petition Date ($) |
|---|---|---|---|
| **Secured Debt** | | | |
| PCP Credit Facility | October 23, 2025 | $180,000,000 | $161,700,000 |
| GFL Credit Facility | December 31, 2027 | $40,000,000 | $16,200,000 |
| PRE Credit Facility | May 5, 2026 | $20,000,000 | $8,600,000 |
| **Unsecured Debt** | | | |
| Senior Unsecured Notes | July 15, 2028 | n/a | $75,000,000 |
| Junior Unsecured Subordinated Notes | various | n/a | $24,600,000 |
| **Total** | | | **$286,100,000** |

## A.      Senior Secured Indebtedness

### i.      *Prepetition First Lien PCP Credit Facility*.

16.      As of the Petition Date, PCP was indebted to the Prepetition First Lien PCP Lenders[9] under the Prepetition First Lien PCP Loan Documents,[10] including that certain *Amended and Restated Credit Agreement* (as amended, modified, restated and/or replaced from time to time) dated as of August 27, 2024, among PCP, as borrower, PCAP, LNCMJ, Mark Jensen, Christi Jensen, and Paxton Wright, as guarantors, the Prepetition First Lien PCP Lenders, and CIBC Bank USA ("**CIBC**"), as administrative agent (the "**Prepetition First Lien PCP Credit Facility**"). In

---

[9] The "**Prepetition First Lien PCP Lenders**" means the following: (i) CIBC BANK USA, as Administrative Agent, Issuing Lender, as a Lender, and as Joint Lead Arranger, (ii) SouthState Bank, N.A. as a Lender, (iii) Hancock Whitney Bank, as a Lender, (iv) Prosperity Bank, a Texas banking association, successor by merger to Legacy Texas Bank, as a Lender, (v) Woodforest National Bank, as a Lender, (vi) First Horizon Bank, as a Lender and as Joint Lead Arranger, (vii) BOKF, NA, d/b/a Bank of Texas, as a Lender, (viii) Sunflower Bank, N.A., as a Lender, (ix) Cadence Bank, as a Lender, (x) The Huntington National Bank, S/B/M to Veritex Community Bank, as a Lender and as a Joint Lead Arranger, and (xi) Georgia Banking Company, as a Lender.

[10] The "**Prepetition First Lien PCP Loan Documents**" means that certain credit agreement, dated as of August 27, 2024, by and among PrimaLend Capital Partners LP, as borrower, each of the guarantors named therein, CIBC Bank USA, as administrative agent, the Prepetition First Lien PCP Lenders, as lenders thereo, and all credit agreements, indentures, notes, instruments, documents, and other agreements, including all related and ancillary agreements, in each case, as amended, supplemented, modified, extended, renewed, restated or replaced from time to time by and between PCP and the Prepetition First Lien PCP Lenders related to the Prepetition First Lien PCP Credit Facility.

January of 2025, the Prepetition First Lien PCP Credit Facility  was amended pursuant to that certain *First Amendment, Consent, and Limited Waiver to Amended and Restated Credit Agreement* (the "**January 2025 Amendment**"). In September of 2025, the Prepetition First Lien PCP Credit Facility was further amended pursuant to that certain *Second Amendment to Amended and Restated Credit* Agreement (the "**September 2025 Amendment**"). As of the Petition Date, the aggregate principal balance owed pursuant to the Prepetition First Lien PCP Credit Facility was approximately $161.7 million. ("**PCP Prepetition Obligations**").

17.     The PCP Prepetition Obligations are secured by liens and security interests granted by PCP (all such liens and security interests, the "**Prepetition PCP First Liens**") on and in the assets of PCP to the extent set forth under the Prepetition First Lien PCP Loan Documents (all such assets, the "**Prepetition PCP Collateral**"), including to the extent the same constitutes PCP Cash Collateral.

*ii.     GFL Credit Facility*

18.     As of the Petition Date, GFL was indebted to Amarillo National Bank, a national banking association ("**ANB**") under the Prepetition GFL Loan Documents,[11] including that certain *Commercial Credit Agreemen*t (as amended, modified, restated and/or replaced from time to time) dated as of September 20, 2022, among GFL, as borrower, PCAP and LNCMJ, as guarantors, and ANB (the "**GFL Credit Agreement**"). In connection with the GFL Credit Agreement, GFL executed that certain Promissory Note providing for a revolving line of credit (the "**ANB Note**"). As of the Petition Date, the aggregate principal balance owed pursuant to the GFL Credit Agreement was approximately $16.2 million.

---

[11] The "**Prepetition GFL Loan Documents**" means all credit agreements, indentures, notes, instruments, documents, and other agreements, including all related and ancillary agreements, in each case, as amended, supplemented, modified, extended, renewed, restated or replaced from time to time in by and between GFL and ANB.

PL 6496767.6

19.      GFL's obligations under the Prepetition GFL Loan Documents are secured by liens and security interests granted by GFL (all such liens and security interests, the "**Prepetition GFL First Liens**") on and in the assets of GFL, to the extent set forth under the Prepetition GFL Loan Documents (all such assets, the "**Prepetition GFL Collateral**" and together with the Prepetition PCP Collateral, the "**Prepetition Collateral**"), including to the extent the same constitutes cash collateral (the "**GFL Cash Collateral**" and together with the Prepetition PCP Cash Collateral, the "**Cash Collateral**").

**THE PCP DIP FACILITY AND CASH COLLATERAL**

**A.**      **There is an Immediate Need for Postpetition Financing and Use of Cash Collateral.**

20.      The Debtors require access to liquidity to continue operating in the ordinary course during these Chapter 11 Cases and to preserve the Debtors' estates. The PCP DIP Lenders have agreed to provide the PCP DIP Facility on the terms set forth in the PCP DIP Term Sheet and the Interim Order, which includes amounts being used in accordance with the Approved Budget. The commencement of these Chapter 11 Cases will place increased demands on the Debtors' liquidity due to, among other things, the costs of administering the Chapter 11 Cases. The relief requested is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtors are denied the proposed interim and final borrowings, including, among other things, frustrating the Debtors' ability to successfully navigate the Chapter 11 Cases.

21.      The proceeds of the PCP DIP Facility and use of Cash Collateral will be used for, *inter alia*, making payments integral to the Debtors' business operations, including funding and honoring the Debtors' lending obligations to their Dealer-Borrower customers, paying administrative expenses associated with these Chapter 11 Cases, and satisfying working capital needs in the ordinary course of business. Moreover, the liquidity to be provided under the PCP

19

DIP Facility, combined with access to existing Cash Collateral, will enable the Debtors to (i) fund their operations during the course of these Chapter 11 Cases including chapter 11 administrative costs, (ii) ensure that value is preserved during the course of the Debtors' Chapter 11 Cases, and (iii) fund value-maximizing transaction(s). The Debtors' advisors, FTI Consulting, Inc. ("**FTI**") and Houlihan Lokey Capital Inc. ("**Houlihan**"), with the assistance of the Debtors' management, have evaluated the Debtors' financing needs and funding alternatives. The Debtors' initial DIP budget is attached as Exhibit B to the Interim Order.

22.     Upon entry of the Interim Order, PCP will use the PCP Cash Collateral in conjunction with the proceeds of the PCP DIP Facility to fund its lending obligations to PCP's Dealer-Borrower customers, pay PCP's share of the administrative expenses (including its share of the professional fees and the costs of these Chapter 11 Cases), and to fund the Debtors' operating expenses.

23.     Upon entry of the Interim Order, GFL will use the GFL Cash Collateral to fund its lending obligations to GFL's Dealer-Borrower customers under their warehouse lines of credit, pay GFL's share of the administrative expenses (including its share of the professional fees and the costs of these Chapter 11 Cases), and to fund the expenses unique to GFL. GFL's initial GFL Cash Collateral budget is attached as Exhibit C to the Interim Order.

24.     PCP and GFL require the use and access to Cash Collateral, together with incremental liquidity under the PCP DIP Facility, to manage their estates during the Chapter 11 Cases—as well as to address unforeseen circumstances and contingencies in the event they might occur. The Debtors' ability to use Cash Collateral and fund their respective lending obligations will not only foster confidence in the market and amongst the customers but will also instill confidence in the vendors and employees.

PL 6496767.6

**B.      The Debtors Have Made Significant Efforts to Secure Postpetition Financing.**

25.      In the months leading up to the Petition Date, the Debtors considered several sources of potential capital to fund these Chapter 11 Cases, including internal sources of cash, existing lenders, potential transaction counterparties, and third parties specializing in providing debtor-in-possession financing. The Debtors and their advisors reached out to various parties to address Debtors' capital needs through the provision of incremental financing.

26.      Economic realities substantially narrow the pool of potential financial partners and the availability of more favorable terms. The Debtors and their advisors' extensive pre-Petition Date efforts did not identify a single financing party that was willing to provide financing to the Debtors on a junior or unsecured basis. The Debtors do not believe they can prime the Prepetition First Lien PCP Lenders without their consent. The Prepetition First Lien PCP Lenders will not consent to priming liens except upon the terms of the PCP DIP Term Sheet. As such, the PCP DIP Borrower submits that the PCP DIP Facility presents the best terms available within the totality of the circumstances of these Chapter 11 Cases.

**C.      The PCP DIP Facility Was Negotiated in Good Faith and at Arm's Length.**

27.      The PCP DIP Borrower and PCP DIP Lenders, each represented by counsel and advisors, engaged in arms'-length negotiations with respect to the terms and conditions of the PCP DIP Facility. The Debtors' management team, legal advisors, and financial advisors were actively involved throughout the negotiations of the PCP DIP Facility, and the terms were vigorously negotiated between the parties. The negotiations have been conducted at arm's length and in good faith. The terms of the PCP DIP Facility, including the rates, fees, waivers, releases, stipulations, and milestones have been negotiated exhaustively. The Debtors have reached an agreement with the PCP DIP Lenders on the most favorable terms available. Ultimately, the PCP DIP Lenders are

21

only willing to lend on terms specifically set forth in the PCP DIP Documents, which the Debtors believe are the best available offer.

28.     The PCP DIP Lenders will not consent to providing postpetition financing without the rates, fees, waivers, releases, stipulations, and milestones contained in the DIP Documents.

29.     Pursuant to the PCP DIP Facility, the PCP DIP Obligor proposes providing priming liens, security interests and super-priority claims that supersede all other security interests, liens, and claims on the PCP DIP Collateral, except for the Carve Out. These are common features of postpetition financing facilities. Given the limited interest from third-party financing providers, these priming liens and super-priority claims are necessary features of the PCP DIP Facility. No third-party lender was willing to provide postpetition DIP financing on an unsecured, *pari passu*, or junior-lien basis.

30.     The PCP DIP Facility also contemplates a roll-up of PCP Prepetition Obligations (the "**Roll-Up**"). The PCP DIP Obligors believe that the Roll-Up is a reasonable concession because (a) the PCP DIP Lenders were unwilling to provide the PCP DIP Facility without the inclusion of the Roll-Up, including upon entry of the Interim Order; and (b) general unsecured creditors or other parties in interest are not prejudiced by the Roll-Up because the PCP Prepetition Obligations that are proposed to be converted are fully secured by perfected, first priority liens. The Roll-Up merely affects the timing, not the amount or certainty, of the PCP DIP Lenders' recovery. Given these circumstances, the Roll-Up feature in the PCP DIP Facility is reasonable and a sound exercise of the Debtors' business judgment.

31.     There are no alternative financing sources available to the PCP DIP Obligors, and PCP has an immediate need to obtain the PCP DIP Facility and to use Cash Collateral to preserve value for their stakeholders and to prevent immediate and irreparable harm to the value of the

PL 6496767.6

Debtors' estates. The PCP DIP Facility, including the Roll-Up, and use of Cash Collateral, is in the best interests of the Debtors and their stakeholders.

**BASIS FOR RELIEF**

**I.      The PCP DIP Borrower Should be Authorized to Obtain Postpetition Financing.**

32.      The PCP DIP Borrower satisfies the requirements for relief under Section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or super-priority financing under certain circumstances. As set out above, the PCP DIP Borrower was unable to procure necessary financing in the form of unsecured credit, which would be allowable under Section 503(b)(1) or as an administrative expense, in accordance with Sections 364(a) or (b) of the Bankruptcy Code. *See* 11 U.S.C. §§ 364(a)–(b). The PCP DIP Borrower negotiated vigorously, and at arm's length with the PCP DIP Lenders to secure the PCP DIP Facility on the terms described herein. For these reasons, as discussed further below, the Debtors satisfy the necessary conditions under Section 364 for authority to enter the PCP DIP Facility.

**A.      Entering the PCP DIP Facility is a Sound Exercise of Business Judgment.**

33.      The Court should authorize the PCP DIP Obligors, in an exercise of its sound business judgment, to enter into the DIP Documents and obtain access to the PCP DIP Facility. If an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their sound business judgment in obtaining postpetition credit. *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.,* No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment).

34.      The Fifth Circuit has described the business judgment standard as a flexible one, which will be satisfied if a debtor articulates a business justification and the decision furthers the

23

interests of the Debtors and other parties in interest. *See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) (in the context of Section 363 of the Bankruptcy Code). To determine whether the business judgment test is met, "the court is required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted). In considering whether the terms of postpetition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.,* 294 B.R. 855, 880 (Bankr. W.D. Mo. 2003).

**B.      The PCP DIP Borrowers Should Be Authorized to Obtain the PCP DIP Facility on a Secured and Super-priority Basis.**

35.      Section 364 of the Bankruptcy Code distinguishes among (i) obtaining unsecured credit in the ordinary course of business, (ii) obtaining unsecured credit out of the ordinary course of business, and (iii) obtaining credit with specialized priority or with security. *See* 11 U.S.C. § 364. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to Section 364(b) of the Bankruptcy Code, a court may authorize a debtor to obtain credit or to incur debt, the repayment of which is entitled to super-priority administrative expense status, or is secured by a senior lien on unencumbered property, or a junior lien on encumbered property, or a combination of the foregoing. *See* 11 U.S.C. § 364. In addition, pursuant to Section 364(d) of the Bankruptcy Code, a court may authorize a debtor to obtain postpetition credit secured by a lien that is equal or senior in priority to existing liens on encumbered property (*i.e.*, a "priming" lien) when a debtor is unable to obtain credit on other terms and the interests of existing lienholders are adequately protected, or if the existing lienholders consent to such priming.

      i.    *The PCP DIP Borrower Satisfies the Condition Under Section 364(c) to Obtain Financing on a Senior Secured and Super-priority Basis.*

36.      If a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, Section 364(c) provides that a court:

> may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

37.      In determining whether to authorize financing under Section 364(c) of the Bankruptcy Code, courts will consider whether (i) the debtor's efforts to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code, (ii) the credit transaction benefits the debtor and is necessary to preserve estate assets, and (iii) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender. *In re Republic Airways Holdings Inc*., No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *In re Ames Dep 't Stores, Inc*., 115 B.R. at 39–40.

38.      *First*, to show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating Section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"). The Debtors have not been able to obtain unsecured credit or alternative DIP financing on better terms than those reflected in the respective PCP DIP Documents, and there are no better offers available to the Debtors

PL 6496767.6

or before the Court at this time. The PCP DIP Documents, including the PCP DIP Term Sheet, are the sole financing proposals allowing the Debtors to continue their going-concern operations for any reasonable period of time after the Petition Date.

39.     *Second*, the PCP DIP Facility is necessary to preserve the Debtors' estates. The DIP Facility has been sized to provide the Debtors with liquidity to continue the operation of their businesses, maintain relationships with clients, and vendors, and satisfy wage and salary obligations their employees, and continue to satisfy other working capital and operational needs during the Chapter 11 Cases.

40.     *Third*, the terms of the PCP DIP Facility are fair, reasonable, and adequate under the circumstances. The PCP DIP Facility provides millions of dollars of new-money financing to ensure that the Debtors can meet all of their lending obligations and maintain their relationships and support of their Dealer-Borrower customers. The terms of the PCP DIP Facility are on terms that are comparable to the Prepetition First Lien PCP Credit Facility and generally consistent with market terms for companies facing similar circumstances as the Debtors.

41.     Considering the foregoing, the Court should authorize the PCP DIP Borrower to provide the PCP DIP Lenders with super-priority administrative expense status in accordance with the PCP DIP Documents, including the PCP DIP Term Sheet, as provided for in Section 364(c)(1) of the Bankruptcy Code.

> ii.     *The DIP Borrowers Should Be Authorized to Obtain Priming Liens Under Section 364(d) of the Bankruptcy Code.*

42.     Section 364(d) provides that debtors may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). To

grant a senior lien on estate property, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders under section 364(d) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37 ("A court, however, may not approve any credit transaction under subsection (c) unless the debtor demonstrates that it has reasonably attempted, but failed, to obtain unsecured credit under sections 364(a) or (b)…Similarly, obtaining credit under section 364(d) may not be authorized if it appears that credit can be obtained under the other subsections of 364.")

43.    PCP may incur "priming" liens under the PCP DIP Facility if it is unable to obtain unsecured or junior secured credit and either (a) the affected secured lenders consent, or (b) adequate protection exists for such priming lien. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

PL 6496767.6

44.    When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by Section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtors' assets. Courts consider several factors, including, without limitation:

- whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s);

- whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

- whether the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003); *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (15th ed. rev. 2008).

45.    The PCP DIP Borrower submits that the priming of the Prepetition PCP First Liens by the PCP DIP Liens of the PCP DIP Facility should be approved by the Court. *First*, the DIP Obligors were unable to find alternative financing that preserved the Debtors as going-concern operations. No potential financing party was willing to provide the Debtors with unsecured or junior secured financing. The Debtors have no pool of unencumbered assets sufficient to attract potential financing counterparties. No counterparty was willing to assume the risk of extending credit on an unsecured or junior secured basis given the existing capital structure. The PCP DIP Lenders were not willing to extend new capital absent being provided priming liens on the PCP DIP Collateral.

46.    *Second*, the PCP DIP Facility is necessary to preserve the Debtors' estates and continued operations. Inability to access the PCP DIP Facility and Cash Collateral will negatively impact the Debtors' ability to continue servicing its loans to the Dealer-Borrowers, and ultimately the Dealer-Borrowers' ability to collect and service their respective RISCs, thereby destroying value.

47.    *Third*, the terms of the PCP DIP Facility are reasonable under the circumstances, and provide for financing on terms that are comparable to other DIP financings and generally consistent with market terms for companies facing similar circumstances as the Debtors.

48.    *Fourth*, the PCP DIP Facility was negotiated at arm's length and in good faith. The terms of the PCP DIP Facility is the result of a thorough prepetition marketing process under the circumstances and reflect a sound exercise of the Debtors' business judgment.

49.    *Last*, PCP is offering the Prepetition First Lien PCP Lenders adequate protection in the form of replacement liens on assets of the PCP DIP Borrower (subject and subordinate to the Carve Out and the PCP DIP Liens) plus cash payments equal to interest accrued as detailed in the DIP Documents, including the PCP DIP Term Sheet. Moreover, they consent to the priming liens.

**C.    The Scope of the Carve Out Is Appropriate.**

50.    The DIP Liens and the DIP Superpriority Claims, and the adequate protection claims and adequate protection liens are subject to the Carve-Out. Without the Carve-Out, the Debtors' estates or other parties in interest could be harmed because the services that professionals might otherwise provide in these Chapter 11 Cases could be significantly restricted. *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against

PL 6496767.6

administrative insolvency during the pendency of the Chapter 11 Cases by ensuring that funds are available to pay U.S. Trustee's fees and professional fees of the Debtors and Creditors' Committee.

### D.   The Repayment Features of the PCP DIP Facility Are Appropriate.

51.   Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). To do so, "the debtor must articulate some business justification, other than the mere appeasement of major creditors." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting that Section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification); *see also In re Equalnet Commc'ns Corp*., 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation). In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty… to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (internal citation omitted).

52.   Repayment of prepetition debt, often referred to as a "roll-up", is a common feature in debtor in possession financing arrangements. Courts in this Circuit have approved similar DIP features, including on the first day of the case. *See, e.g.*, *TGI Friday's Inc.*, Case No. 24-80069 (SGJ) (Bankr. N.D. Tex November 4, 2024) [Dkt. 61 and 291] (authorizing incurrence of $25.257 million in DIP financing, with a first-day roll-up of $3.3 million on an interim basis and an additional $14.80 million roll-up on a final basis, compared to a total new money advance of $7.175 million); *In re Buca Texas Restaurants, L.P.*, Case No. 24-80058 (SGJ) (Bankr. N.D. Tex

PL 6496767.6

Aug. 29, 2024) [Dkt. 206] (authorizing $12.1 million in new money DIP financing plus $24.2 million roll up); *In re Studio Movie Grill Holdings, LLC*, Case No. 20-32633 (SGJ) (Bankr. N.D. Tex. Oct. 27, 2020) [Dkt. 52] (authorizing DIP advance in interim order in order to repay prepetition loan obligations); *In re Ebix, Inc*., Case No. 23-80004 (SWE) (Bankr. N.D. Tex. Jan. 26, 2024) [Docket No. 255] (final DIP order approving roll-up); *In re Rockall Energy Holdings, LLC*, Case No. 22-90000 (MXM) (Bankr. N.D. Tex May 3, 2022) [Dkt. 408] (authorizing $17 million in new money DIP financing plus a $34 million roll up); *In re Fresh Acquisitions, LLC*, Case No. 21-30721 (SGJ) (Bankr. N.D. Tex. May 14, 2021) [Dkt. 157] (authorizing incurrence of $3.0 million in new money DIP financing plus a $500,000 roll-up on a final basis); *In re CiCi's Holdings, Inc*., Case No. 21-30146 (SGJ) (Bankr. N.D. Tex. Jan. 27, 2021 and Feb. 18, 2021) [Dkt. 51 and 130] (authorizing incurrence of $9.0 million in DIP financing, with a first-day "baby roll-up" of $500,000 on an interim basis and a total $6.0 million roll-up on a final basis); *In re ATP Oil & Gas Corp.*, No. 12-36187 (Bankr. S.D. Tex. Sept. 21, 2012) [Dkt. 440] (authorizing refinancing of $367,600,000 plus accrued and unpaid interest under the postpetition facility); *In re Reddy Ice Holdings, Inc*., No. 12-32349 (SGJ) (Bankr. N.D. Tex. May 4, 2012) [Docket No. 249] (authorizing $70,000,000 in DIP financing that included the roll up of prepetition debt).

53.     Here, as it relates to the PCP DIP Facility, the roll-up of funds as set forth in the Interim Order and as contemplated by the Final Order, is a sound exercise of the Debtors' business judgment, is a material component of the PCP DIP Facility, and is required by the PCP DIP Lenders as a condition to their commitment to provide postpetition financing.

54.     The roll-up of the prepetition amounts owed to the PCP DIP Lenders merely accelerates the satisfaction of the prepetition obligations owed to the DIP Lenders without affecting recovery to other creditors, because the Debtors believe that the amount of these rolled-

PL 6496767.6

up obligations are fully secured by perfected, first priority liens, and the refinancing is otherwise

justified by the facts and the terms of the PCP DIP Facility (as reflected in the Interim Order).

**E.      The DIP Borrowers Should Be Authorized to Pay Fees Required by DIP Documents.**

55.      The PCP DIP Obligors have agreed to pay certain interest and fees in connection with

the PCP DIP Facility, which are integral to the financing package. The terms of the PCP DIP Facility,

including the fees and other economic terms of the PCP DIP Facility, were all negotiated at arm's

length. Under the circumstances, the terms of the PCP DIP Facility, which include the fees payable

in connection therewith, are the most favorable terms the Debtors can obtain. Furthermore, the

Debtors submit that the interest payments and fees required by the PCP DIP Facility are reasonable,

comparable to other debtor-in-possession financings, and generally consistent with market terms

for companies facing similar circumstances as the Debtors. The Debtors believe that under these

circumstances, authorization to pay the fees is warranted.

**F.      The PCP DIP Lenders Should Each Be Deemed a Good Faith Lender under Section 364(e).**

56.      Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to

collect on loans extended to a debtor, and its rights with respect to liens securing those loans, even

if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified

on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

PL 6496767.6

57. The Debtors are prepared to carry their burden that negotiations of the PCP DIP Facility was conducted in good faith and at arm's length. The proceeds of the PCP DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Accordingly, the Court should find that the DIP Lenders are each a "good faith" lender within the meaning of Section 364(e) of the Bankruptcy Code and therefore entitled to all the protections afforded by that section.

## II.    The Debtors Should Be Authorized to Use Cash Collateral.

58. The Debtors' use of property of their estates, including the respective Cash Collateral, is governed by Section 363 of the Bankruptcy Code, which provides:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A)    each entity that has an interest in such cash collateral consents; or
>
> (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2)).

59. Here, with respect to the PCP Cash Collateral, the Debtors' have satisfied the standards of Section 363(c)(2) of the Bankruptcy Code because the Prepetition First Lien PCP Lenders consent to the use of their respective Cash Collateral pursuant to the terms of the PCP DIP Term Sheet and the Interim Order.

60. With respect to the GFL Cash Collateral, the Debtors satisfy Section 363(c)(2) of the Bankruptcy Code because ANB is adequately protected. "On request of an entity that has an interest in property used, sold, or leased . . .by the [debtor in possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

61. The Bankruptcy Code does not define adequate protection. *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). Rather, section 361 provides a list of

nonexclusive examples—providing a lump sum cash payment or periodic cash payments to the entity asserting an interest in the collateral, providing such entity with an additional or replacement lien to the extent of diminution in value, and granting such other relief "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." *See* 11 U.S.C. § 361. As the Supreme Court has explained, adequate protection exists to protect a creditor's interest in collateral from diminution value while the property is being used or retained in a bankruptcy case. *See United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365 (1988). The concept is derived from the Fifth Amendment's protection of property interest. *See Wright v. Union Central Life Ins. Co.*, 311 U.S. 273 (1940); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935). Adequate protection is the counter-balance to the Bankruptcy Code's automatic stay and provides creditors with protection of their collateral while they are prohibited from exercising rights they otherwise have outside of bankruptcy.

62. Because adequate protection protects a creditor's interest in collateral for *postpetition* use, the inquiry for evaluation of the sufficiency of adequate protection includes: (1) what is the creditor's interest, (2) what is the value of that interest (i.e., the value of the collateral), and (3) what, if any diminution in value is occurring during the pendency of the use. *See In re Gallegos Research Group, Corp.*, 193 B.R. 577, 584 (Bankr. D. Colo. 1995) ("Therefore, to determine whether an entity is entitled to adequate protection and the type and the amount of adequate protection required, a court must determine the value of the collateral, the creditor's interest in the collateral and the extent to which that value will decrease during the course of the bankruptcy case."). Where a debtor desires to use cash collateral, a court must determine the value of the creditor's interest in the cash collateral and whether the debtor's proposed use of cash collateral would impair that interest, and to what extent adequate protection is required. *Id.*; *see*

34

*also Martin v. U.S. Commodity Credit Corp. (In re Martin)*, 761 F.2d 472, 476-77 (8th Cir. 1985);

*In re Dynaco Corp.*, 162 B.R. 389 (Bankr. D.N.H. 1993); *In re Weiser*, 74 B.R. 111, 115 (Bankr.

S.D. Iowa 1986).

63.    Here, as an initial matter, the proposed use of the GFL Cash Collateral is necessary

to stabilize and maintain operations and avoid immediate and irreparable harm. Specifically, as

detailed above and as detailed more thoroughly in the First Day Declaration, GFL makes floorplan

revolving lines of credit to Dealer-Borrower clients to finance their purchase of vehicles and

inventory. GFL must use the GFL Cash Collateral to, among other things, fund the revolving lines,

manage, maintain, and service the lending arrangements, pay employees who are essential to

maintaining a going concern, and pay ordinary course operating expenses necessary to support

operations. Any interruptions or delays in the same could have catastrophic consequences for the

value of ANB's collateral. If Dealer-Borrower clients cannot draw on their lines to purchase

vehicles and inventory, they must find alternative financing quickly or be forced to liquidate

because they will be unable to procure inventory to sell to their own customers. As such, ANB is

adequately protected by use of cash because it preserves and protects the value of their collateral.

64.    ANB is also adequately protected because this Motion seeks authorizing GFL to

grant to ANB, notwithstanding Section 552 of the Bankruptcy Code, as adequate protection of its

interest in the Prepetition GFL Collateral, valid, enforceable, non-avoidable, and automatically

and fully perfected security interests and replacement liens on all future acquired property and

interests of any nature whatsoever, real and personal, tangible and intangible, cash, accounts

receivable, general intangibles, payment intangibles, supporting obligations, investment property,

commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock,

loans, chattel paper, documents, instruments, deposit accounts, contract rights, equity interests,

PL 6496767.6

any tax refunds of GFL (the "**Postpetition GFL Collateral**"), solely to the extent of any Diminution of ANB's interest in the Prepetition GFL Collateral, subject and subordinate to the Carve-Out.

### III.    Modification of the Automatic Stay Is Warranted.

65.    The relief requested herein contemplates a modification of the automatic stay to the extent necessary to permit the PCP DIP Lenders to exercise their respective rights and remedies, and to take certain actions without further order of or application to the Court, upon the occurrence of a DIP Termination Event (as defined in the Interim Order). Upon the occurrence of a DIP Termination Event, the PCP DIP Lenders may, as applicable: (i) deliver a written notice (which may be via email) to counsel for the Debtors, the U.S. Trustee, and counsel for the Creditors' Committee (the "**Remedies Notice**") declaring the occurrence of a DIP Termination Event (such date, the "**DIP Termination Declaration Date**") and deliver a Carve Out Trigger Notice; (ii) declare the termination, reduction or restriction of any commitments under the PCP DIP Facility to the extent any such commitment remains; (iii) declare all respective PCP DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors; (iv) declare the termination, restriction or reduction of the PCP DIP Facility and the PCP DIP Documents as to any further liability or obligation thereunder, but without affecting the respective PCP DIP Liens, the respective PCP DIP Superpriority Claims, or the respective PCP DIP Obligations; (v) charge default interest at the default rate set forth herein; and (vi) declare the termination, restriction, or revocation of the ability of the respective Debtors to use respective Cash Collateral.

66.    These provisions were part of the negotiations over the terms and conditions of the PCP DIP Facility and use of Cash Collateral. The exercise of remedies, including remedies with

PL 6496767.6

respect to prepetition claims and collateral, will be subject to seven (7) days' notice (or otherwise extended by the Court) to allow the Debtors to seek relief if necessary. Under these circumstances, the Debtors believe that the modifications to the automatic stay under the Interim Order are reasonable under the circumstances and should be approved.

### IV.   Immediate Access to Cash Collateral and the PCP DIP Facility Should Be Approved.

67.     The Court may grant interim relief in respect of a motion filed pursuant to Section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions. *See In re Ames Dep't Stores*, 115 B.R. at 40.

68.     As set forth in the First Day Declaration, the Debtors have an immediate need for additional liquidity through the PCP DIP Facility and continued access to Cash Collateral in order to continue the operation of their business, maintain relationships with customers and vendors, and satisfy wage and salary obligations, and continue to satisfy other working capital and operational needs during the Chapter 11 Cases. Approval of the PCP DIP Facility will not only provide essential funding, but should provide the Debtors with sufficient liquidity to execute transactions to maximize value of the Debtors' assets to the benefit of all key stakeholders and creditors by preserving the Debtors' going-concern value. Accordingly, the Debtors request the Court grant the interim relief requested herein to be effective immediately.

## IMMEDIATE RELIEF

69.     Federal Rule of Bankruptcy Procedure 6003(b) empowers the Court to grant relief within the first twenty-one (21) days after the Petition Date if the "relief is necessary to avoid

PL 6496767.6

immediate and irreparable harm." Fed. R. Bankr. P. 6003(b). Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990)(discussing the elements of "immediate and irreparable harm" in relation to Federal Rule of Bankruptcy Procedure 4001). For the reasons described above and in the *First Day Declaration*, the relief requested is necessary for the Debtors to operate their businesses in the ordinary course and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors believe that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS

70.     The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors' ongoing operations and value-maximizing process. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14)-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## RESERVATION OF RIGHTS

71.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (i) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (ii) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (iii) a promise or requirement to pay any claim; (iv) an implication or admission that any

particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (v) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to Section 365 of the Bankruptcy Code; (vi) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (vii) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (viii) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the requested relief, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## EMERGENCY CONSIDERATION

72.     Pursuant to the N.D. Tex. L.B.R. and Complex Case Procedures, the Debtors request emergency consideration of this Motion. The Debtors submit that emergency relief in connection with this Motion is essential to the success of these chapter 11 cases. As discussed herein, and in the *First Day Declaration*, any delay in granting the relief requested could hinder the ultimate success of the Debtors' chapter 11 cases, and significantly impact the Debtors' ability to move forward in this case and pursue a value-maximizing process. Consequently, the Debtors have met the "immediate and irreparable harm standard," and emergency consideration is not only warranted, by necessary to avoid immediate and irreparable harm.

PL 6496767.6

## NOTICE

73.     Notice of this Application shall be given to (i) the Office of the United States Trustee for the Northern District of Texas; (ii) the Debtors' collective thirty largest unsecured creditors on a consolidated basis; (iii) CIBC Bank USA, administrative agent under PrimaLend Capital Partners, LP's *Amended and Restated Credit Agreement*; (iv) Hinshaw & Culbertson LLP, as counsel to the administrative agent under PrimaLend Capital Partners, LP's *Amended and Restated Credit Agreement*; (v) Amarillo National Bank, prepetition secured lender of Good Floor Loans LLC; (vi) Mullin Hoard & Brown, counsel to Amarillo National Bank; (vii) the United States Trustee's Office for the Region 6; (viii) the Internal Revenue Services; and (ix) any other party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service. Due to the nature of the relief requested herein, the Debtors submit that no other or further notice need be provided.

## NO PREVIOUS REQUEST

74.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors request entry of the Interim Order and substantially in the form attached hereto granting the relief requested herein and granting such other relief as is just and proper.

*[Remainder of Page Intentionally Left Blank]*

40

Dated: October 22, 2025.

Respectfully submitted,

*/s/ Jason P. Kathman*
Jason P. Kathman (Texas Bar No. 24070036)
Laurie N. Patton (Texas Bar No. 24078158)
Alex Anderson (Texas Bar No. 24138084)
**SPENCER FANE LLP**
5700 Granite Parkway, Suite 650
Plano, TX 75024
(972) 324-0300 – Telephone
(972) 324-0301 – Facsimile
Email:  jkathman@spencerfane.com
          lpatton@spencerfane.com
          alanderson@spencerfane.com

-and-

Zachary R.G. Fairlie (*Pro Hac Vice* Pending)
**SPENCER FANE LLP**
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
Email: zfairlie@spencerfane.com

**PROPOSED COUNSEL FOR DEBTORS
AND DEBTORS-IN-POSSESSION**

PL 6496767.6