Office of the United States Trustee
1100 Commerce Street, Room 976
Dallas, Texas 75242
(214) 767-8967

Susan Hersh
for the United States Trustee
SBOT: 09543925
susan.hersh@usdoj.gov

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

In re:

|  |  |  |
|---|---|---|
| | § | |
| **PRIMALEND CAPITAL PARTNERS, LP, et al,** | § | **Case No. 25-41886-mxm-11 (v)** |
| *Debtors-in-Possession*. | § | |
| | § | |

**UNITED STATES TRUSTEE'S OBJECTION TO (I) FINAL APPROVAL OF AMENDED DISCLOSURE STATEMENT FOR AMENDED JOINT PLAN OF REORGANIZATION OF PRIMALEND CAPITAL PARTNERS, LP. *et al* , AND (II) CONFIRMATION OF AMENDED JOINT PLAN OF REORGANIZATION OF PRIMALEND CAPITAL PARTNERS, LP. *et al***
(related to Dkt. Nos. 288 and 289)

TO THE HONORABLE MARK X. MULLIN, UNITED STATES BANKRUPTCY JUDGE:

Lisa L. Lambert, the United States Trustee for Region 6 (the "**United States Trustee**"), submits this Objection (the "Objection") to (i) final approval of Amended Disclosure Statement [Dkt. 289] ("**Amended Disclosure Statement**") for the Amended Joint Plan of Reorganization [Dkt. 288] ("**Amended Plan**") of PrimaLend Capital Partners, LP, *et al*, (the "**Debtor**") and (ii) confirmation of the Amended Plan and, in support thereof, respectfully show as follows:

### Summary

The Amended Plan contains Third-Party Releases to effectuate Mutual Creditor Releases[1] between two non-debtor groups of creditors. These Mutual Creditor Releases are nonconsensual

---

[1] As set forth in Section 11.4 of the Amended Plan between two creditor groups --the PCAP Noteholder Mutual Release Parties and the PCP Lender Mutual Release Parties.

Confirmation Objection of United States Trustee – Page 1

because they rely on an opt-out mechanism to establish consent, but which is not sufficient to convey knowing and voluntary consent. Additionally, the Amended Plan contains impermissible injunction and gatekeeping provisions and exculpations.  Specifically, the United States Trustee objects for the following reasons:

a. The Amended Plan imposes nonconsensual releases of non-debtor third parties by non-debtor third parties that are not authorized by the United States Bankruptcy Code;

b. The Solicitation Procedures -- to the extent that they provide, for Class 3 and 7 members, that parties who **do not affirmatively opt out of the releases (and even those who do affirmatively opt out of the release, but otherwise vote to accept the plan) --**are deemed to be bound by the Mutual Creditor Releases (which are Third-Party Releases[2])—are ineffective to confer affirmative consent to the Mutual Creditor Releases;

c. The Amended Plan violates the Bankruptcy Code by imposing a sweeping injunction to enforce the exculpation provision;

d. The Amended Plan includes a gatekeeper provision that exceeds the Court's authority and jurisdiction and the limits of Fifth Circuit precedent; and

e. The Amended Plan includes parties as Exculpated Professionals that contravenes binding Fifth Circuit authority.

## Factual Background

**A. Procedural History**

1.      The Debtors filed their Chapter 11 cases on October 12, 2025.

2.      On December 8, 2025, the Debtors filed their original plan [Dkt. 168] and their original disclosure statement [Dkt. 169].

3.      On December 9, 2025, the Debtors moved for conditional approval of the disclosure statement and approval of solicitation procedures and confirmation related deadlines [Dkt. 171].

---

[2] For the purposes of this Objection, the term "Mutual Party Release" or "Third-Party Release" refers to the Mutual Creditor Releases set forth in Section 11.4 of the Amended Plan and the terms are used interchangeably herein.

4.      On January 5, 2026, the Debtors filed their Amended Plan and their Amended Disclosure Statement.

5.      On January 8, 2026, the Court entered its Order (I) Conditionally Approving the Disclosure Statement; (II) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing; (III) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures; (IV) Approving the Solicitation and Notice Procedures: and (V) Granting Related Relief [Dkt. 304] ("**Disclosure Statement Order**").

6.      On February 2, 2026, the Debtors filed their Plan Supplement.

7.      Pursuant to the Disclosure Statement Order, the confirmation hearing is scheduled for February 20, 2026.  The Confirmation Objection Deadline is February 9, 2026.

**B.  Mutual Creditor Release Provisions of Section 11.4**

8.      The Amended Plan imposes improper non-consensual Third-Party Releases between two creditor groups - (the PCAP Noteholders and the PCP Lenders- by defaulting these creditors into a new defined group, "Mutual Release Parties." The provisions creating the new Mutual Release Parties grouping are buried within the the Amended Plan's definition section.[3]

9.      These definitions both purport to bind certain creditors as Mutual Release Parties if they "(i) …vote to accept the Plan, (ii) … [if their] vote to accept or reject the Plan is solicited but that [they] do not vote to accept or reject the Plan, (iii) … [they] vote, or are deemed, to reject the Plan but do not opt out of granting releases set forth in the Plan, and (iv) …were given the opportunity to opt out of granting the releases set forth in the Plan but did not opt out."

---

[3] Section 2.2.116 defines the PCAP Noteholder Mutual Release Parties, *Amended Plan*, p.12. Section 2.2.127 defines the PCP Lender Mutual Release Parties, *Amended Plan*, p. 13.

10.     Under the Amended Plan, a creditor who is a PCAP Noteholder will be among the PCAP Noteholder Mutual Release Parties under the circumstances described in the definition in Section 2.2.116 of the Amended Plan.[4]

11.     Under the Amended Plan, a creditor who is a PCP Lender will be among PCP Lender Mutual Release Parties under the circumstances described in the definition in Section 2.2.127 of the Amended Plan.[5].

12.     Per the Amended Plan, the PCP Lenders are Class 3 Creditors and the PCAP Noteholders are Class 7 Creditors.  On their respective ballots, above the "opt out box," the text of the Section 11.4 Mutual Release paragraphs is included along with a paragraph reciting the circumstances under which the creditor will be "deemed to consent to the releases."

---

[4]

2.2.116     PCAP Noteholder Mutual Release Parties: Collectively, and in each case, solely in their capacities as such, (i) the holders of PCAP Unsecured Notes that vote to accept the Plan, (ii) the holders of PCAP Unsecured Notes whose vote to accept or reject the Plan is solicited but that do not vote to accept or reject the Plan, (iii) the holders of PCAP Unsecured Notes that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth in the Plan, and (iv) the holders of PCAP Unsecured Notes that were given the opportunity to opt out of granting the releases set forth in the Plan but did not opt out.

[5]

2.2.127     PCP Lender Mutual Release Parties: Collectively, and in each case, solely in their capacities as such, (i) First Lien PCP Lenders that vote to accept the Plan, (ii) First Lien PCP Lenders whose vote to accept or reject the Plan is solicited but that do not vote to accept or reject the Plan, (iii) First Lien PCP Lenders that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth in the Plan, and (iv) First Lien PCP Lenders that were given the opportunity to opt out of granting the releases set forth in the Plan but did not opt out.

13.     Pursuant to the Amended Plan, a Class 3 or Class 7 creditor who votes to accept the plan will be "deemed" to have consented to the release ---even if they check the "opt out box".

**C. Injunction/Gatekeeping Provisions of Section 11.6**

14.     As defined in the Amended Plan, the "Released Parties,[6]" are

(a) The Debtors;
(b) Wind Down Administrator
(c) The DIP Agent and each DIP Lender
(d) The First Lien PCP Agent and each First Lien PCP Lender
(e) The Committee and each member of the Committee (solely in their capacity as such)
(f) The Independent Manager and any Professional Retained by the Independent Manager
(g) Tanya Meerovich, in her capacity as Chief Restructuring Officer, or any successor
(h) Any Professional retained by the Debtors, or the Committee by order of the Bankruptcy Court in the Chapter 11 cases
(i) Each Related Party[7] of each Person or Entity in clauses (c) through (i) above
(j) (per the footnote) possible additional parties including officers, directors, employees of the Debtors.

*Amended Plan, Section 2.2.153* [Dkt. 288].

15.     As defined in the Amended Plan, "Released Parties" are unidentifiable.    The definition of "Related Parties" includes (i) several groups of persons or entities not specifically named (ii) "Related Parties" to those otherwise categorized (but which includes large groups of

---

[6] "Released Parties:  Each of the following solely in its capacity as such: (a) the Debtors; (b) Wind Down Administrator; (c) the DIP Agent and each DIP Lender; (d) the First Lien PCP Agent and each First Lien PCP Lender; (e) the Committee and each member of the Committee, solely in their capacity as such; (f) all holders of PCAP Unsecured Notes, solely in their capacity as such; (g) the Independent Manager and any Professional retained by the Independent Manager; (h) Tanya Meerovich, in her capacity as Chief Restructuring Officer, or any successor to such position; (i) any Professional retained by the Debtors, or the Committee by order of the Bankruptcy Court in the Chapter 11 Cases; and (j) each Related Party of each Person or Entity in clauses (c) through (i). " *See Section 2.2.153 of the Amended Plan.* [Dkt. 288].

[7] "Related Parties: With respect to any Person or Entity, such Person's or Entity's current or former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, and assigns, subsidiaries, Affiliates, managed accounts or funds, and each of their respective current and former equity holders, directors, managers, owners, principals, shareholders, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, investment bankers, consultants, representatives, other professionals and the respective successors and assigns thereof" *See Section 2.2.152 of the Amended Plan.* [Dkt. 288].

wholly unidentified persons and entities) and (iii) some unidentified persons who may be named later.  No additional information on the Released Parties is set forth in the Amended Plan.

The Section 11.6Injunction Provision[8]tion imposes a permanent injunction to effectuate the Amended Plan's releases and exculpations.  Section 11.6 seeks to enjoin all 'entities' and 'persons' from commencing or pursuing any claim or cause of action against a Released Party- and, in addition,  sets up a gatekeeping function for the Bankruptcy Court prior to any action being brought against a Released Party.

### D.  Exculpation Provision of Section 11.5

---

[8] 11.6 Injunction. Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released pursuant to Section 11.3, discharged pursuant to Section 11.1, or are subject to exculpation pursuant to Section 11.5, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind Down Estates, the Released Parties, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property, or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; or (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action. Notwithstanding anything to the contrary in the foregoing, this injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action in the Bankruptcy Court to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan. Subject in all respects to Article XI, no entity or person may commence or pursue a Claim or Cause of Action of any kind against any Released Party or Exculpated Party that arose or arises from, in whole or in part, the Chapter 11 Cases, the Debtors, the Plan, the Plan Supplement, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim or Cause of Action of any kind, including negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Released Party or Exculpated Party and (ii) specifically authorizing such entity or person to bring such Claim or Cause of Action against any such Released Party or Exculpated Party. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible and as provided for in Article XI, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action. *See Section11.6 of the Amended Plan*. [Dkt. 288].

16.    Additionally, Amended Plan Section 11.5 exculpates the Exculpated Parties, who, in turn, are defined as Exculpated Fiduciaries which are (i) the Debtors, (ii) Wind Down Administrator, (iii) The Committee and each of its members in their capacity as such, and (iv) the Independent Manager. *See Amended Plan, Sections 2.2.69 and 2.2.70.*

17.    As defined in the Amended Plan, the Wind Down Administrator is the "Person or Persons identified in the Plan Supplement, if known, and appointed on the Effective Date, who will serve as the trustee and administrator overseeing the Wind Down Estates and dissolution of the Debtors and their Estates in accordance with the Plan." *See Amended Plan, Section 2.2.167.* As such, the Wind Down Administrator is appointed on the Effective Date and has no role prior to confirmation or the Effective Date.

## Argument and Authority

**A.    Objection No. 1 – The Amended Plan contains impermissible Non-consensual Third-Party Releases**

18.    The Amended Plan must be fair to all creditors and comply with the Bankruptcy Code and applicable law.  The Amended Plan is unconfirmable because it imposes ***non-consensual*** third-party releases in violation of the express ruling of the Supreme Court in *Harrington v. Purdue Pharma L.P.,* 144 S. Ct. 2071, 2082-88 (2024).[9]

19.    The Mutual Creditor Releases force Class 3 and 7 creditors to mutually release each other unless they (a) timely execute an opt-out and (b) either vote to reject the Amended Plan or do not vote.

---

[9] The United States Trustee files this objection to further preserve her appellate rights. The Office of the U.S Trustee has appealed a confirmation order, which used "opt outs," in *The Container Store Group, Inc.* (Case No. 24-90627).  That appeal is before the United States District Court for the Southern District of Texas in Case No. 25-00618.

20.     A Class 3 or 7 creditor who votes to accept the Amended Plan may not opt-out even
if that creditor timely executed an opt-out. Per their respective definitions of the PCAP Noteholder
Mutual Release Party and PCP Lender Mutual Release Party,[10] if a creditor executes an opt-out but
votes to accept the Plan, they will be "deemed" to have consented to their release of other non-debtor
parties. ***Forcing a party to release claims –when they have elected to opt-out, but voted to accept
the plan—clearly cannot be construed as consenting to the release.***

21.     The United States Trustee opposes the use of the opt-out mechanism in the Amended
Plan because it does not satisfy the requirements to establish actual consent as defined under
applicable state law. Absent voluntary and knowing consent, the Amended Plan's Mutual Creditor
Releases are improper and render the Amended Plan unconfirmable. *Harrington v. Purdue Pharma
L.P.,* 144 S. Ct. 2071, 2082-88 (2024).

### The Bankruptcy Code Does Not Authorize Nonconsensual Third-Party Releases

22.     The Supreme Court has definitively held that non-consensual third-party releases are
not authorized under the Bankruptcy Code. *Harrington v. Purdue Pharma L.P.,* 603 U.S.204, 144
S. Ct. 2071, 2082-88 (2024) ("*Purdue*"). This has long been the conclusion held by the Fifth Circuit
Court of Appeals. *See Bank of N.Y. Trust Co. v. Off'l Unsecured Creditors' Comm. (In re Pacific
Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009) (observing that prior Fifth Circuit authority "seem
broadly to foreclose ***non-consensual*** non-debtor releases and permanent injunctions") ("*Pacific
Lumber*")(emphasis added).

23.     The Supreme Court in *Purdue* did not address whether ***consensual*** non-debtor
releases can be included in a chapter 11 plan and confirmation order. As set forth below, the opt-

---

[10] Sections 2.2.116 and 2.2.127, respectively, of the Amended Plan.

out mechanism of the Amended Plan cannot be a substitute for the affirmative consent required by state law.

### *State Contract Law Applies, Not Federal Law*

24.     The foundation of a consensual release is an agreement between the parties. Whether non-debtor parties have reached an agreement—including an agreement to release one's claims against another (i.e., not to sue)—is governed by state law.  The only exception is if there is federal law that preempts applicable state contract law in some specific context.  *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)).

25.     No such exception applies here. The Bankruptcy Code does not define a "consensual release." It contains no provision that addresses how to determine whether one non-debtor has agreed to extinguish its direct claims against another non-debtor. And no Bankruptcy Code provision authorizes courts, as part of an order confirming a chapter 11 plan or otherwise, to "deem" a non-debtor to have consented to an agreement to release claims against other non-debtors where such consent would not otherwise be found to exist as a matter of state law.

26.     Nor does 11 U.S.C. § 105(a) itself confer any power to override state law.  Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 144 S. Ct. at 2082 n.2 (quotation marks omitted).  Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity."  *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted).  Accordingly, any authority to include third-party releases in a plan must

derive from some other source of law. Thus, the Bankruptcy Code does not change the state-law

definition of consent as applicable to claims among non-debtor parties.[11]

27.     As courts have recognized, because the Bankruptcy Code does not govern

relationships between claim holders and non-debtor third-parties, state-law contract principles serve

as controlling authority when considering whether a release is consensual.  *See, e.g.*, *Patterson v.*

*Mahwah Bergen Retail Grp., Inc.,* 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy

courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the

bankruptcy court's confirmation authority to conclude that the validity of the releases requires

affirmative consent"); *Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938, at *11 (Bankr. D. Del.

Sept. 25, 2024) (recognizing that "some sort of affirmative expression of consent that would be

sufficient as a matter of contract law" is required); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr.

S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents

to a third-party release."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506, 507 (Bankr. D.N.J. 1997)

(explaining that a third-party release "is no different from any other settlement or contract" and thus

"the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law

rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted)

(alterations in original).  As one court recently held, because "'nothing in the bankruptcy code

---

[11] Indeed, even as to a debtor, it is well settled that whether parties have entered a valid settlement agreement is governed by state law.  *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").  That is because "the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (quotation marks omitted); *Butner v. United States*, 440 U.S. 48 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

contemplates (much less authorizes it)' . . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp*., 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 144 S. Ct. at 2086). Accordingly, "any such consensual agreement would be governed by state law." *Id.*

28.     Here, the Debtors will be unable to meet their burden of establishing that the releasing parties have affirmatively agreed to release their property rights in a manner sufficient to demonstrate consent under state law.

### *Under State Law, Silence Is Not Acceptance*

29.     The "general rule of contracts is that silence cannot manifest consent." *Patterson*, 636 B.R. at 686; see also, e.g., *McGurn v. Bell Microproducts, Inc*., 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer"). Moreover, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981); accord 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.); *Reichert v. Rapid Investments, Inc*., 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance."). Instead, under state law, an agreement to release claims—like any other contract—generally requires a manifestation of assent to that agreement. See, e.g., RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration."). Consent cannot be imputed or "deemed" based on a party's failure to object—rather, consent must be affirmatively shown to exist. See, e.g., id.; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

30.     There are only very limited exceptions to this principle. "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered

benefits, and those where one party relies on the other party's manifestation of intention that silence

may operate as acceptance.  Even in those cases the contract may be unenforceable under the Statute

of Frauds."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  But absent such

extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's

freedom of action or inaction or impose on him any duty to speak."  *Id.*  And "[t]he mere fact that

an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege

to remain silent without accepting."  *Id.* § 69, cmt. c; *see also Patterson*, 636 B.R. at 686 (explaining

how contract law does not support deeming consent based upon a failure to opt out).

31.     Both New York and Texas common law, as a point of reference, are in accord.[12]  *See,*

*e.g.*, *Advantage Physical Therapy v. Cruse*, 165 S.W.3d 21 (Tex. App. 2005) (quoting Restatement

(Second) of Contracts § 69 (1981)); *See, e.g., Hornberger Mgmt. Co. v. Haws & Tingle Gen.*

*Contractors*, Inc., 768 A.2d 983, 991 (Del. Super. Ct. 2000) (quoting Restatement (Second) of

Contracts § 69 (1981))].  Absent limited exceptions not triggered here, silence and inaction are not

assent to an offer.  See *Texas Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.*, 52

S.W.3d 128, 131-33 (Tex. 2000) (quoting 2 Williston on Contracts § 6:49 (4th ed. 1991)**.** *See also*

*Urban Green Techs., LLC v. Sustainable Strategies*, 2050 LLC, No. N136-12-115, 2017 WL

527565, at *3 (Del. Super. Ct. Feb. 8, 2017).

32.     As the Fifth Circuit explained: "Tacit acquiescence between relative strangers

ignores the basic tenets of contract law. . . .  While there may be exceptions in cases involving parties

with longstanding relationships, generally speaking, 'silence or inaction does not constitute

---

[12]Ordinary choice of law principles govern which state's law applies to contracts between non-debtors, although
a choice of law analysis may not be necessary absent any assertion that there is a difference in potentially applicable
state laws governing what constitutes consent.  *See Smallhold*, 2024 WL 4296938, at *13 n.57.

acceptance of an offer.'"  *Imperial Ind. Supply Co v. Thomas*, 825 F. App'x 204, 207 (5th Cir. Sept. 2, 2020) (quoting *Norcia v. Samsung Telecomms Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017)).

33.     No exception to the rule -- that silence cannot be equated to consent -- applies here.

### ***Failing to Opt-Out Does Not Constitute Consent***.

34.     The Ninth Circuit's decision in *Norcia*, F.3d 1279, 1286 (9th Cir. 2017), cited with approval by the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas,* 825 F. App'x 204, 207 (5th Cir. 2020), illustrates the point.  In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement. *Norcia*, 845 F.3d at 1282. Among the contents of the phone's box was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number." *Id.* It also stated that opting out would not affect the warranty coverage. *Id.* The customer did not take any steps to opt out. *Id.* When the customer later sued Samsung, Samsung argued that the arbitration provision applied. *Id.* at 1282-83.

35.     As an initial matter, the *Norcia* court rejected the argument that the customer agreed to the arbitration provision by signing his contract with Verizon: "The Customer Agreement is an agreement between Verizon Wireless and its customer. Samsung is not a signatory." 845 F.3d at 1290.

36.     The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did not constitute consent to arbitrate. Unsurprisingly—because there was no applicable federal law—the court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer." 845 F.3d at 1284 (quotation marks omitted); *accord e.g., Tex.*

*Ass'n of Ctys. Cty. Gov't Risk Mgmt. Pool v. Matagorda Cty.,* 52 S.W.3d 128, 132–33 (Tex. 2000).

The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a

manner that would show his intent to use his silence, or failure to opt out, as a means of accepting

the arbitration agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted). This was true, even

though the customer did take action to accept the offered contract from Verizon Wireless.

"Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement

because the person to whom it is made or sent makes no reply, even though the offer states that

silence will be taken as consent, unless an exception to this general rule applies." 845 F.3d at 1286

(quotation marks and citation omitted).

37.    The Ninth Circuit explained that there are two exceptions to this rule—when the

offeree has a duty to respond, or when the offeree retains the offered benefits—but held neither

exception applied. *Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the

customer to act in response to the offer, the parties did not have a prior course of dealing that might

impose such a duty, and the customer did not retain any benefits by failing to act given that the

warranty applied whether or not he opted out of the arbitration provision. *Id.* at 1286.

38.    Here, too, members of Class 3 and Class 7 (who have not specifically consented to

the Mutual Creditor Releases) have not signed an agreement to release other creditor parties or acted

in any other manner to suggest that their silence manifests an intention to accept an offer to release

their claims.

39.    Likewise, voting on a chapter 11 plan cannot be equated with consent to release non-

debtor third parties. Not only are the non-debtor parties to be governed by the Mutual Creditor

Releases not signatories to the chapter 11 plan, a chapter 11 plan is a creature of the Bankruptcy

Code specifically for determining how the debtor will pay its creditors, not a contract to resolve

claims between non-debtors. As the Ninth Circuit has explained, "[w]hen a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors . . . . [T]he payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release non-party obligators." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020) (quotation marks omitted).

### ***Voting to accept a Plan Without Opting Out Does Not Provide the Required Affirmative Consent***

40.     *First*, voting for a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

41.     Voting for a plan disposing of claims against one party does not reflect the unambiguous assent necessary to find consent to a release of claims against other parties. *See, e.g., In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp*., 211 B.R. 497, 507 (Bankr. D.N.J. 1997).  And the mere act of voting on the chapter 11 plan does not "manifest[] [an] intention that silence may operate as acceptance" of a proposal that the creditor release claims against non-debtors.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.  Rather, voting on a chapter 11 plan is governed by the Bankruptcy Code, and a favorable vote reflects only approval of the plan's treatment of the voters' claims against the debtor.  *See Arrowmill*, 211 B.R. at 507; *Congoleum Corp.*, 362 B.R. at 194; *In re Digital Impact, Inc*., 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998).

42.     As explained in *Arrowmill*, a voluntary release arises only "because the *creditor agrees*" to it.  211 B.R. at 507 (emphasis in original).  There is nothing in the Code that authorizes treating a vote to accept a chapter 11 plan as consent to a third-party release.  Instead, the "validity

of th[at] release" necessarily "hinges upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order." *Id.* (citation and alterations omitted). Because "a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings," "it is not enough for a creditor . . . to simply vote 'yes' as to a plan" in order to destroy its rights under nonbankruptcy law. *Id.* (quotation marks omitted); *accord Congoleum Corp.*, 362 B.R. at 194; *In re Digital Impact, Inc.*, 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998). Rather, a creditor must "unambiguously manifest[] assent to the release of the nondebtor from liability on its debt." *Arrowmill*, 211 B.R. at 507.

43.     Because merely voting to approve a plan does not manifest consent to a non-debtor release, such a vote plus a failure to opt out is still nothing more than silence with respect to the offer to release claims against non-debtors. Voting to accept a plan but remaining silent about a non-debtor release by failing to check an opt-out box does not fit within any of the exceptions to the rule that silence is not acceptance of an offer.

44.     Creditors who vote for a plan without opting out of a non-debtor release are not "silently tak[ing] offered benefits" from the released non-debtors, such that consent may be inferred. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). The only benefits received by the creditors are distributions from the debtor's chapter 11 plan. Thus, "[e]ssentially, creditors are being asked to give releases to third parties for no consideration." *Tonawanda Coke Corp.*, 662 B.R. at 222. Because creditors are entitled to whatever distributions the Plan allocates them regardless of whether they opt out of the non-debtor releases, consent to the non-debtor release cannot be inferred from mere acceptance of the benefits of the debtor's plan. *See Norcia*, 845 F.3d at 1286 (explaining that customer's failure to opt out did not imply his consent where warranty applied regardless, meaning that customer did not thereby obtain any additional benefit).

45.     Further, non-debtors have no right to prevent a debtor's creditors from receiving distributions under the debtor's chapter 11 plan, and thus acceptance of those distributions does not manifest acceptance of an offer to release non-debtors.  *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co*., 428 F.3d 214, 223 (5th Cir. 2005) ("In the absence of any evidence that Strong had the right to exclude CFS from the property in question or that CFS accepted any service or thing of value from Strong, no reasonable jury could conclude that CFS's failure to remove its pipeline upon Strong's demand constituted consent to a contract.").

46.     Nor does voting to approve a chapter 11 plan while remaining silent about a non-debtor release "manifest [an] intention that silence may operate as acceptance" of an offer to release claims against non-debtors.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.  Because impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan, 11 U.S.C. § 1126(a), merely exercising that right does not manifest consent to release claims against non-debtors.  Rather, voting on a chapter 11 plan is governed by the Bankruptcy Code, and a favorable vote reflects only approval of the plan's treatment of the voters' claims *against the debtor*.

47.     And as in *Norcia*, creditors have no state law duty to respond to an offer to release non-debtors such that their silence can be understood as consent, nor have they any prior course of dealing with the released non-debtors that would impose such a duty.  *See Norcia*, 845 F.3d at 1285-86.  Nor do creditors have any affirmative obligation to act on a plan, either to vote or to opt out. *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison, Inc.*, 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence).  A claimant's vote in favor of a plan while remaining silent regarding a non-debtor release thus does not fit within the exception to the general rule that consent cannot be inferred from silence.

Confirmation Objection of United States Trustee – Page 17

48.     Because the Plan would impose non-debtor releases on these parties without their
affirmative consent as to those releases, the releases are not consensual and thus cannot be approved
under *Purdue*.

### *Voting to Reject A Plan Without Opting Out Is Not Consent to Release Non-Debtors.*

49.     *Second*, for the same reasons, releases cannot be imposed on those who vote to reject
the plan but do not opt out.  It is implausible to suggest that a party returning a ballot rejecting the
plan but neglecting to opt out of the third-party release is evidencing consent to the third-party
release.  Not only is there no "mutual agreement" as to the plan, much less the third-party release,
the creditor has expressly stated its rejection of the plan.  As the court in *In re Chassix Holdings,
Inc.*, reasoned: "[A] creditor who votes to reject a plan should also be presumed to have rejected the
proposed third-party releases that are set forth in the plan.  *The additional 'opt out' requirement, in
the context of this case, would have been little more than a Court-endorsed trap for the careless or
inattentive creditor.*"  533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

### *Not Voting and Not Opting Out Does Not Constitute Consent to Release Non-Debtors.*

50.     Third, even more obviously, as courts have previously held, the releases cannot be
imposed on those who do not vote and do not opt out.   *See Smallhold,* 2024 WL 4296938, at *2[13];
*SunEdison*, 576 B.R. at 458–61; *Chassix Holdings*, 533 B.R. at 81–82; *In re Wash. Mut., Inc.*, 442
B.R. 314, 355 (Bankr. D. Del. 2011).  This applies both to those creditors who simply abstain from

---

[13] The United States Trustee recognizes that the court in *Smallhold* found that, in at least some circumstances, the
act of voting on a debtor's plan (whether to accept or reject it) combined with a failure to exercise an opt-out option
can constitute consent to a non-debtor release.  *See Smallhold,* 2024 WL 4296938, at *14.  The *Smallhold* decision,
however, although stating it was applying "ordinary contract principles," 2024 WL 4296938, at *3, failed to
faithfully apply those principles to the question of when silence can constitute consent.  For the reasons discussed
above, contract principles do not support imputing consent for a third-party release based merely upon a creditor's
neglect to exercise an opt-out option and that remains true even when that option is conspicuous or well-advertised.

voting and those creditors who are not entitled to vote on a plan.  Those who abstain from voting

cannot be said to be consenting to anything—they are taking no action with respect to the plan.  The

same is true for those who have no right to vote on a plan—whether an unimpaired creditor who is

deemed to accept the plan or an impaired creditor receiving nothing under a plan who is deemed to

reject the plan.  Creditors who do not vote on a plan do not manifest consent to a non-debtor release

by failing to return an opt out form.

51.     Thus, even where there are conspicuous warnings in the ballots or an opt out form

that silence or inaction will constitute consent to a release, that is not sufficient to recast a party's

silence as consent to the release.  *SunEdison*, 576 B.R. at 458–61.  Just as creditors have no federal

or state law duty to vote on a plan, they also have no obligation to read a plan.  And creditors who

have no intention of voting in the first place are unlikely to do so.  Moreover, parties who are solicited

but do not vote may have failed to vote for reasons other than an intention to assent to the releases[14]

-- including confusion, misunderstanding and lack of comprehension concerning the Plan, the ballot,

the opt out form and related materials.

52.     This is particularly so given that the solicitation materials are being transmitted by

the Debtors to third parties to forward to members of the affected class.  The Debtors may not be

certain that the solicitation materials have even been received by certain members of Class 7.  The

failure of a creditor to return the Opt-out form, under these circumstances certainly cannot be

presumed to evidence a knowing, intentional and informed consent by that creditor to having their

claims against non-debtor third parties released.

---

[14] *SunEdison*, 576 B.R. at 461.

53.     Recognizing that creditors may have other reasons for not returning a ballot (other than their agreement to the releases), the court in *SunEdison* rejected the debtors' argument that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the non-voting creditors' failure to object to or reject the plan should be deemed their consent to the release.  *SunEdison, 576 B.R.* at 460–61.  The court found that the nonvoting creditors' silence was not misleading and did not signify their intention to consent to the release (finding that silence could easily be attributable to other causes).  *Id*. at 460-61.

54.     Simply put, "[f]ailing to return a ballot is not a sufficient manifestation of consent to a third-party release."  *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see also Chassix Holdings*, 533 B.R. at 81–82.  An "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)."  *Wash. Mut., Inc.*, 442 B.R. at 355.

55.     "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point."  *Chassix Holdings*, 533 B.R. at 81.  "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor.  But as to the creditor's rights against third parties – which belong to the creditor and not the bankruptcy estate – a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy."  *Smallhold, Inc.*, 2024 WL 4296938, at *12; *see also id.* at *10 (discussing *Chassix*).  As the court in *Emerge Energy Services, LP*, similarly explained, "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out

simply do not qualify" as implied consent through a party's silence or inaction. No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original). "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake." *Id.*

56. Furthermore, failure to return an opt out form is not consent because—whether they are asked to vote or not—claimants have no reason to expect that an offer to contract with non-debtors will be included in the plan solicitation. As the Third Circuit has explained, there can be no presumption that someone has agreed to contractual provisions of which they are "on notice," unless "there is a reasonable basis to conclude that consumers will have understood the document contained a bilateral agreement." *See Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017).

### *Inclusion as a Mutual Release Creditor is Not Conspicuous*

57. The Amended Plan sets forth, in approximately two pages of bold writing each, in Sections 11.4(a) and 11.4(b), that there are releases being exchanged between the PCAP Noteholder Mutual Release Parties and the PCP Lender Mutual Release Parties. However, for a creditor in either group to know that he is going to be bound by that paragraph as one of those "Mutual Release Parties", he would have had to have read and understood the respective definition in Section 2. It is in that definition, that the Amended Plan sets forth the circumstances that classifies a creditor as one of those "Mutual Release Parties".

58. The Class 3 and Class 7 Ballots do have a paragraph above the 'opt out box' that recites the circumstances under which the voting creditor will be "deemed" to have consented.

59. The United States Trustee objects to the use of the opt-out procedures to bind creditors to release non-debtor third parties, as not being consensual releases.

Confirmation Objection of United States Trustee – Page 21

**B.    Objection No. 2 -- The Section 11.6 Injunction/Gatekeeping Injunction Violates *Purdue* and the Bankruptcy Code**

60.    Section 11.06 seeks to accomplish several types of actions.    This provision is untenable as it is (i) is so broad as to cover causes of action held by third parties (ii) seems to bar a creditor's ability to challenge whether he received proper notice and due process to be bound by the Mutual Creditor Releases and (iii) it is impossible and unknowable exactly who would constitute a Released Party covered by this provision (because Released Party includes, in turn, Related Parties to the Released Parties).

61.    Buried in that single paragraph are the following distinct provisions (only generally described below):

  *a.*    A permanent injunction enjoining any creditor or party from asserting any claims or causes that have been released, discharged or exculpated under the Amended Plan;

  *b.*    Clarification that this injunction does not enjoin an action to enforce the terms of the Plan;

  *c.*    No person or entity may pursue any cause of actions against a Released Party (again, not identifiable who they are) or Exculpated Party connected to the Debtors or Plan or "upon any other act" without first coming to the Bankruptcy Court (and compliance with the gatekeeping provisions).

62.    This provision is overly broad in that it is intended to be operative based on the definition of "Released Parties", which includes the further unknowable group of persons included as "Related Parties." *See Amended Plan, Sections 2.2.152 and 2.2.153*.

63.    The Court addressed the breadth of a definition of "Related Parties" at the confirmation hearing in *In re CareMax, Inc.*, Case No. 24-80093-MVL-11 ("*CareMax*").

64. The definition of Related Party in the *CareMax* second amended plan (*CareMax* Docket No. 580) provided as follows:

"*Related Party*" means, with respect to any Person or Entity, each of, and in each case in its capacity as such, current and former directors, managers, officers, Committee members, members of any Governing Body, equity holders (regardless of whether such Interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors of any such Person or Entity, in each case solely in their capacities as such, and any such Person's or Entity's respective heirs, executors, estates, and nominees.

65. This Court found that this definition was "entirely too broad," but permitted the Debtors the opportunity to take "one more crack as some language, either to do [the] least damage to the otherwise-defined terms in your plan, or if you want to work the actual parties that you think are related parties and deserve a release in there." *See* Transcript of Proceedings, p. 94, ln. 9-19, January 28, 2025.

66. The *CareMax* debtor modified the term "Related Party" as follows in its third amended plan (*CareMax* Docket No. 586):

"*Related Party*" means, with respect to any (and in each case solely in their capacity as such to each person or entity) (a) each Debtor, Post-Effective Date Debtor, and each Transferred Entity, as applicable; (b) each Consenting Term Loan Lender; (c) the DIP Lenders; (d) the DIP Agent; (e) the Prepetition Term Loan Lenders and the Prepetition Agent; (f) the ACO Purchaser; (g) the Core Centers Purchaser; (h) the Stalking Horse Purchaser; or (i) the Committee (and its members), current and former directors, managers, officers, members of any Governing Body, affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, fund advisors or managers, employees, agents, financial advisors, attorneys, accountants, investment bankers, and representatives.

67. The definition of Related Parties in the Amended Plan is nearly identical to the language in the *CareMax* second amended plan:

2.2.152    <u>Related Parties</u>:  With respect to any Person or Entity, such Person's or Entity's current or former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, and assigns, subsidiaries, Affiliates, managed accounts or funds, and each of their respective current and former

equity holders, directors, managers, owners, principals, shareholders, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, investment bankers, consultants, representatives, other professionals and the respective successors and assigns thereof.

68.    The Amended Plan defines "Entity" as "such term is defined in section 101(15) of the Bankruptcy Code."  Section 101(15) of the Bankruptcy Code defines "entity" as including "person, estate, trust, governmental unit, and United States trustee."

69.    Like in *CareMax*, the definition of Related Parties in the Amended Plan is too broad and should similarly be tailored.

***The Standards for Granting Injunctive Relief must be Satisfied***.

70.    The Amended Plan seeks to impose permanent injunctions to enforce the Debtors' release of their claims, under Section 11.1, and the Exculpation provisions, of Section 11.5, and then goes further with respect to imposing Gatekeeping provisions so broad as to restrict persons from asserting their rights against the unidentifiable group of persons/entities defined as the Released Parties.

71.    The Amended Plan should not be approved to the extent that it imposes an injunction enforcing the non-debtor releases because non-consensual third-party releases and injunctions are not permitted by the Bankruptcy Code.  *See Purdue,* 144 S. Ct. at 2088.

72.    However, even if the Court were to deem the non-debtor releases consensual, there is no Bankruptcy Code provision that authorizes chapter 11 plans or confirmation orders to include

injunctions to enforce them. Further, such an injunction is not warranted by the traditional factors that support injunctive relief.  A party seeking an injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); see also Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)* ("An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'") *(quoting Cavanaugh v. Looney, 248 U.S. 453, 456 (1919)); id.* (noting that an injunction is an "extraordinary remedy").

73.    A consensual release may serve as an affirmative defense in any ensuing, post-effective date litigation between the third-party releasees and releasors, but there is no reason for this Court to be involved with the post-effective date enforcement of those state-law releases.

### *The Injunction Provision Bars Creditors from Challenging their Lack of Notice of the Amended Plan*

74.    This provision is further objectionable because, according to the Debtors, the import of the Mutual Creditor Releases is because there are creditors –who are subject to these provisions and who, specifically, are the parties that the Debtors want to be bound by the Amended Plan— whose names and addresses are not known to the Debtors.  Instead, the Debtors are relying on third parties to effectuate service.

75.    The terms of Section 11.6 are particularly problematic to the extent that they preclude a party deemed to consent to the Mutual Creditor Releases from raising any issue with respect to their actual receipt of the Amended Plan, proper notice and due process and the effectiveness or

enforceability of the release (such as mistake or lack of capacity) under applicable non-bankruptcy law.

**C.      Objection No. 3 -- The Court should not approve the "Gatekeeper" Provision in Section 11.6.**

76.     Section 11.6 is entitled "Injunction." Buried in the second half of that one half page paragraph is the creation of a gatekeeping protocol which covers an unidentifiable group of persons or entities and, functionally, goes even further than the purported "permanent injunction" meant to enforce the Debtors' releases of its claims.

77.     The United States Trustee objects to the Amended Plan's "gatekeeper" provision in Section 11.6.  These provisions are not separately named and are not conspicuous.  Insufficient notice of the gatekeeping provision was provided.

78.     Separate from the lack of notice, the United States Trustee objects to the gatekeeping provisions of Section 11.6 because  (i) it is unclear who are the target parties that would trigger use of the gatekeeper provisions—inasmuch as the identities of the Released Parties (including their Related Parties) is too broad and unknowable and (ii) it forces a non-debtor who wishes to pursue a claim or cause of action against another non-debtor to come to this Court—and only this Court—for a determination of whether such claim or cause of action can proceed.  Though styled as a "gatekeeper," as the Fifth Circuit recently clarified, it is an injunction.  *Highland Capital Mgmt. Fund Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, No. 23-10534, 2025 U.S. App. LEXIS 6320, n.2 (5th Cir. Mar. 18, 2025) ("*Highland II*") (referring to a gatekeeper clause as "an injunction—a pre-filing injunction.").   And the Fifth Circuit clarified in *Highland II* that the *Barton* doctrine would allow for a gatekeeping provision only for claims brought "'against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official

capacity' in a bankruptcy proceeding, even if the bankruptcy court would not have jurisdiction to actually adjudicate those claims" *Id.* at *13–*14 (quoting *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015).

79.    The Amended Plan's gatekeeping injunction also explicitly grants this Court exclusive jurisdiction to adjudicate a claim or cause of action between non-debtors. The gatekeeping injunction appears to apply to any "party," and it is not clear whether such injunction is even limited to those who received notice of these cases. Furthermore, it would apply even after Debtors' bankruptcy cases have been closed, and which would then require a non-debtor seeking to pursue a claim against another non-debtor to first move to reopen the bankruptcy cases.

80.    The Amended Plan's gatekeeping injunction is improper for the same reasons as its injunction barring claims: the bankruptcy court lacks both jurisdiction and statutory authority to enter such an injunction and there has been no showing that injunctive relief is warranted. And even if there were "related to" jurisdiction, reserving exclusive jurisdiction in the bankruptcy court to determine whether those non-debtor claims can proceed is contrary to Congress's grant of concurrent jurisdiction over such claims. 11 U.S.C. § 1334(b) (providing "original but not exclusive jurisdiction"); *In re Brady, Texas, Mun. Gas Corp.*, 936 F.2d 212, 218 (5th Cir. 1991). Additionally, the defense of "release" is an affirmative defense that cannot be adjudicated prior to the filing of the action to which it relates. *See, e.g.*, Fed. R. Civ. P. 8(c)(1), incorporated in Fed. R. Bankr. P. 7008. There is no reason why the court in which the relevant action has been filed cannot determine whether the non-debtor claim was released under the Plan.

81.    Further, the gatekeeping injunction contravenes the basic premise that once a company confirms a reorganization plan it "is without the protection of the bankruptcy court. It may not come running to the bankruptcy judge every time something unpleasant happens." *Bank of*

*Louisiana v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Texas, Inc.)*, 266 F.3d 388, 390

(5th Cir. 2001) .  This is even more true for the non-debtors protected by the gatekeeping injunction.

Gatekeeping would create inefficient piecemeal litigation contrary to the purpose of "related to"

jurisdiction.  *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 752 (5th Cir. 1995) ("[W]hen

we define 'related to' jurisdiction, we should avoid the inefficiencies of piecemeal adjudication and

promote judicial economy by aiding in the efficient and expeditious resolution of all matters

connected to the debtor's estate.").  Parties would have to go to the bankruptcy court for permission

to sue, then to the court where they want to sue to file the complaint, and then back to the bankruptcy

court again if they want to amend the complaint, then back to the court presiding over the suit if the

bankruptcy court allows the amendment.  That makes no sense.  And, as noted, this would continue

even after the cases were closed, and thus, parties would need to reopen the case to do this.

82.      The gatekeeping injunction increases the burden on the courts, imposes unnecessary

costs and delay on the parties, and unnecessarily interferes with other courts' jurisdiction and ability

to manage the cases before them.  *See Zale*, 62 F.3d at 755 ("[C]ourts must be particularly careful

in ascertaining the source of their power, lest bankruptcy courts displace state courts for large

categories of disputes.").  There is no reason to deviate from the ordinary course in which the court

presiding over a lawsuit determines whether the claims are "colorable," adjudicates any defenses,

including the defense of release, and determines whether any amendments to the complaint should

be permitted.  As a court rejecting a similar provision explained: "the plan says what it says, and

other courts should be entitled to exercise their authority to interpret it," and "[i]mposing such a

requirement could also impose an unnecessary administrative hurdle and cost the parties when these

cases are closed."  *Gulf Coast Health Care, LLC*, No. 21-11336 (KBO) (Bankr. D. Del.), D.I. 1236,

Transcript of May 4, 2022, Confirmation Hearing at 30:18-23.

83.     Considering the foregoing, the gatekeeping injunction should be stricken from the Plan except to the extent it applies to the Exculpated Parties (once properly defined).

**D.     Objection No. 4 -- The Exculpation Provision Violates Fifth Circuit Authority**

84.     The Amended Plan is also patently unconfirmable because, to the extent that applicable law authorizes exculpations beyond 11 U.S.C. § 1125(e), the Plan's exculpation provisions are too broad in contravention of Fifth Circuit precedent. The inclusion of the Wind Down Administrator as an Exculpated Party is contrary to prevailing Fifth Circuit Authority. The exculpation of the Wind Down Administrator also makes no temporal sense given that this party does not even exist pre-Effective Date.

85.     The Amended Plan defines "Exculpated Party" as:

> 2.2.69  Exculpated Fiduciaries:  Collectively, and in each case in their capacities as such during the Chapter 11 Cases (i) the Debtors, (ii) the Wind Down Administrator, (iii) the Committee and each of its members in their capacity as such, and (iv) the Independent Manager.
>
> 2.2.70  Exculpated Parties: The Exculpated Fiduciaries.

*Amended Plan, Section 2.2.68-2.2.69.*

86.     The Fifth Circuit has affirmed that, in accordance with *Bank of New York Trust Company, NA v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.)* 584 F.3d 229 (5th Cir. 2009), and section 524(e) of the Bankruptcy Code, "any exculpation in a Chapter 11 reorganization plan [must] be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties . . . ." *NexPoint Advisors, L.P. v. Highland Cap. Mgmt. L.P., (In re Highland Cap. Mgmt., L.P.),* 48 F.4th 419, 437 (5th Cir. 2022)("*Highland Capital*").

87.     Specifically, the Fifth Circuit in *Highland Capital* analyzed whether the independent directors, who were specifically appointed to act together similar to a bankruptcy trustee, could be exculpated and concluded that they could because they "were entitled to all the rights and powers of a trustee." 48 F.4th at 437[15].

88.     The Fifth Circuit in *Highland Capital* then rejected any exculpation for the debtors' employees, officers, directors, and professionals:

> As it stands, the Plan's exculpation provision extends to Highland Capital and its employees and *CEO*; Strand; the Reorganized Debtor and HCMLP GP LLC; the Independent Directors; the Committee and its members; the Claimant Trust, its trustee, and the members of its Oversight Board; the Litigation Sub-Trust and its trustee; professionals retained by the Highland Capital and the Committee in this case; and all "Related Persons." *Consistent with § 524(e), we strike all exculpated parties from the Plan except Highland Capital, the Committee and its members, and the Independent Directors*.

> *Highland Capital,* 48 F.4th at 438 (emphasis added).

89.     The Wind Down Administrator should be removed from the list of Exculpated Parties in the Amended Plan. This position is not even filled until the Effective Date and no exculpation should issue for persons in the future, related solely to actions to take place in the future.

### Conclusion

90.     Accordingly, for the foregoing reasons, the Court should deny confirmation of the Amended Plan.

---

[15] This holding was based on the fact that the Independent Directors, in *Highland*, were appointed in connection with a bankruptcy court order to act together as a 'bankruptcy trustee'. In this case, the Debtors' Independent Directors were not so appointed and would not be entitled to be exculpated. Inclusion of the Debtors' Independent Directors as Exculpated Parties is violative of *Highland* and thus is not permitted.

WHEREFORE, the United States Trustee respectfully request this (i) deny confirmation of the Amended Plan and (ii) grant such other and further relief as it may deem just and proper.

DATED: February 9, 2026

Respectfully submitted,

LISA L. LAMBERT
UNITED STATES TRUSTEE

*/s/ Susan Hersh*
Susan Hersh, Trial Attorney
Texas State Bar No. 09543925
Office of the United States Trustee
1100 Commerce Street, Room 976
Dallas, Texas  75242
(214) 767-1073
Susan.hersh@usdoj.gov

## Certificate of Service

The undersigned counsel certifies that copies of the foregoing document were served on those parties receiving service via ECF in this case on the day this was filed.

*s/ Susan Hersh*