MULLIN HOARD & BROWN, L.L.P.
Steven L. Hoard, SBN: 09736600
P.O. Box 31656
Amarillo, Texas 79120-1656
Telephone: (806) 372-5050
Facsimile: (806) 372-5086
shoard@mhba.com
***Counsel for Amarillo National Bank***

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| PRIMALEND CAPITAL PARTNERS, LP, *et al.*[1] | § | Case No. 25-90013 (MXM) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## AMARILLO NATIONAL BANK'S OBJECTION TO CONFIRMATION OF PLAN

TO THE HONORABLE U.S. BANKRUPTCY COURT:

Amarillo National Bank ("ANB"), a secured creditor and party-in-interest, files the following objection to Debtor's Amended Joint Plan of Reorganization [Docket No. 288] (the "Plan"):

### I. INTRODUCTION

1.     ANB[2] is a secured creditor of GFL. As of the petition date, GFL was indebted to ANB in the amount of $16,306,772.65. GFL pledged all of its assets to secure the debt owed to ANB. GFL has no other secured creditors. GFL has no unsecured creditors other than the Intercompany claims that are being canceled and released pursuant to Section 5.11 of the Plan.

---

[1] The debtors and debtors-in-possession in these Chapter 11 Cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: PrimaLend Capital Partners, LP (0313) ("**PCP**"), Good Floor Loans LLC (8219) ("**GFL**"), LNCMJ Management, LLC (1374) ("**LNCMJ**"), and PCAP Holdings LP (8774) ("**PCAP**"). The location of the Debtors' headquarters is 3460 Lotus Dr. Ste. 100, Plano, TX 75075.
[2] ANB's address is 401 S. Taylor Street, Amarillo, Texas 79101.

2.      GFL makes loans to used-car dealers based upon and secured by the dealers' vehicle inventory. The dealers' notes are revolving lines of credit, which are referred to as RLOCs. The RLOCs are GFL's principal asset and ANB's principal collateral. Historically, when a dealer sells a vehicle financed on its line of credit with GFL, the dealer would then borrow money from PrimaLend Capital Partners, LP ("PCP") to pay down the amount the dealer owed to GFL related to the vehicle sold. GFL would then pay down its note to ANB.

3.      GFL's schedules listed $22,737,562.42 in RLOC notes receivable. That may have been the amount due on the face of the RLOCs, but the actual value of the RLOCs was much lower. The last pre-bankruptcy borrowing base provided by GFL to ANB showed a collateral value of $11,241,788.00. Houlihan Lokey was unsuccessful in finding anyone to purchase GFL's RLOCs at any price. ANB's credit bid of $3,600,000.00 was not only the highest bid for GFL's assets, it was the only bid. ANB is doubtful that GFL's RLOCs are worth even the amount of its credit bid.

4.      During the pendency of the bankruptcy, various dealers have made payments on their RLOCs, and the amount of cash held by GFL has increased from approximately $1,500,000.00 as of the petition date to approximately $4,800,000.00 as of the last report ANB received from GFL. This is the result of dealers making payments on their RLOCs. ANB has a lien on this cash. The total value of ANB's collateral, consisting primarily of the RLOCs and the cash, has gone down during the pendency of the bankruptcy from approximately $12,760,000.00 as of the petition date to approximately $8,190,000.00 as of the last report ANB received from GFL.

5.      For several months prior to the filing of the bankruptcy, ANB and GFL were both aware that GFL's debt to ANB was woefully undersecured. On June 18, 2025, ANB sent GFL a

formal notice of default. The notice of default gave GFL 30 days to cure its default, but GFL failed to do so. Among other events of default, ANB discovered that GFL had allowed approximately $5,000,000.00 in vehicle inventory to be sold by its dealers without payment to GFL. The retail installment contracts generated by those sales constitute proceeds from the sale of GFL's collateral. In the normal course, PCP would have advanced the funds necessary to finance the retail installment contracts as a condition to assigning or pledging the retail installment contracts to PCP. In this instance, however, PCP advanced no funds, but instead simply created an intercompany account owed by PCP to GFL. This constituted a conversion of GFL's collateral. The converted retail installment contracts, and the proceeds therefrom, rightfully constitute the property of GFL that is subject to ANB's lien. As discussed below, ANB seeks imposition of a constructive trust on those identifiable assets.

6.     After GFL's failure to cure the events of default, ANB asked GFL to assign its assets to ANB in lieu of foreclosure. But GFL refused to do so. ANB would have credited the full amounts recovered against the loan. GFL's counsel, Jason Kathman, took the position that he and GFL's other advisors wanted to go forward with a pre-packaged bankruptcy plan in order to "maximize" the value of GFL's assets. Of course, the only party with any interest in maximizing the value of GFL's assets was ANB. Everyone understood that ANB was woefully undersecured. Everyone knew ANB was GFL's only real creditor. Importantly, ANB is an experienced lender in vehicle floor plan lending, including loans to buy-here pay-here dealers like the ones financed by GFL. As far as GFL is concerned, the bankruptcy was completely unnecessary and conferred no benefit on any party-in-interest. In fact, as noted above, the value of GFL's assets, all of which are pledged to ANB, has diminished during the pendency of this bankruptcy.

7.      An Interim Order Authorizing the Use of Cash Collateral was entered on October 24, 2025 [Docket No. 79]. This order authorized GFL to use ANB's cash collateral for two limited purposes. First, GFL was an authorized to pay operating disbursements and restructuring costs but only to the extent there were "sufficient interest payment collections from Dealer-Borrowers." Second, GFL was authorized to honor Dealer-Borrower draws, provided that prior to funding draws to a Dealer-Borrower that is in default, GFL had to first consult with ANB. A Final Order Authorizing the Use of Cash Collateral was entered on December 18, 2025 [Docket No. 247]. The terms of this Final Order, as applicable to GFL and ANB, were substantially the same as the terms of the Interim Order except that GFL was also required to meet with ANB once per week "to discuss all aspects of GFL's business."

8.      Since entry of the Final Order, GFL has refused to allow ANB to review GFL's bank statements. Review of the bank statements was necessary for ANB to ensure GFL's compliance with the cash collateral orders, including in particular determining that GFL's expenditure of ANB's cash collateral was limited to the two allowed purposes. Likewise, since entry of the Final Order, GFL has refused to provide ANB with GFL's dealer inventory field audits. Although both the Interim and Final Orders required GFL to provide to ANB a bi-weekly "current inventory report for each of GFL's Dealer-Borrower clients that includes vehicles at the dealership or in transit," GFL has taken the position that it is not required to give ANB the dealer inventory field audits because they are not expressly listed in the Interim or Final Order. Mr. Kathman has on multiple occasions stated that GFL might be willing to give ANB the requested information if ANB would agree not to oppose GFL's use of ANB's cash collateral to pay restructuring costs, including attorneys' fees.

9. On January 5, 2026, GFL along with its co-debtors filed their Amended Plan of Reorganization [Docket No. 288]. The Plan provides that the assets of GFL will be sold to ANB pursuant to the GFL Credit Bid Transaction and that ANB shall receive all of GFL's cash, "*provided* that the GFL cash shall be reduced by an amount estimated by GFL to pay or escrow for any and all Administrative Claims (including Professional Claims and Independent Manager Claims, Priority Tax Claims, Other Secured Creditor Claims (subject to the Other Secured Claims Cap), and other Priority Claims attributable to GFL," (hereinafter "Administrative Claims"), Section 5.4(b) of the Plan.[3] As discussed below, ANB objects to the use of its cash collateral to pay Administration Claims. ANB would very much like for the sale of GFL's assets to be consummated. This would result in ANB (or its designee) owning the GFL dealer RLOCs – something ANB asked for prior to the filing of the bankruptcy. ANB has not received any benefit from this bankruptcy, and it is not agreeable to allowing the payment of Administrative Fees from its cash collateral. Nor is ANB agreeable to cancellation of the $5,000,000.00 intercompany account receivable that arose when GFL's collateral vehicle inventory was sold without payment to GFL and the retail installment contracts that were the proceeds of GFL's collateral were converted by PCP.

## II. OBJECTIONS TO PLAN

### A. Treatment of ANB's Secured Claim

10. ANB objects to Section 5.4(b) of the Plan for two reasons. First, ANB objects to the extent the Plan provides that the assets ANB is to receive pursuant to its credit bid shall be "in full satisfaction of [ANB's] Prepetition Credit Facility Claim." Because it is woefully unsecured,

---

[3] The Plan also contemplated an alternative auction sale of GFL's assets, but as noted above there were no bidders for GFL's assets other than ANB's credit bid.

ANB will have a large deficiency still owed after applying the amount of ANB's credit bid and

after applying the GFL cash. ANB is concerned that the "in full satisfaction" language could be

used by a guarantor or other third-party to argue that ANB no longer has a deficiency. The language

in Section 5.4(b) of the Plan should be modified to remove the "full satisfaction" language and

provide simply that after consummation of the sale of GFL's assets and the transfer of GFL's cash

to ANB, GFL will have no other assets and therefore ANB will not pursue a deficiency claim

against GFL.

11.    Second, ANB objects to the provision in Section 5.4(b) of the Plan that provides

for payment or escrow of any and all Administrative Claims and Priority Claims out of ANB's

cash collateral. Under Section 506(c) of the Bankruptcy Code, a trustee or debtor-in-possession

"may recover from property securing an allowed claim the reasonable, necessary costs and

expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of

such claim." In this case, in order to use ANB's cash collateral to pay Administrative Expenses,

GFL bears the burden to prove (1) that the expense was necessary, (2) that the amount of the

expense was reasonable, and (3) that the expense provided a direct, quantifiable benefit to ANB.

*In re: Domistyle, Inc.*, 811 F. 3d 691, 696 (5th Cir. 2015). Courts allow a secured creditor's

collateral to be surcharged to pay administrative expenses only in "sharply limited circumstances."

No such circumstances exist in this case.

12.    ANB is effectively GFL's only creditor – secured or unsecured.[4] Both GFL and

ANB were keenly aware in the months leading up to the bankruptcy that ANB was woefully

undersecured. ANB has vehicle floor plan borrowers of its own, and has a whole staff dedicated

---

[4] As noted above, GFL has scheduled some unsecured intercompany claims. The Plan provides for the cancellation
and release of these claims. However, ANB is objecting to release of GFL's claim against PCP arising from PCP's
conversion of the proceeds of GFL's collateral.

to administering loans to buy-here pay-here dealers. ANB expressly asked GFL to assign its assets to ANB in lieu of foreclosure so that ANB could administer GFL's dealer RLOCs. GFL expressly refused. But after four months of bankruptcy, that is exactly where things have ended – with ANB being the only bidder for GFL's assets. The only difference is that GFL's assets are worth less now than when the bankruptcy was filed. Under these circumstances, it would seem impossible for GFL to show that ANB has received any benefit from the bankruptcy.

13.    ANB proposes that the language in Section 5.4(b) be modified to eliminate the requirement of payment of Administrative Expenses out of ANB's cash collateral. Alternatively, ANB proposes that an amount of cash collateral sufficient to cover the Administrative Expenses be placed into an escrow account pending this Court's adjudication of the issue of whether ANB's cash collateral can be used to pay Administrative Expenses under Section 506(c) of the Bankruptcy Code.

## B. Conversion Claim Against PCP and CIBC

14.    ANB objects to Section 5.11 of the Plan, which provides for the cancellation and release of all intercompany claims, to the extent that provision would result in cancellation of GFL's claim for approximately $5,000,000.00 against PCP. As noted above, this claim arose when GFL's vehicle inventory was sold without payment to GFL and the retail installment contracts that were the proceeds of GFL's inventory collected were converted by PCP. The vehicles that were sold and the retail installment contracts that were generated by those sales are all identifiable. PCP includes those retail installment contracts (or their proceeds) either as assets of its own or as collateral securing its loans to the Dealer-Borrowers. CIBC claims either a direct lien on those assets or a derivative claim arising by virtue of its lien on PCP's RLOCs and the collateral securing those RLOCs. These retail installment contracts are rightfully the property of GFL, but they are

included directly or indirectly in the assets of PCP that are being sold to CIBC under the terms of Section 5.3(c) of the Plan. ANB objects to Section 5.3(c) and Section 6.2(b) to the extent they provide for the transfer (directly or indirectly) of the converted retail contracts free and clear of GFL's conversion claim. The objection applies only to the converted retail installment contracts.

15.    ANB proposes to modify Sections 5.3(c) and 6.2(b) to provide that ANB, by virtue of its security interest in GFL's assets and by virtue of its anticipated ownership of GFL's assets pursuant to the credit bid, shall have the right to pursue GFL's claims for conversion against PCP and CIBC and to seek the imposition of a constructive trust on the converted retail installment contracts and all proceeds thereof. ANB will have an unsecured claim in the PCP bankruptcy for the full amount of the intercompany receivable and shall have a constructive trust claim against CIBC as the purchaser of PCP's assets, but only to the extent of the identifiable retail installment contracts and the proceeds thereof. Such claim should survive the sale of PCP's assets to CIBC. If settlement discussions do not result in resolution of the claim, ANB will file an adversary proceeding in this Court to seek adjudication of the claim. Because CIBC is purchasing PCP's assets pursuant to a credit bid, ANB does not ask that any funds be escrowed to preserve the status quo.

**C. Objection to Definitions and Administrative Provisions of Plan**

16.    To the extent that there are definitions or other provisions of the Plan that support the provisions of Sections 5.4(b), 5.11, and 6.2(b) of the Plan to which ANB objects, ANB also objects to those definitions and other provisions and requests that they be modified to be consistent with the modifications requested herein by ANB.

**D. Objection Based on Section 1129(a)(10)**

17.  Section 1129(a)(10) requires the affirmative acceptance of the Plan by at least one impaired class of claims, with acceptance determined without counting any acceptance by an insider. Elimination of insiders leaves ANB as GFL's only creditor. ANB has rejected the Plan. Therefore, ANB objects to confirmation of the Plan because it does not comply with the requirements of Section 1129(a)(10).

**E. Objection Based on Section 1129(a)(7)**

18.  Section 1129(a)(7) requires that ANB will receive under the Plan on account of its claim not less than what it would have received in a Chapter 7 proceeding. The Plan's proposed treatment of ANB's claim does not meet this requirement. The Plan proposes that ANB's collateral be surcharged for an estimated $1,000,000.00 in Administrative Claims. That estimate greatly exceeds the expense that would have been incurred in a Chapter 7 case. In addition, the Plan proposes to cancel and release GFL's claim against PCP (and the concomitant constructive trust claim against CIBC). This claim would not be released in a Chapter 7 case. Accordingly, the Plan provides for ANB to receive less than it would have received in a Chapter 7 case. Therefore, ANB objects to confirmation of the Plan because it does not comply with the requirements of Section 1129(a)(7).

**F. Objection Based on Section 1129(a)(3)**

19.  Section 1129(a)(3) requires that the Plan "has been proposed in good faith." The Plan and the GFL bankruptcy case itself will not achieve a result consistent with the objectives and purposes of the Bankruptcy Code. *In re Madison Associates*, 749 F. 2d 410 (7th Cir. 1984). In GFL's case, there was never any thought given to reorganization. Liquidation was always

contemplated. However, GFL had no other creditors, other than ANB, except for the intercompany and insider claims. ANB was woefully undersecured, so there was never any prospect of a dividend to any other party. ANB did not want or need the bankruptcy, and the bankruptcy has only resulted in diminution in the value of ANB's collateral. This is not consistent with the objectives and purposes of the Bankruptcy Code. Therefore, ANB objects to confirmation of the Plan because it fails to comply with the requirements of Section 1129(a)(3).

## III. CONCLUSION

ANB asks that the Plan be modified as requested herein so that it can be confirmed. If the requested modifications are not approved, then confirmation of the Plan should be denied. ANB is cognizant of the requirements in Section 1129(a)(9) that all Administrative Claims be paid – "[e]xcept to the extent the holder of a particular claim has agreed to a different treatment of such claim." ANB hoes that will happen in this case. That result would certainly be fair and appropriate. However, ANB acknowledges that its objection to payment of Administrative Claims using ANB's cash collateral may prevent the Plan from being confirmed. Accordingly, ANB will be filing a Motion to Lift Automatic Stay, with any hearing to be set after the confirmation hearing scheduled for February 20, 2026. If the Plan is confirmed, then ANB will of course withdraw the motion as moot. If the Plan is not confirmed, then ANB will move forward with the Motion to Lift Automatic Stay.

Dated: February 9, 2026

Respectfully submitted,

/s/ *Steven L. Hoard*

Steven L. Hoard, SBN: 09736600
shoard@mhba.com
MULLIN, HOARD & BROWN, L.L.P.
P.O. Box 31656
Amarillo, Texas 79120-1656
Telephone: (806) 372-5050
Facsimile: (806) 372-5086
***Attorneys for Amarillo National Bank***

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing Amarillo National Bank's Objection to Confirmation of Plan was sent via ECF Notification, on this the 9TH day of February, 2026.

/s/ *Steven L. Hoard*

Steven L. Hoard