**DECHERT LLP**
Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
Debbie E. Green (TX 24059852)
2651 N. Harwood Street, Suite 120
Dallas, Texas 75201-1574
Telephone: (214) 453 4900
marcus.helt@Dechert.com
jack.haake@Dechert.com
debbie.green@Dechert.com

*Counsel for Oha Papi, LLC d/b/a SIMPLE AUTO DFW*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| PRIMALEND CAPITAL PARTNERS, LP, *et al.*,[1] | Case No. 25-90013 (MXM) |
| Debtors. | (Jointly Administered) |
| OHA PAPI, LLC, d/b/a SIMPLE AUTO DFW | Adv. Pro. No. |
| Plaintiff, | |
| v. | |
| PRIMALEND CAPITAL PARTNERS, LP, GOOD FLOOR LOANS LLC, AND LNCMJ MANAGEMENT, LLC, | |
| Defendants. | |

## ADVERSARY COMPLAINT

Plaintiff, Oha Papi, LLC d/b/a Simple Auto DFW ("**Simple Auto**"), by way of this

---

[1] The debtors and debtors-in-possession in these chapter 11 cases, along with the last four digits of their respective Employer Identification Numbers, are as follows: PrimaLend Capital Partners, LP (0313), Good Floor Loans LLC (8219), and LNCMJ Management, LLC (1374). The location of the Debtors' headquarters is 3460 Lotus Drive, Suite 100, Plano, TX 75075.

adversary complaint against (i) PrimaLend Capital Partners, LP ("**PCP**"), (ii) Good Floor Loans LLC ("**GFL**"), and (iii) LNCMJ Management, LLC ("**LNCMJ**" and, together with PCP and GFL, "**PrimaLend**" and, collectively, the "**Defendants**"), hereby states as follows:

**PRELIMINARY STATEMENT**

1.      This action arises from Defendants' self-serving abuses of trust aimed at temporarily preserving their own balance books and reputations.

2.      In June 2024, Simple Auto, a mom-and-pop Buy Here Pay Here ("**BHPH**") dealership, learned of a potential business opportunity: Sunflower Bank ("**Sunflower**") was about to foreclose on a large Texas dealership, Adonis Auto Group ("**Adonis**"), and Simple Auto was invited to bid. But there was a catch: after a putative buyer dropped out at the last minute, Simple Auto was given less than three days to decide whether to make a bid for a portfolio of Adonis' assets (*i.e.* loan portfolio of auto loans), which had a face value of over $46,000,000. The purchase would be the largest transaction in Simple Auto's history and would increase Simple Auto's outstanding debt more than a hundred times over. Recognizing the stakes, Simple Auto hired the most sophisticated operator it knew in the BHPH industry as an advisor: PrimaLend, its institutional lender.

3.      In addition to being one of the largest lenders in the BHPH industry, PrimaLend was well-acquainted with Adonis' portfolio, as well as the nature, risks and terms of the proposed sale. Simple Auto, therefore, trusted that by hiring PrimaLend as an advisor it was placing its financial future in good hands. Ultimately, Simple Auto paid PrimaLend a so-called "advisory fee" of $950,000 pursuant to that certain Advisor and Arrangement Agreement with an effective date of June 12, 2024 (the "**Advisory Agreement**", Exhibit A).

4.      Although any prudent advisor would have recognized that Simple Auto lacked the staffing, experience, and infrastructure to profitably take on a $46,000,000 distressed subprime auto loan portfolio, PrimaLend was desperate to broker a sale because Adonis owed

2

millions in unpaid loans to PrimaLend. Moreover, a prior purchaser for Adonis' assets that PrimaLend had been courting for months backed out at the eleventh hour, leaving PrimaLend desperate to locate an alternative buyer.

5. In its desperation to persuade Simple Auto that the prospective sale was in Simple Auto's best interests, PrimaLend ignored Simple Auto's inability to profitably absorb a loan portfolio of this magnitude, and also declined to inform Simple Auto that Adonis' assets (with which PrimaLend had a long history) were systemically overvalued and would likely underperform under the watch of even the most sophisticated BHPH operator. Moreover, PrimaLend's $950,000 fee was illegal under federal and Texas law prohibiting unlicensed brokering and dealing.

6. Ultimately, despite Simple Auto's best efforts to maximize the value of the Adonis assets, those assets systematically underperformed, causing Simple Auto to incur losses to date of greater than $15,000,000, with at least $3,000,000 more in losses expected to follow, for a minimum aggregate loss of at least $18,000,000. This, in turn, has placed Simple Auto at imminent risk of foreclosure by PrimaLend—the very company that had advised Simple Auto to purchase Adonis' assets (and the related debt) in the first place.

7. Simple Auto now brings the following claims: (a) breach of the fiduciary duty of candor; (b) breach of the fiduciary duty of care; (c) breach of the fiduciary duty of loyalty; (d) participation in breach of fiduciary duty; (e) civil conspiracy; (f) fraudulent misrepresentation; (g) negligent misrepresentation; (h) unregistered investment advice under the Investment Advisers Act; (i) unregistered investment advice under Texas state law; (j) unregistered brokering of securities under the Securities Exchange Act; (k) general partner liability; (l) a declaratory judgment confirming Simple Auto's right to offset any debts owed to the Debtors due to their wrongful conduct, despite the Debtors' attempts to liquidate its assets free of claims under the Bankruptcy Code; and (m) an order restraining Defendants from taking steps to unlawfully

foreclose on Simple Auto's assets in violation of the Uniform Commercial Code.

## JURISDICTION AND VENUE

8.　　　The United States Bankruptcy Court for the Northern District of Texas (the "**Court**") has jurisdiction over the parties and the subject matter of this proceeding pursuant to §§ 157 and 1334 of title 28 of the United States Code.

9.　　　Simple Auto confirms its consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure, to the entry of a final order by this Court if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.　　　Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

11.　　　Plaintiff Oha Papi, LLC is a Texas limited liability company with its principal place of business at 11700 Garland Rd, Dallas, TX 75218.

12.　　　Upon information and belief, Defendant PrimaLend Capital Partners, LP is a Texas limited partnership with its principal place of business at 3460 Lotus Drive Suite 100, Plano, TX 75075.

13.　　　Upon information and belief, Defendant Good Floor Loans LLC is a Texas limited liability company with its principal place of business at 3460 Lotus Drive Suite 100, Plano, TX 75075. It is a wholly owned subsidiary of non-Defendant PCAP Holdings, LP ("**PCAP**").

14.　　　Upon information and belief, Defendant LNCMJ Management, LLC is a Texas limited liability company with its principal place of business at 3460 Lotus Drive, Suite 100, Plano, TX 75075. LNCMJ is the managing entity and general partner of both PCP and PCAP.

15.      Upon information and belief, non-Defendant PCAP Holdings, LP, is a Texas limited partnership with its principal place of business at 3460 Lotus Drive, Suite 100, Plano, TX 75075. PCAP owns 100% of the limited partnership interests in PCP, and 100% of the LLC membership interests in GFL.

16.      On October 22, 2025, Defendants PCP, GFL, and LNCMJ filed in this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), in which they were subsequently joined on December 12, 2025, by PCAP (the "**Chapter 11 Cases**").

17.      Simple Auto is a party in interest in the Chapter 11 Cases pursuant to 11 U.S.C. § 1109(b).

## **FACTUAL BACKGROUND**

### A.      **Buy Here Pay Here Car Dealerships.**

18.      Under the direction of Jensen, its Chief Executive Officer, PrimaLend operates one of the nation's largest lending operations targeted at BHPH dealerships, which offer financing to buyers who often do not qualify for traditional loans, typically due to having poor credit or no credit history.

19.      BHPH transactions employ Retail Installment Sales Contracts ("**RISCs**"), which outline the financing terms for the purchase of vehicles by customers, and allow dealerships to repossess vehicles upon default. A robust secondary market exists to facilitate the bulk-sale of large portfolios of RISCs.

20.      Given the credit-challenged nature of most BHPH customers, BHPH transactions feature a heightened rate of default. Accordingly, to remain profitable, BHPH dealerships must be able to rapidly repossess, repair, and resell the vehicles upon a consumer's default. As such, a BHPH dealership's expertise, headcount, and ability to continuously monitor and service its outstanding loans are important to the number of RISCs that it can profitably hold.

**B.**     **PrimaLend.**

21.     In financing BHPH dealerships, PrimaLend acts primarily through various subsidiaries of its holding company—PCAP. Defendants PCP and GFL are two of those subsidiaries.

22.     Defendant PCP provides revolving lines of credit ("**RLOCs**") to its client dealerships for the purpose of originating (or purchasing) RISCs. Defendant GFL offers specialized lines of credit to its client dealerships for the purpose of acquiring vehicular inventory and preparing that inventory for sale ("**Floorplans**").

23.     PrimaLend has engaged in systemic aberrant lending practices by implementing a scheme that extends far beyond the wrongs committed against Simple Auto.

24.     During periods when the BHPH industry prospered, PrimaLend consistently encouraged dealerships to expand their loan portfolios beyond their servicing capabilities, supported by freely issued debt from PrimaLend that they could not repay.

25.     PrimaLend's profligate lending inevitably pushed these dealerships into over-leveraged and over-advanced positions, such that their debts to PrimaLend far exceeded the value of their collections, repossessions, and inventory. However, foreclosing on dealerships where PrimaLend had loaned millions or tens of millions of dollars would have (a) compromised PrimaLend's reputation of financial success to the public, its lenders, and its clients, (b) damaged PrimaLend's financial and accounting statements, and (c) prompted PrimaLend's lenders to take steps to rein in PrimaLend's reckless lending practices.

26.     PrimaLend's consistently chosen path for navigating this dilemma was, time and time again, to loan money to *new* dealerships or operators to purchase the distressed RISC notes from PrimaLend's failing borrowers, regardless of that *new* dealership's or operator's ability to actually pay down the newly acquired debt.

27. To delay recognition of the inevitable losses stemming from its inappropriate lending practices, PrimaLend constantly needed dealerships that it could persuade, induce, or pressure into purchasing distressed loan portfolios from PrimaLend's other dealership-clients. At the same time, PrimaLend artificially inflated the value of its dealership-clients to conceal PrimaLend's precarious financial position from its lenders.

28. By means of these tactics, PrimaLend was able to direct millions of dollars in cash distributions to Jensen, which PrimaLend's lenders would not have permitted if PrimaLend and Jensen had taken timely and appropriate losses on distressed portfolios.

**C. Simple Auto.**

29. Simple Auto was founded in February 2023 by Kathryn Gruner ("**Gruner**") as a small, mom-and-pop BHPH dealership. At all times since its founding, Simple Auto has been wholly owned by Gruner.

30. Prior to founding Simple Auto, Gruner had worked in various capacities at other small, low-throughput, BHPH dealerships. Gruner had no prior involvement with any BHPH dealership with an unpaid principal balance on its portfolio larger than about $6,000,000, and neither did any of Simple Auto's other employees.

31. On May 15, 2024, Simple Auto secured a $1,000,000 RLOC from PCP (the "**RLOC Agreement**", Exhibit B). On that same day, Simple Auto obtained a $500,000 floor plan loan from GFL (the "**Floorplan Agreement**", Exhibit C).

32. Gruner provided a $500,000 personal guarantee on both lines of credit.

**D. PrimaLend is Retained by Simple Auto as Broker of the Adonis Transaction.**

33. In late May of 2024, Simple Auto learned that a large portfolio of assets owned by the BHPH dealership Adonis was for sale after Sunflower, one of Adonis' lenders, initiated foreclosure proceedings of said portfolio (the "**Adonis Portfolio**"). The assets for sale included over 250 repossessed vehicles and more than 2,600 RISCs, with a combined unpaid

7

principal balance on those RISCs of over $46,000,000 impaired by more than $29,000,000 in outstanding debt to Sunflower. The foreclosure sale was scheduled to take place on or after June 14, 2024.

34. At the time Sunflower initiated foreclosure proceedings, Adonis owed roughly $10,000,000 to GFL, which had provided Adonis with Floorplan financing for over a decade. The impending foreclosure sale would leave the surviving Adonis entity without sufficient assets to pay down those debts and would erase GFL's junior lien on the Adonis Portfolio. This, in turn, would have forced GFL to write-off nearly all of the debt it was owed by Adonis as uncollectable.

35. To delay the recognition of this loss, PrimaLend needed the portfolio to sell at a heavily overvalued price and needed to collect an inflated commission from that sale. As such, PrimaLend had a vested, selfish interest in securing a buyer for the Adonis Portfolio.

36. On June 11, 2024, Simple Auto contacted Paxton Wright ("**Wright**"), PrimaLend's Chief Operating Officer, to seek advice regarding whether it might be a good buyer for the Adonis Portfolio. At this time, Simple Auto had only four employees (including Gruner). It had originated just 35 loans since its founding, and the collective unpaid principal balance of all RISCs in its portfolio was under $200,000. Consistent with its small size and low throughput, Simple Auto owed no debt under its RLOC and less than $108,000 under its Floorplan.

37. By the time Simple Auto reached out to Wright, the impending foreclosure on the Adonis Portfolio by Sunflower Bank was merely days away and the BHPH dealership PrimaLend had spent months courting had just suddenly backed out of the transaction (after performing approximately 60 days of due diligence). As a result, PrimaLend urgently needed a new dealership to purchase the Adonis Portfolio and found its mark in Simple Auto.

38. On June 11, 2024, shortly after 2:00 PM, Wright called Simple Auto and said that, if it was serious about its interest in the transaction, Gruner should show up at

PrimaLend's offices in Dallas, TX at 10:00 AM the next morning—Wednesday, June 12, 2024—along with her husband (who, like Gruner, had done prior work at small BHPH dealerships).

39.    To formalize PrimaLend's advisory relationship, which formed the backbone of Simple Auto's due diligence process, Simple Auto and PCP entered into the Advisory Agreement, with an effective date of June 12, 2024. Pursuant to Article 1 of the Advisory Agreement, PCP agreed to "provide advisory services to [Simple Auto] from time to time at [Simple Auto's] request," including "sourcing potential investment and acquisition opportunities and consulting with and advising [Simple Auto's] management regarding the same." As compensation for its advisory services, Simple Auto agreed to pay PCP the sum of $950,000 for each transaction on which PCP advised or which PCP originated for Simple Auto's benefit.

40.    Gruner spent the morning of June 12, 2024 at PrimaLend's Dallas office reviewing documents, including an R12 Report (defined below), projected recovery values, and a model prepared by PrimaLend projecting the performance of the Adonis Portfolio. Gruner asked to visit Adonis' real property, but was told that this could not take place until Friday morning and that they would need to be prepared to submit a bid immediately after doing so.

41.    Neither Simple Auto, Gruner, or any of Simple Auto's employees, had ever handled a transaction of this size or complexity, but Simple Auto was told it had only 48 hours to place a binding bid. Simple Auto therefore turned to its long-term lender, and the most reliable expert in the BHPH industry it knew—PrimaLend—to advise it on the potential transaction.

42.        On June 12, 2024, Jensen contacted Simple Auto and assured it that the proposed transaction would be in Simple Auto's best interests, and that it would be a good opportunity for Gruner. Jensen promised that PrimaLend would do whatever it could to ensure Simple Auto's success and that PrimaLend's resources would be available for Simple Auto's use.

43.        Jensen advised that, in light of PrimaLend's projections, Gruner and Simple Auto stood to realize more profit by acquiring the Adonis Portfolio than they would in 60 years of handling Simple Auto's current, smaller portfolio. Jensen further informed Simple Auto that Adonis had updated its underwriting software in January of 2024. Jensen assured Simple Auto that this new software, which Simple Auto would be given access to as part of the transaction, ensured that all issued loans were reliable and high-quality.

44.        On June 13, 2024, Gruner was given her sole opportunity to view Adonis' dealership real property before making a decision and was informed that she had until 2:00 PM to submit a final binding bid.

**E.        Simple Auto's Bid and Purchase of the Adonis Portfolio.**

45.        Trusting in PrimaLend's advice and analysis, Simple Auto delivered a bid to purchase the Adonis Portfolio from Sunflower for $29,150,233.51, consisting of the entire outstanding balance Adonis owed to Sunflower and a $50,000 legal fee. Simple Auto further agreed to pay accrued interest on account of the Adonis Portfolio through June 14, 2024. On June 17, 2024, Sunflower accepted Simple Auto's bid and the parties entered into a contract formalizing the sale of the Adonis Portfolio for $29,410,000 (the "**Adonis Transaction**").

46.        All aspects of Simple Auto's purchasing process were done at PrimaLend's encouragement and under PrimaLend's supervision and control. PrimaLend, which maintained a back-channel with Sunflower throughout the auction process, told Simple Auto how much to bid, prepared all documents Simple Auto was asked to sign, and handled all communications between Simple Auto and Sunflower. At no point did Simple Auto itself have an opportunity to even speak

with Sunflower—the counterparty with whom it was executing a $29,410,000 transaction.

47.     Simple Auto funded the entire Adonis Transaction by drawing on its RLOC, which, on June 17, 2024, PrimaLend increased to $37,500,000 via an amendment to Simple Auto and PCP's RLOC Agreement (the "**June 2024 RLOC Amendment**", Exhibit D). Also on June 17, 2024, Jensen persuaded Gruner to amend Simple Auto's Floorplan Agreement with GFL to increase its Floorplan limit from $500,000 to $2,500,000 (the "**June 2024 Floorplan Amendment**", Exhibit E).

48.     The Adonis Transaction further obligated Simple Auto to assume the lease for Adonis' property located at 8045 East R.L. Thornton Freeway, Dallas, Texas 75228, thereby incurring over $12,000 in monthly rent expenses to Adonis' former-landlord SWGR Management.

49.     Separately from the funds owed to PrimaLend for financing Simple Auto's bid, PrimaLend further demanded, and Simple Auto paid, a $950,000 advisory fee pursuant to the Advisory Agreement as consideration for PrimaLend's role in originating the Adonis Transaction and advising Simple Auto.

50.     Finally, PrimaLend insisted that, given its projections, the value of the Adonis Portfolio far exceeded Sunflower's asking price. As a reward for assisting Simple Auto, PrimaLend therefore demanded (and received) over $2,000,000 in *additional* payments to account for what it called "the intrinsic value of the portfolio above the payoff" to Sunflower. These fees enabled PrimaLend to pay down millions of dollars of Adonis' Floorplan debt—thereby delaying recognition of its losses until the Adonis Portfolio inevitably collapsed as well.

**F.     The True Value of the Adonis Portfolio Comes to Light.**

51.     Even under the best of circumstances, any competent advisor would have counseled Simple Auto that it was not well-positioned to purchase a portfolio the size of Adonis, given that Simple Auto was a small shop that lacked the infrastructure to profitably manage a portfolio of that size. As Simple Auto quickly discovered, however, these were far from the best

of circumstances and that PrimaLend had failed to inform Simple Auto that the assets it was purchasing could not possibly be made profitable by even a much larger dealerships, and certainly could not be adequately serviced by Simple Auto's limited resources, staff, and experience.

52.    One of the primary data-points Simple Auto was given by PrimaLend to evaluate the Adonis Portfolio was a report listing the percentage of Adonis' outstanding RISCs which were current on their payments, or within 30, 60, or 90 days of being current, during the year preceding the sale (the "**R12 Report**"). The R12 Report showed that over 90% of Adonis' RISCs had been within 30 days of currency during every month of the prior year and that, on average, over 70% had been fully up to date. This high rate of repayment eased Simple Auto's concerns regarding the feasibility absorbing the Adonis Portfolio, and was an important factor in persuading Simple Auto to follow PrimaLend's advice in entering a bid.

53.    Within months of the Adonis Transaction, Simple Auto learned that many of the RISCs it purchased on PrimaLend's assurance that they were current were actually months overdue. This was because Adonis had adopted a policy of freely extending the due-dates for RISCs that would otherwise become past due, causing such loans to be incorrectly reported as current on the R12 Report. Indeed, records provided by PrimaLend to Simple Auto only *after* the Adonis Transaction had been finalized showed that in the one year period covered by the R12 Report, Adonis had agreed to modify the due date for its borrowers over 3,800 times, and granted almost 1,000 formal extensions.

54.    These extensions were generally granted without any paperwork and without even notifying the borrower that their loan had been modified and as such served no valid business purpose, but were intended to improve Adonis' R12 Report. As a result, the average percentage of current RISCs in the Adonis Portfolio which were fully current dropped to below 50% in the 12 months following the Adonis Transaction, while the percentage of RISCs within 30 days of being current declined to less than 80%.

12

55.      Upon information and belief, these extensions were entered into with the full knowledge and encouragement of PrimaLend, which had its own interest in preserving Adonis' appearance of success. Indeed, when Simple Auto raised with PrimaLend—post-purchase—the large number of apparently unjustified extensions that Adonis had granted, PrimaLend encouraged Simple Auto to issue further extensions to avoid harming their ability to borrow money from PrimaLend under the RLOC Agreement.

56.      The undisclosed deficiencies in the Adonis Portfolio were not limited to the RISCs in that portfolio—and extended its repossessed vehicles as well. Simple Auto quickly learned that, although these vehicles were purportedly Repossession On Hand ("**ROH**"), many had not in fact been reclaimed. Indeed, the GPS information for the vehicles in the Adonis Portfolio that Simple Auto received after the transaction closed showed that many were scattered across the United States, and some were as far away as Mexico and El Salvador. PrimaLend had full, and long-standing, access to Adonis' GPS data, and therefore knew (or, at least, should have known) that these vehicles either had significant obstacles to recovery or were for practical purposes completely unrecoverable. It failed to disclose that deficiency—which was material—to Simple Auto, and instead encouraged Simple Auto to bid on what PrimaLend knew (or should have known) was overpriced inventory.

57.      To make matters worse, while the repossessed vehicles in the Adonis Portfolio should have—under industry standards and the terms of Adonis' RLOC—been deducted from the Adonis Portfolio's borrowing base, this had not occurred. Instead, the charged-off vehicles continued to be partially credited towards Adonis' borrowing base, so as to increase the amount Adonis could spend financing RISCs. As a result, not only was Simple Auto paying interest to PrimaLend for cars that had no value, it was *also* paying for those cars a second time through their inflationary effect on the value of Adonis' RISCs.

13

58.        Moreover, even when Simple Auto *was* able to repossess the vehicles in the Adonis Portfolio securing its faulty RISCs (or reclaim the vehicles that had been purportedly repossessed from the get-go), it discovered that those vehicles had been frequently overvalued. Upon information and belief, such overvaluation constituted routine practice among PrimaLend's distressed clients—whose available credit was directly tied to the value of the vehicles in their inventory—and was done with the full knowledge and support of PrimaLend.

59.        PrimaLend was fully aware (or, at the very least, *should have been* fully aware) of each of these deficiencies prior to the closing of the Adonis Transaction, having served as Adonis' long-term lender with unfettered access to its books and records. Moreover, as one of the most sophisticated entities operating in the BHPH industry, it defies credulity that PrimaLend was not well-aware of the undisclosed risk these deficiencies posed to Simple Auto as buyer.

G.    **Post-Transaction Events.**

60.        PrimaLend's successful persuasion of Simple Auto to enter into the Adonis Transaction had measurable and pronounced effects on Simple Auto's profitability as the Adonis Portfolio unsurprisingly underperformed. For example, through the end of 2025 the RISCs in the Adonis Portfolio have needed to be charged off (or written down) at over 155% the rate projected by PrimaLend (resulting in over $10,000,000 in excess charge offs), and have then recovered at barely 70% of PrimaLend's valuations, leaving the remaining unpaid principal balance on the portfolio at less than 75% of what Adonis predicted to Simple Auto.

61.        These deficiencies, coupled with Simple Auto's refusal to artificially conceal them through sham-extensions, drove Simple Auto into an over-advanced posture within weeks of the Adonis Transaction. Perversely, this over-advanced posture provided PrimaLend and Jensen with even more leverage over Simple Auto, which they utilized to Simple Auto's detriment as they sought to further inflate the value of PrimaLend's books.

62.        Almost immediately upon the closing of the Adonis Transaction,

PrimaLend unilaterally authorized Adonis (which was in the process of winding up its operations, but continued to owe debt to PrimaLend) to start drawing down on Simple Auto's RLOC in order to collect a 1% fee for servicing Simple Auto's debts under PrimaLend's supervision. Simple Auto never signed a contract with Adonis appointing it as a servicer, never consented to this fee, and never authorized PrimaLend to approve this fee on Simple Auto's behalf.

63.     By January of 2025, Jensen (on behalf of PrimaLend) was actively pressuring Gruner to sell a majority of her stake in Simple Auto to another BHPH dealership at a significant loss.

64.     Also in January 2025, Simple Auto's accountant noticed a $7,000,000 unexplained increase in its borrowing base. In February 2025, Simple Auto discovered that PrimaLend had written off $7,000,000 of debt on account of legacy Adonis Portfolio assets without informing Simple Auto or providing Simple Auto an opportunity to plan for the resulting tax liability.

65.     Throughout 2024 and 2025, PrimaLend frequently, and with no connection to Simple Auto's business needs, instructed Simple Auto to draw from its floorplan line of credit (owed to GFL) to pay specific debt amounts on its RLOC (owed to PCP). This had no impact on Simple Auto's actual debts to PrimaLend, but enabled PCP to present to its lenders superficially and artificially improved financial metrics in an effort to stave off (and ultimately prepare for) bankruptcy.

66.     Once it became clear that PrimaLend would be filing for bankruptcy, PrimaLend artificially increased Simple Auto's borrowing base to counterbalance PrimaLend's over-advance and to bolster PrimaLend's financial status at the time of petition for the benefit of PrimaLend.

15

67.        Despite PrimaLend's post-petition assurances that Floorplan support for all outstanding dealership-clients would not be affected by the Chapter 11 Cases, PrimaLend currently refuses to fund any new wholesale purchases originated by Simple Auto.

68.        To date, Simple Auto has incurred over $15,000,000 in losses from the purchase of the Adonis Portfolio, and Simple Auto is expected to incur at least $3,000,000 in additional losses from the Adonis Portfolio as that portfolio continues to decline—for an estimated aggregate loss of *at least* $18,000,000. As a result of these losses, on July 15, 2025, Simple Auto received default notices from PrimaLend relating to both its Floorplan and RLOC Agreements.

69.        PrimaLend has engaged in escalating efforts to foreclose and collect on Simple Auto's assets as a result of Simple Auto's ostensive default—including through instructing its staff to deny Simple Auto access to the titles for vehicles in Simple Auto's inventory which Simple Auto has resold, thereby placing Simple Auto at risk of large fines for failing to timely transfer those titles to the purchasers.

## CAUSES OF ACTION

### COUNT ONE
### (Breach of Duty of Candor – PCP)

70.        Simple Auto incorporates all previous and subsequent allegations as though fully stated herein.

71.        While contemplating the largest transaction in its history under an abbreviated timeline, Simple Auto entered into an Advisory Agreement with PCP. This Advisory Agreement tasked PCP with "sourcing potential investments and acquisition opportunities and consulting with and advising [Simple Auto's] management regarding" potential investments, including the Adonis Transaction. (Ex. A at Article 1.)

72.        At all times while advising Simple Auto, PCP was aware that Simple Auto was relying on, and dependent upon, PCP's expertise in evaluating the Adonis Transaction, and

16

that Simple Auto did not have the time, expertise, or resources to perform traditional due diligence on its own. PCP controlled all aspects of Simple Auto's interactions and negotiations with Sunflower and determined what information was provided to Simple Auto regarding the Adonis Transaction.

73.    Pursuant to Texas law, PCP's agreement to act as a paid financial and business advisor caused it to owe fiduciary duties to Simple Auto. Among those duties was an obligation to proactively and candidly disclose all material information concerning the Adonis Transaction.

74.    PCP breached its fiduciary duty of candor by failing to disclose to Simple Auto that (a) the Adonis Portfolio was both over-valued and under-performing and that (b) even were it accurately valuated, the magnitude of the Adonis Portfolio meant it could not reasonably be made profitable by a dealership with Simple Auto's staffing and experience constraints.

75.    PCP further breached its duty of candor by failing to disclose to Simple Auto that material deficiencies existed in the due diligence information PCP provided—including inaccuracies regarding the currentness of the RISCs in the Adonis Portfolio and the repossession status of the vehicles in that portfolio.

76.    PCP further breached its duty of candor by failing to disclose to Simple Auto that PCP had material conflicts of interest regarding the Adonis Transaction which prevented it from giving competent and unbiased advice to Simple Auto.

77.    PCP's breaches of its duty of candor caused harm to Simple Auto that resulted in damages to be determined at trial.

78.    Wherefore, Simple Auto respectfully requests an order awarding compensatory and exemplary damages in an amount to be determined at trial.

## COUNT TWO
### (Breach of Fiduciary Duty – PCP)

79.        Simple Auto incorporates all previous and subsequent allegations as though fully stated herein.

80.        Simple Auto entered into the Advisory Agreement with PCP, with an effective date of June 12, 2024, which tasked PCP with "sourcing potential investments and acquisition opportunities and consulting with and advising [Simple Auto's] management regarding" potential investments, including the Adonis Transaction. (Ex. A at Article 1.) PCP was aware that Simple Auto (a) was relying and dependent on PCP's expertise in evaluating the Adonis Transaction and (b) did not have the time, expertise, or resources to perform traditional due diligence on its own.

81.        Pursuant to Texas law, PCP owed a fiduciary duty of care to Simple Auto while acting within the scope of the Advisory Agreement. As such, PCP was obligated to act reasonably and prudently in making use of the position of confidence and control it held towards Simple Auto, and to conduct adequate due diligence prior to rendering advice.

82.        No reasonable or prudent advisor would have encouraged Simple Auto, a small mom-and-pop auto dealership, to acquire over $46,000,000 in loans impaired by over $29,000,000 in debt when it lacked any reasonable method to properly fully service such loans.

83.        Moreover, no reasonable or prudent advisor with PrimaLend's experience in the BHPH industry would have failed to miss the evidence indicating that the Adonis Portfolio was over-valued, or, having seen such evidence, would have failed to recognize its significance.

84.        Indeed, any reasonable or prudent advisor would have recognized the readily foreseeable effects of Simple Auto's decision to enter the Adonis Transaction, including the ensuing over-advance that now threatens Simple Auto with potential foreclosure.

85.        In nevertheless strongly encouraging Simple Auto to enter the Adonis

Transaction, PCP failed to uphold its fiduciary duty of care to Simple Auto by not acting with the necessary diligence, care, and competence required under the circumstances.

86.     PCP and Jensen's breach of duty of care caused harm to Simple Auto that resulted in damages to be determined at trial.

87.     Wherefore, Simple Auto respectfully requests an order awarding compensatory and exemplary damages in an amount to be determined at trial.

## COUNT THREE
**(Breach of Duty of Loyalty and Good Faith– PCP)**

88.     Simple Auto incorporates all previous and subsequent allegations as if fully stated herein.

89.     Simple Auto entered into the Advisory Agreement with PCP, with an effective date of June 12, 2024, which tasked PCP with "sourcing potential investments and acquisition opportunities and consulting with and advising [Simple Auto's] management regarding" potential investments, including the Adonis Transaction. (Ex. A at Article 1.) PCP was aware that Simple Auto (a) was relying and dependent on PCP's expertise in evaluating the Adonis Transaction and (b) did not have the time, expertise, or resources to perform traditional due diligence on its own.

90.     Pursuant to Texas law, PCP owed a fiduciary duty of loyalty and good faith to Simple Auto while acting within the scope of the Advisory Agreement. Thus, PCP was obligated to exercise utmost good faith and scrupulousness in its dealings with Simple Auto, and to place Simple Auto's interests above its own in the event of any conflict.

91.     Instead of abiding by its duties, PCP strongly encouraged Simple Auto to enter the Adonis Transaction, which PCP knew was against Simple Auto's best interests, because doing so would permit PCP to push off the realization of its losses to a future date and allow it to preserve its reputation with its lenders.

92. By willfully encouraging Simple Auto to enter a transaction that it knew would likely cause Simple Auto's insolvency, all for the purpose of temporarily improving PCP's own balance book and reputation, PCP breached its duty of loyalty and good faith.

93. PCP's breach of its duty of loyalty and good faith caused harm to Simple Auto that resulted in damages to be determined at trial.

94. Wherefore, Simple Auto respectfully requests an order awarding compensatory and exemplary damages in an amount to be determined at trial.

## COUNT FOUR
### (Participation in Breach of Fiduciary Duty)

95. Simple Auto incorporates all preceding and subsequent allegations as if fully set forth herein.

96. Under Texas law, any party which "knowingly participates in the breach of a fiduciary duty becomes a joint tortfeasor with the fiduciary and is liable as such." *D'Onofrio v. Vacation Publ'ns, Inc.,* 888 F.3d 197, 215 (5th Cir. 2018) (cleaned up).

97. Under Texas law, and as reflected by the Advisory Agreement, PCP owed fiduciary duties of loyalty, care, and good faith to Simple Auto while advising Simple Auto regarding the Adonis Transaction. As described in the foregoing Counts, PCP breached each of these duties by encouraging Simple Auto to enter into the Adonis Transaction, despite knowing that this would harm Simple Auto's interests, and despite being aware of material deficiencies in the Adonis Portfolio, out of a selfish desire to temporarily better PrimaLend's own balance book and reputation.

98. Jensen was at all times aware of PCP's agreement to act as a financial advisor to Simple Auto, of Simple Auto's reliance and dependence upon PCP's advice, and of all information known to PCP regarding the Adonis Portfolio and the Adonis Transaction.

99. Jensen supervised all aspects of PCP's operations, and directed PCP to

breach its fiduciary duties towards Simple Auto as described in the foregoing counts.

100.    Jensen further aided and participated in those breaches by meeting with Gruner on June 12, 2024, in order to advise Simple Auto to enter into the Adonis Transaction. In that meeting, Jensen assured Gruner that entering into the Adonis Transaction would be both prudent and profitable, and would further the financial interests of Simple Auto. Jensen did not disclose the deficiencies in the Adonis Portfolio to Gruner during that meeting, and did not disclose that the Adonis Portfolio could not be profitably absorbed by Simple Auto.

101.    Jensen's participation in PCP's breaches of fiduciary duty caused harm to Simple Auto that resulted in damages to be determined at trial.

102.    Wherefore, Simple Auto respectfully requests an order awarding compensatory and exemplary damages in an amount to be determined at trial.

## COUNT FIVE
### (Conspiracy to Commit Breach of Fiduciary Duty – All Defendants)

103.    Simple Auto incorporates all preceding and subsequent allegations as if fully set forth herein.

104.    On June 11, 2024, Simple Auto contacted Wright, the Chief Operating Officer of Defendants PCP and GFL, to seek advice regarding the potential acquisition of the Adonis Portfolio. At this time, Adonis was heavily in debt to GFL, and GFL was at risk of recognizing a multi-million dollar loss following the foreclosure of the Adonis Portfolio. This, in turn, would have jeopardized PCP and GFL's financial standing with their lenders, borrowers, and the public and would have placed at risk Jensen's continued ability to take large ongoing distributions from PCP and GFL.

105.    On or about June 11, 2024, Defendants therefore entered into a voluntary combination, along with other known and unknown individuals, in order to persuade Simple Auto to acquire the Adonis Portfolio using funding from PCP—with the goal of later pressuring Simple

21

Auto into assuming Adonis' outstanding debt to GFL.

106.     Defendants agreed to this course of conduct despite their mutual awareness that Simple Auto could not profitably absorb the assets in the Adonis Portfolio, that no prudent advisor would recommend Simple Auto's participation in the Adonis Transaction, and that the value of the assets in the Adonis Portfolio had been inflated.

107.     In order to effectuate the goals of Defendants' conspiracy, PCP entered into an Advisory Agreement with Simple Auto, with an effective date of June 12, 2024, under which it accepted responsibility for "consulting with and advising [Simple Auto's] management regarding" potential investments, including the Adonis Transaction. (Ex. A at Article 1.)

108.     In order to effectuate the goals of Defendants' conspiracy, Jensen advised Simple Auto, including during a meeting on June 12, 2024, that entering into the Adonis Transaction would be both prudent and profitable, and would further the financial interests of both Simple Auto and Gruner.

109.     As described in the foregoing counts, PCP and Jensen's conduct in furtherance of Defendants' conspiracy caused PCP to breach the fiduciary duties it owed under the Advisory Agreement, including the duties of loyalty, care, and good faith.

110.     Defendants' conspiracy caused harm to Simple Auto that resulted in damages to be determined at trial.

111.     Wherefore, Simple Auto respectfully requests an order awarding compensatory and exemplary damages in an amount to be determined at trial.

### COUNT SIX
**(Fraudulent Misrepresentation – PCP)**

112.     On or about June 12, 2024, PCP provided Gruner with projections prepared at PCP's direction valuating the assets in the Adonis Portfolio.

113.     On June 12, 2024, aiding and acting as an agent of PCP, Jensen met with

Simple Auto to discuss PCPs projections. Jensen informed Simple Auto that, in his professional opinion, (a) purchasing the Adonis Portfolio would be profitable for Simple Auto, (b) Adonis' loans in 2024 were consistently high quality, and (c) it was in Simple Auto's best interest to enter into the Adonis Transaction. PCP continued to provide such advice to Simple Auto from June 12, 2024, through Simple Auto's decision to enter a binding bid on June 14, 2024.

114.    In providing these projections and this assessment, Jensen failed to inform Simple Auto that much of the vehicular inventory it was purchasing as part of the Adonis Portfolio had been improperly labelled ROH despite being, as a practical matter, uncollectable.

115.    In addition, Jensen failed to inform Simple Auto that the vehicles at issue were pervasively over-valued and that the underlying loans had been frequently and improperly extended, with PrimaLend's encouragement, to superficially inflate their value.

116.    Jensen's omissions rendered his statements regarding the Adonis Portfolio materially misleading and they also breached PCP's fiduciary obligations of disclosure pursuant to the Advisory Agreement.

117.    Upon information and belief, Jensen had actual knowledge (based on the length and breadth of his access to Adonis' books and records) of the falsehood of his representations to Simple Auto.

118.    Upon information and belief, Jensen further had actual knowledge that Simple Auto would be unable to verify the accuracy of the provided information within the roughly 48 hours provided to evaluate the deal.

119.    Simple Auto reasonably relied upon Jensen's misrepresentations in deciding to enter the Adonis Transaction.

120.    Simple Auto's reliance upon Jensen's misrepresentations resulted in damages to Simple Auto in the form of over $15,000,000 in losses to date, with at least $3,000,000 in losses expected to follow, placing Simple Auto imminently at risk of foreclosure.

23

121.     Wherefore, Simple Auto respectfully requests an order awarding compensatory and exemplary damages in an amount to be determined at trial.

## COUNT SEVEN
**(Conspiracy to Commit Fraudulent Misrepresentation – All Defendants)**

122.     Simple Auto incorporates all preceding and subsequent allegations as if fully set forth herein.

123.     On June 11, 2024, Simple Auto contacted Wright, the Chief Operating Officer of Defendants PCP and GFL, to seek advice regarding the potential acquisition of the Adonis Portfolio by Simple Auto. At this time, Adonis was heavily in debt to GFL, and GFL was at risk of recognizing a multi-million dollar loss following the foreclosure of the Adonis Portfolio. This, in turn, would have jeopardized PCP and GFL's financial standing with their lenders, borrowers, and the public and would have placed at risk Jensen's continued ability to take large ongoing distributions from PCP and GFL.

124.     On or about June 11, 2024, Defendants therefore entered into a voluntary combination, along with other known and unknown individuals, in order to persuade Simple Auto to acquire the Adonis Portfolio using funding from PCP—with the goal of later pressuring Simple Auto into assuming Adonis' outstanding debt to GFL.

125.     Defendants agreed to this course of conduct despite their mutual awareness that Simple Auto could not profitably absorb the assets in the Adonis Portfolio, that no prudent advisor would recommend Simple Auto's participation in the Adonis Transaction, and that the value of the assets in the Adonis Portfolio had been inflated.

126.     In furtherance of Defendants' conspiracy, and as described in the foregoing counts, employees of PCP met with Simple Auto to review PrimaLend's projections that the Adonis Portfolio would be a profitable investment for Simple Auto. These meetings included Jensen's meeting with Simple Auto on June 12, 2024.

127.     During these meetings and communications, and as detailed in the foregoing counts, PCP and Jensen fraudulently misrepresented the financial condition of the assets in the Adonis Portfolio to Simple Auto. They failed to inform Simple Auto that the vehicles being purchased as part of (or serving as collateral for) the Adonis Portfolio were systemically overvalued and frequently uncollectible. And they did not disclose that due dates on the RISCs in the Adonis Portfolio had been frequently extended without any business justification.

128.     Defendants' conspiracy caused harm to Simple Auto that resulted in damages to be determined at trial.

129.     Wherefore, Simple Auto respectfully requests an order awarding compensatory and exemplary damages in an amount to be determined at trial.

### COUNT EIGHT
### (Negligent Misrepresentation – PCP)

130.     Simple Auto incorporates all preceding and subsequent allegations as if fully set forth herein.

131.     On June 12, 2024, acting as an agent of PCP, Jensen met with Simple Auto and advised it that, in his professional opinion, (a) purchasing the Adonis Portfolio would be profitable for Simple Auto, (b) Adonis' recent loans were consistently high quality, and (c) it was in Simple Auto's best interest to enter into the Adonis Transaction.

132.     In providing this assessment, Jensen failed to inform Simple Auto that much of the vehicular inventory it was purchasing as part of the Adonis Portfolio, had been improperly labelled ROH despite being, as a practical matter, uncollectable.

133.     In providing this assessment, Jensen failed to inform Simple Auto that the RISCs in the Adonis Portfolio had been systemically overvalued, including through widespread use of improper extensions to conceal the delinquent status of those RISCs.

134.     Jensen's omissions rendered his statements regarding the Adonis Portfolio

materially misleading and they also breached PCP's obligations of disclosure pursuant to the Advisory Agreement.

135.     Based upon PCP and Jensen's years of experience in the BHPH industry, long-term relationship with Adonis, and long-running access to Adonis' books and records, a reasonably diligent actor in PCP and Jensen's shoes would have realized that Jensen was providing Simple Auto with misleading information.

136.     Upon information and belief, PCP and Jensen further had actual knowledge that Simple Auto would be unable to verify the accuracy of the provided information within the short amount of time given to evaluate the deal.

137.     Simple Auto reasonably relied upon PCP and Jensen's misrepresentations in deciding to enter the Adonis Transaction.

138.     Simple Auto's reliance upon Jensen's misrepresentations resulted in damages to Simple Auto in the form of over $15,000,000 in losses to date, with at least $3,000,000 of losses expected to follow, placing Simple Auto at imminent risk of foreclosure.

139.     Wherefore, Simple Auto respectfully requests an order awarding compensatory and exemplary damages in an amount to be determined at trial.

### COUNT NINE
**(Violations of the Investment Advisers Act – PCP)**

140.     Simple Auto incorporates all preceding and subsequent allegations as if fully set forth herein.

141.     Simple Auto executed the Advisory Agreement with PCP, with an effective date of June 12, 2024, to retain PCP to advise Simple Auto regarding the proposed Adonis Transaction.

142.     Between June 12, 2024 and June 14, 2024, PCP provided advice to Simple Auto pursuant to the Advisory Agreement, encouraged Simple Auto to enter into the transaction,

and assured Simple Auto that the transaction was in Simple Auto's best interest.

143.     Pursuant to the Advisory Agreement, PCP charged Simple Auto a $950,000 advisory fee for PCP's role in advising Simple Auto and brokering the Adonis Transaction.

144.     The assets comprising the Adonis Portfolio were liquid notes with a robust secondary market and constituted securities pursuant to 15 U.S.C. § 80b-2(a)(18). The Adonis Portfolio included numerous RISCs bundled together to produce an overall product with reduced volatility and increased investment value—and, as such, likewise constituted a security under 15 U.S.C. § 80b-2(a)(18).

145.     In advising Simple Auto regarding the Adonis Transaction, PCP acted as an investment advisor pursuant to 15 U.S.C. § 80b-2(a)(11).

146.     The issuance of such advice involved the ordinary course of PCP's business, including for clients residing outside of the state of Texas. As such, 15 U.S.C. § 80b-3(a) obligated PCP to register as an investment advisor prior to advising Simple Auto regarding the Adonis Transaction.

147.     PCP did not, in fact, register as an investment advisor pursuant to 15 U.S.C. § 80b-3(a) prior to advising Simple Auto (or prior to collecting payment for serving in such role).

148.     Pursuant to 15 U.S.C. § 80b-15(b), any contract entered into in violation of any provision of the Investment Advisers Act, including the requirement that investment advisors register under 15 U.S.C. § 80b-3(a), is void as regards to the rights of the unlawful investment advisor.

149.     Wherefore, Simple Auto respectfully requests a judgment (a) rescinding the Advisory Agreement insofar as it grants rights to PCP and (b) requiring PCP and LNCMJ to disgorge the $950,000 fee that PCP unlawfully received under the Advisory Agreement along with appropriate interest.

## COUNT TEN
### (Unregistered Investment Advice under Texas Law – PCP and LNCMJ)

150.    Simple Auto incorporates all preceding and subsequent allegations as if fully set forth herein.

151.    On June 12, 2024, Simple Auto signed the Advisory Agreement with PCP to retain PCP to advise Simple Auto in connection with the proposed Adonis Transaction.

152.    Between June 12, 2024 and June 14, 2024, PCP (acting through its agent Jensen) provided advice to Simple Auto pursuant to the Advisory Agreement, encouraged Simple Auto to enter into the Adonis Transaction, and assured Simple Auto that the Adonis Transaction was in Simple Auto's best interest.

153.    Pursuant to the Advisory Agreement, PCP charged Simple Auto a $950,000 advisory fee for PCP's role in advising Simple Auto in connection with the Adonis Transaction and for brokering the deal.

154.    The assets comprising the Adonis Portfolio were liquid notes with a robust secondary market and constituted securities pursuant to Tex. Gov. C. § 4001.068. The Adonis Portfolio included numerous RISCs bundled together to produce an overall product with reduced volatility and increased investment value—and, as such, likewise constituted a security under Tex. Gov. C. § 4001.068.

155.    In advising Simple Auto regarding the Adonis Transaction within the state of Texas, PCP acted as an investment advisor pursuant to Tex. Gov. C. § 4001.059. As such, PCP was required to register as an investment advisor pursuant to Tex. Gov. C. § 4004.051.

156.    PCP did not, in fact, register as an investment advisor pursuant to Tex. Gov. C. § 4004.051 prior to advising Simple Auto (or prior to collecting payment its advice).

157.    In advising Simple Auto that the Adonis Transaction would likely be profitable and was a prudent business decision, including during Jensen's meeting with Simple

Auto on June 12, 2024, PCP failed to inform Simple Auto that the assets comprising the Adonis Portfolio were systemically overvalued, many of the purportedly "repossessed" vehicles were as a practical matter uncollectable, and the RISCs making up the Adonis Portfolio had been repeatedly extended with no business justification.

158.      PCP's failure to disclose these deficiencies in the Adonis Portfolio, in light of the circumstances under which its recommendation was made, rendered its advice misleading pursuant to Tex. Gov. C. § 4008.101.

159.      PCP possessed extensive expertise in the BHPH industry and had full and long-standing access to Adonis' records. As such, it either knew of the foregoing deficiencies that it failed to disclose to Simple Auto or, at a minimum, should have known those deficiencies through the exercise of reasonable care.

160.      Pursuant to Tex. Gov. C. § 4008.101 and Tex. Gov. C. § 4008.103, Simple Auto is entitled to damages in the amount of the $950,000 fee paid by Simple Auto to PCP under the Advisory Agreement, as well as all losses incurred by Simple Auto in reliance on PCP's unlawful advice, interest, court costs, and attorney's fees.

161.      Furthermore, as an entity exercising direct or indirect control over PCP, LNCMJ is liable to the same extent as PCP pursuant to Tex. Gov. C. § 4008.102(a).

162.      Wherefore, Simple Auto respectfully requests a judgment order awarding compensatory and exemplary damages in an amount to be determined at trial.

### COUNT ELEVEN
**(Violations of the Securities Exchange Act – PCP)**

163.      Simple Auto incorporates all preceding and subsequent allegations as if fully set forth herein.

164.      In addition to remuneration for its role in advising Simple Auto, the Advisory Agreement further provided that the $950,000 payment made by Simple Auto to PCP

rewarded PCP for its role in originating the Adonis Transaction.

165. The assets making up the Adonis Portfolio were liquid notes with a robust secondary market and constituted securities pursuant to 15 U.S.C. § 78c(a)(10). The Adonis Portfolio included numerous RISCs bundled together to produce an overall product with reduced volatility and increased investment value—and, as such, likewise constituted a security under 15 U.S.C. § 78c(a)(10).

166. In accepting an origination fee for the Adonis transaction, PCP acted as a broker pursuant to 15 U.S.C. § 78c(a)(4).

167. Pursuant to 15 U.S.C. § 78o(a)(1), and barring exceptions not applicable here, it is unlawful for a broker to "make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security" unless the broker is registered with the Securities and Exchange Commission.

168. Pursuant to 15 U.S.C. §78cc(b), any contract entered in violation of any provision of the Securities Exchange Act, including the requirement that brokers register under 15 U.S.C. § 78o(a)(1), is void as regards to the rights of the unregistered broker.

169. Wherefore, Simple Auto respectfully requests a judgment (a) rescinding the Advisory Agreement to the extent that it grants rights to PCP and (b) requiring PCP to disgorge the $950,000 fee that PCP unlawfully received pursuant to the Advisory Agreement along with appropriate interest.

### COUNT TWELVE
#### (General Partner Liability – LNCMJ)

170. Simple Auto incorporates all preceding and subsequent allegations as if fully set forth herein.

171. Pursuant to Tex. Bus. Org. Code C. § 152.304 and Tex. Bus. Org. C. § 153.152(a)(2), LNCMJ is "jointly and severally liable for all obligations" of PCP.

172.     Pursuant to Tex. Bus. Org. Code C. § 152.306, Simple Auto is entitled to seek a judgment against LNCMJ holding it liable for any judgment issued against PCP.

173.     Wherefore, Simple Auto respectfully requests a judgment holding LNCMJ jointly and severally liable for the full amount of any judgment issued against PCP under this Complaint.

## COUNT THIRTEEN
### (Declaratory Judgement – All Defendants)

174.     Simple Auto incorporates all preceding and subsequent allegations as if fully set forth herein.

175.     PrimaLend has asserted that Simple Auto is indebted to it under the RLOC and Floorplan Agreements, and that this debt extends to the full face value of those agreements.

176.     Pursuant to Texas law, Simple Auto is entitled to offset the debts it owes to PrimaLend, if any, by the amount PrimaLend owes Simple Auto, including for claims of unregistered investment advice, unregistered brokering, breach of fiduciary duty, misrepresentation and bad faith.

177.     Pursuant to 11 U.S.C. § 553(a), and barring exceptions not applicable here, nothing in the Bankruptcy Code "affect[s] any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case."

178.     Wherefore, Simple Auto respectfully requests a declaratory judgment that its debts to the Defendants, if any, remain subject to offset under 11 U.S.C. § 553(a) up to the full values of Simple Auto's claims as determined at trial.

## COUNT FOURTEEN
### (Order Restraining Foreclosure – All Defendants)

179.     Simple Auto incorporates all preceding and subsequent allegations as if fully set forth herein.

180.        In reliance on Simple Auto's alleged defaults under the RLOC and Floorplan Agreements, PrimaLend has taken multiple steps towards foreclosing on Simple Auto's assets—including through instructing its employees to obstruct Simple Auto's efforts to transfer the titles to vehicles sold by Simple Auto.

181.        The Defendants' allegations of default, however, do not account for Simple Auto's aforementioned claims, and all amounts allegedly owed by Simple Auto must first be set off by Simple Auto's recovery on account of those claims.

182.        Pursuant to Tex. Bus. & Com. Code § 9.625, this Court may "order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions" wherever the proposed disposition would not comply with the Uniform Commercial Code (as enacted in Tex. Bus. & Com. Code § 9). Such compliance includes, of course, the existence of a valid default prior to any foreclosure.

183.        Wherefore, Simple Auto respectfully requests an order, pursuant to Tex. Bus. & Com. Code § 9.625, restraining the Defendants from foreclosing on Simple Auto's property except to the extent that, following liquidation and setoff of Simple Auto's claims, Simple Auto retains net-liability towards the Defendants.

WHEREFORE, for the forgoing reasons, Simple Auto respectfully requests that this Court enter a judgment against the Defendants:

a)    Ordering disgorgement of all funds improperly received by PrimaLend under the Advisory Agreement;

b)    Granting damages in an amount to be determined at trial, but in no event less than $18,000,000;

c)    Holding LNCMJ jointly and severally liable for any judgment issued against PCP;

d)    Setting off all obligations owed by Simple Auto to any of the Defendants by the damages recovered by Simple Auto;

e)    Permanently enjoining the Defendants from collecting or seeking to collect on

Simple Auto's collateral on the basis of the offset debt;

f)    Permanently enjoining the Defendants from transferring, withholding, restricting

access to, or otherwise impairing Simple Auto's collateral on the basis of the offset

debt;

g)    Restraining the Defendants from foreclosing on Simple Auto's property pursuant

to Tex. Bus. & Com. Code § 9.625;

h)    Awarding pre- and post-judgment interest;

i)    Awarding reasonable attorneys' fees; and

j)    Granting such other and further relief as this Court deems just and equitable.

Dated: June 10, 2026
      Dallas, Texas

**DECHERT LLP**

*/s/ Debbie E. Green*
Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
Debbie E. Green (TX 24059852)
2651 N. Harwood Street, Suite 120
Dallas, Texas 75201-1574
Telephone: (214) 453 4900
marcus.helt@Dechert.com
jack.haake@Dechert.com
debbie.green@Dechert.com

*Counsel for Oha Papi, LLC d/b/a SIMPLE
AUTO DFW*